Sean Gates, SBN 186247
sgates@charislex.com
CHARIS LEX P.C.
155 N. Lake Ave., Suite 800
Pasadena, CA 91101
T: (626) 508-1715 | F: (626) 508-1730

J. Caleb Dalton (*pro hac vice*)
cdalton@adflegal.org
Erik C. Baptist (*pro hac vice*)
ebaptist@adflegal.org
Allison H. Pope (*pro hac vice*)
apope@adflegal.org
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, Virginia 20176
T: (571) 707-4655 | F: (571) 707-4656

Lincoln Davis Wilson (*pro hac vice*)
lwilson@adflegal.org
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
Tel: (202) 393-8690 | F: (202) 347-3622

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| **NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES on behalf of itself and its members,** and **SCV PREGNANCY CENTER**, <br><br> *Plaintiffs,* <br><br> v. <br><br> **ROB BONTA**, in his official capacity as Attorney General of the State of California, <br><br> *Defendant.* | Case No. 2:24-cv-08468 <br><br><br> **VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND ATTORNEYS' FEES AND COSTS AND DEMAND FOR JURY TRIAL** |

1

Plaintiffs National Institute of Family and Live Advocates ("NIFLA"), on behalf of itself and its members, and SCV Pregnancy Center ("SCV"), by and through counsel, and for their Verified Complaint against the Defendants, hereby state as follows:

## Introduction

1. Two years ago, Atoria Foley gave birth to a healthy baby girl. Today her daughter is a happy toddler, but she would not be alive if Atoria had not seen information about abortion pill reversal ("APR").

2. Facing an unexpected pregnancy and lacking support from her baby's father, Atoria felt abortion was her only option. So she took mifepristone—the first drug in a two-part abortion drug regimen—which blocks receptors for naturally occurring progesterone and typically leads to the death of the unborn child.

3. But Atoria's fear surrounding her pregnancy quickly turned into panic and regret. Desperate to undo her decision, she remembered seeing a sign for "abortion pill reversal." She went on the internet, found an abortion-pill-reversal hotline, and was connected with NIFLA member Alternatives Pregnancy Center in Sacramento, California.

4. To try to save the life of Atoria's developing child, Alternatives' medical professionals prescribed her supplemental progesterone—a medication that the United States Food and Drug Administration ("FDA") has approved to treat pregnancy complications. By competing with the mifepristone for receptors, studies have found, supplemental progesterone

can help reverse mifepristone's effects. Atoria paid nothing for this treatment.

5. The progesterone likely saved Atoria's daughter's life. She was born healthy months later and today is a thriving toddler. Declaration of Atoria Foley, attached as Exhibit A.

6. Atoria states, "If I hadn't heard about abortion pill reversal, I firmly believe my baby girl would not be alive today." *Id.* ¶ 28.

7. Thousands of women across the country share similar stories.

8. Desirae Exendine also found hope at Alternatives. She felt pressured to have an abortion, took mifepristone, but quickly regretted it. She was prescribed supplemental progesterone by Alternatives' medical staff and her baby was born healthy in August of 2024. Declaration of Desirae Exendine, attached as Exhibit B.

9. But if Defendant Rob Bonta, the Attorney General of California, had his way, these children would not be alive today. That's because he is seeking an injunction to prevent pregnancy centers from telling the public about this life-saving option.

10. The Attorney General is trying to stop pro-life pregnancy centers like Alternatives from providing the public with truthful information about using progesterone to counter the lethal effects of mifepristone. He has invoked his power under business-fraud statutes to prevent nonprofit pregnancy-support organizations from speaking and sharing the information that saved Atoria's daughter's life. Complaint, *People v. Heartbeat Int'l, Inc.*,

3

No. 23CV044940 (Cal. Super. Ct., Alameda Cnty., Sept. 21, 2023), attached as Exhibit C.

11. The Attorney General alleges those nonprofits are spreading "false and misleading" information about progesterone treatment. *Id.* ¶ 3. He seeks an injunction and other penalties to censor their speech about it. Those organizations are not plaintiffs here.

12. Plaintiffs here, a pregnancy center and a network of affiliated centers, wish to truthfully inform the public that it may be possible to counteract the first abortion drug's lethal effects if women change their minds and seek treatment within the first three days after taking it.

13. Plaintiffs wish to say the same (and similar) things about APR that the other nonprofits have. But the Attorney General's actions show that if they do, they may be subject to injunctions, civil penalties of up to $2,500 per "violation," and potential jail time.

14. Multiple scientific studies support the information Plaintiffs wish to provide to women and the public.

15. What's more, doctors have safely and effectively used supplemental progesterone to help maintain pregnancies for decades.

16. The Attorney General cites some of those studies in his lawsuit, so he knows that scientific research supports the statements at issue.

17. Yet he has chosen to target organizations that tell women about this option because of their pro-life viewpoint and the content of their speech.

18. The Attorney General says he supports a woman's right to choose

whether to keep her pregnancy, yet he seeks to deprive a woman who changes her mind, or who was coerced or tricked into taking the first abortion drug, of truthful information about a safe and effective way to save her pregnancy.

19.    The Constitution protects Plaintiffs' right to speak to the public and women about lawful medical treatments provided by licensed medical professionals.

20.    This action seeks to enjoin the Attorney General from targeting, chilling, and punishing Plaintiffs' speech about APR and a declaration that his actions violate Plaintiffs' First and Fourteenth Amendment rights to speak freely, to practice their religion, and to due process under the law.

## Jurisdiction and Venue

21.    This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

22.    This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

23.    This court can issue the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57, the requested injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

24.    Venue is proper in this district under 28 U.S.C. § 1391 because Defendant resides in the state of California and a substantial part of the

events or omissions giving rise to the claim occurred in the Central District of California.

**PLAINTIFFS**

***National Institute of Family and Life Advocates and Its Members***

25.     Plaintiff National Institute of Family and Life Advocates ("NIFLA") is a religious not-for-profit corporation duly incorporated under the laws of Virginia.

26.     NIFLA is a Christian, non-denominational ministry.

27.     NIFLA is a membership organization with 1,780 member pregnancy centers located across the nation, including 136 centers in California.

28.     One of NIFLA's California members is Plaintiff SCV Pregnancy Resource Center.

29.     NIFLA's California members also include non-parties Sacramento-based Alternatives Pregnancy Center and San Diego-based Pregnancy Care Clinic.

30.     NIFLA's mission is to empower women and men facing unplanned pregnancies to choose life and to protect life-affirming pregnancy centers by equipping them with legal resources, counsel, education, training, and support, and by representing their interests in litigation when necessary to preserve their constitutional rights. It aims to develop a network of life-affirming ministries in every community across the nation.

31.     NIFLA also routinely speaks about APR, advising its members

and women about this progesterone-treatment option, including sharing content at conferences and on its social media accounts.

32. NIFLA's own speech is chilled and altered and its mission is impaired by the Attorney General's censorship campaign against APR content.

33. NIFLA's members do not provide or refer for abortions.

34. NIFLA and its members affirm that God is sovereign over all life, and that he calls and commands them to make special efforts to protect the unborn.

35. To that end, NIFLA's California members offer free services, such as pregnancy tests, counseling, information concerning pregnancy options, and material support to new mothers and fathers.

36. Many of NIFLA's California members also offer on-site medical services, such as ultrasounds, under the direction of an affiliated licensed physician or medical professional.

37. Many of NIFLA's California members who operate licensed medical facilities provide medical screening for progesterone treatment and, if a woman wishes to proceed after discussion with a licensed medical professional, a prescription for progesterone treatment.

38. All APR progesterone treatment offered by NIFLA's California members is free of charge. Neither NIFLA nor its members receive any remuneration for this service.

39. NIFLA's California members advertise their services and any

referral services on their websites and through print handouts and brochures, newspaper or magazine ads, social media, and other online ads.

40. Some of NIFLA's California members make, have made, or would like to make statements about progesterone treatment that the Attorney General alleges violate California's Unfair Competition Law, California Business and Professions Code § 17200, and False Advertising Law, California Business and Professions Code § 17500 (collectively the "Business Fraud Statutes").

41. California NIFLA members' speech, including that of SCV Pregnancy Center, is chilled because of the Attorney General's censorship campaign against progesterone treatment information.

42. California NIFLA members have canceled or postponed plans to advertise about APR options, or to offer APR, because of the Attorney General's censorship campaign against progesterone treatment.

43. For example, member Pregnancy Care Center last year suspended its pre-existing plans to provide APR because of the Attorney General's interpretation and enforcement of the Business Fraud Statutes.

44. Pregnancy Care Center also decided not to renew a paid advertisement campaign to inform women of the option of progesterone treatment because of the Defendant's interpretation and enforcement of the Business Fraud Statutes.

45. NIFLA was forced to advise Plaintiff member SCV Pregnancy Center to suspend its plans to offer APR services in the future as well.

46. These California members have standing to sue in their own right.

47. NIFLA asserts associational standing on behalf of all of its California members, whose ability to advertise and provide services, counseling, and information about progesterone treatment is impeded by the Attorney General's application of the Business Fraud Statutes and his censorship campaign against pro-life pregnancy-support organizations. *See New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 9 (1988).

48. The interests that NIFLA seeks to protect are germane to NIFLA's purpose as a membership association, which include supporting its pro-life pregnancy-center members, enabling them to carry out their missions consistent with their pro-life and religious viewpoints, protecting their legal interests, and empowering women and men facing unplanned pregnancies to choose life for their unborn children.

49. NIFLA also sues on its own behalf.

50. NIFLA itself has organizational standing because the Attorney General's challenged actions have required NIFLA to change its own speech, alter its member recommendations, and have hampered its efforts to achieve its mission.

51. NIFLA has changed and censored its own speech because of the Attorney General's censorship campaign.

***SCV Pregnancy Center***

52. SCV Pregnancy Center is a 501(c)(3) nonprofit, faith-based organization incorporated under the laws of California and with a principal

9

place of business in Santa Clarita, California.

53. SCV is a NIFLA member.

54. SCV is a Christian ministry and community health clinic that specializes in providing pregnancy confirmations by a licensed physician. SCV assists those facing unexpected pregnancies in exploring pregnancy-outcome options through a holistic model of care (physical, emotional, and spiritual).

55. SCV has been serving its community since 1987.

56. In addition to pregnancy testing, SCV provides patient education on pregnancy options, sexually transmitted diseases and infections (STDs/STIs), and sexual health.

57. SCV also provides ultrasound confirmation of pregnancy, prenatal care referrals, and limited STD/STI testing and treatments.

58. SCV provides parenting classes, childbirth classes, life-skills education, adoption referrals, and community-resource information and referrals.

59. SCV does not charge for any services.

60. SCV is a faith-based organization. It requires everyone from its board to volunteers to be Christian believers and adhere to its statement of faith.

61. The center abides by its Christian beliefs in how it operates, including what it teaches and how it treats others.

62.    Central to SCV's beliefs is that life begins at conception and that God created every child in his or her mother's womb. SCV further believes that its expression of love and service to God requires that it work to protect and honor life at all stages of development. These beliefs also compel the center's statements about progesterone treatment.

63.    Before the Attorney General's censorship campaign against faith-based, pro-life pregnancy organizations, SCV made various public statements about progesterone treatment, including on its social media accounts, some of which were identical or nearly identical to, and others of which were substantially similar to, the statements made by the faith-based organizations that the Attorney General has sued.

64.    Some of SCV's statements referred individuals seeking treatment to the Abortion Pill Rescue Network, which is a Defendant in the Attorney General's enforcement action.

**DEFENDANT**

65.    Defendant Rob Bonta is sued in his official capacity as the Attorney General of California for violating the United States Constitution.

66.    The Attorney General is the chief legal officer of the State of California.

67.    Defendant Bonta has the authority to bring enforcement actions for violations of the Business Fraud Statutes and has invoked this authority to bring an enforcement action against parties similarly situated to Plaintiffs to enjoin and penalize the expression of content about progesterone

treatment that Plaintiffs have published in the past and wish to publish in the future.

## FACTUAL BACKGROUND

### I.     Pro-Life Pregnancy Centers

68.    Thousands of pregnancy centers across the country, including NIFLA members, provide free services, resources, information, adoption referrals, counseling, and material support to women and families experiencing unexpected pregnancies.

69.    Many of these pregnancy centers also provide or refer for medical services, such as ultrasounds, STI testing and treatment, and progesterone treatment, under the supervision of licensed medical directors or through affiliated on-site medical professionals.

70.    Often pregnancy centers provide training and support for fathers so that mothers will be supported by their partners and children by both parents.

71.    In 2022 alone, pro-life pregnancy centers provided services valued at over $358 million. This included over 500,000 free ultrasounds, 200,000 STI tests, 3.5 million packs of diapers, 43,000 car seats, and more.[1]

72.    Pro-life pregnancy centers are almost uniformly faith-based, Christian organizations.

---

[1] *Pregnancy Centers Offer Hope for a New Generation*, Charlotte Lozier Institute (2022), https://perma.cc/WJJ2-45K3. A true and accurate copy is attached as Exhibit D.

12

73.    Unlike abortion clinics, which have a financial interest in performing as many abortions as possible, most pregnancy centers—including Plaintiff SCV—charge nothing for their services, meaning that they do not financially benefit from any choice a woman makes.

74.    As a recent study published in Contraception—the official journal of the pro-abortion Society of Family Planning—found, pregnancy centers offer more efficient help at a lower cost than abortion facilities, have shorter wait times, and are more available for same-day care. Abortion facilities almost always require clients to pay for pregnancy tests and ultrasounds, while pro-life pregnancy centers almost always offer these services for free.[2]

**II.    The Use of Supplemental Progesterone for Abortion Pill Reversal**

75.    Scientific research supports the use of supplemental progesterone for abortion pill reversal.

***Use of Progesterone in Pregnancy***

76.    Progesterone is a naturally occurring hormone that plays an essential role in regulating female reproductive function in the uterus, ovaries, mammary glands, and brain.[3]

---

[2] Kavita Vinekar et al., *Early pregnancy confirmation availability at crisis pregnancy centers and abortion facilities in the United States*, 117 Contraception 30 (Sept. 6, 2022). A true and accurate copy is attached as Exhibit E.

[3] *See generally* Lucie Kolatorova et al., *Progesterone: A Steroid with Wide Range of Effects in Physiology as Well as Human Medicine*, 23 Int'l J.

77. Progesterone is essential to achieve and maintain a healthy pregnancy.

78. During the first ten weeks of pregnancy, progesterone is naturally secreted by the corpus luteum while the placenta develops. It is thereafter secreted by the placenta.[4]

79. Progesterone prepares the uterine lining (the "endometrium") to accept implantation of the embryo and stimulates the tissue glands to secrete nutrients for the embryo.[5]

80. Later in pregnancy, progesterone relaxes the smooth muscle cells, helping to suppress uterine contractions until delivery.[6]

81. Progesterone has been used to support female fertility in a variety of ways for more than 50 years.[7]

---

Molecular Sci. 14 (July 2022). A true and accurate copy is attached as Exhibit F.

[4] Jessie K. Cable, *Physiology, Progesterone*, StatPearls (Michael H. Grider ed., 2022). A true and accurate copy is attached as Exhibit G.

[5] *See* Arri Coomarasamy et al., *PROMISE: first-trimester progesterone therapy in women with a history of unexplained recurrent miscarriages – a randomised, double-blind, placebo-controlled, international multicentre trial and economic evaluation*, 20(41) Health Tech. Assessment 1 (May 2016). A true and accurate copy is attached as Exhibit H.

[6] *See* N.E. Simmons et al., *The long-term effect of prenatal progesterone treatment on child development, behaviour and health: a systematic review*, 128 Brit. J. of Obstetrics & Gynaecology 964 (Nov. 2020). A true and accurate copy is attached as Exhibit I.

[7] *See* Gian Carlo Di Renzo et al., *Progesterone: History, facts, and artifacts*, 69 Best Prac. Rsch. Clinical Obstetrics & Gynaecology 2, 9 (2020). A true and accurate copy is attached as Exhibit J.

14

82. Obstetricians and gynecologists commonly prescribe progesterone to support patients with a history of recurrent miscarriages, prevent preterm birth, support endometrial function during in vitro fertilization, treat absent menstrual periods (secondary amenorrhea), treat excessive blood loss during menstruation, treat premenstrual syndrome, and prevent irregular thickening of the endometrium during menopause.[8]

83. Since 1978, the FDA has approved progesterone medications in multiple forms (i.e. injections, oral capsules, vaginal insert and vaginal gel).[9]

84. These FDA approvals include for treatments for infertility, irregular thickening of the endometrium ("endometrial hyperplasia"), and to support embryo implantation and early pregnancy.[10]

---

[8] *See* Ex. F, Kolotorova et al., *supra* note 3.

[9] Approval Letter from Lisa D. Rarick M.D., Food and Drug Admin. to Howard Levine, Pharm. D., Columbia Rsch. Lab'ys, Inc. (May 13, 1997), https://www.accessdata.fda.gov/drugsatfda_docs/nda/97/20756 _CRINONE_APPROV.PDF (vaginal gel). A true and accurate copy is attached as Exhibit K. Approval Letter from Lisa Rarick M.D., Food and Drug Admin. to Joseph Lamendola, Ph.D, Schering Corp. (Dec. 16, 1998), https://perma.cc/M7T7-VSDL (oral capsule). A true and accurate copy is attached as Exhibit L. Approval Letter from Scott Monroe, M.D., Dep't of Health & Human Servs. to James H. Conover, Ph.D., Ferring Pharms., Inc. (June 21, 2007), https://www.accessdata.fda.gov/drugsatfda_docs/nda/ 2007/022057_endometrin_toc.cfm (vaginal insert). A true and accurate copy is attached as Exhibit M. Determination that Progesterone Injection, USP, 50 Milligrams/Milliliter Was Not Withdrawn From Sale for Reasons of Safety or Effectiveness, 88 Fed. Reg. 50158, 50159 (Aug. 1, 2023) (intramuscular injection approved in 1978).

[10] *Id.*

85. Progesterone is classified as a Category B drug for pregnant women—the same category as Tylenol, the most commonly used pain reliever during pregnancy.[11]

86. Drugs are categorized "Category B" when animal studies have found no evidence that the drugs pose any risk to the fetus.[12]

87. Healthcare professionals may lawfully prescribe a drug for purposes indicated by the FDA-approved label ("on-label use") or for purposes not prescribed, recommended, or suggested by the FDA-approved label ("off-label use").

88. Off-label use of FDA-approved prescription drugs is a common practice in health care when a physician determines it is medically appropriate for their patient.[13]

89. The FDA has long allowed healthcare professionals to prescribe FDA-approved drugs off-label, stating that "once a [drug] product has been

---

[11] FDA, *Prometrium Label*, at 19, U.S. https://perma.cc/CR46-2FTS; Drugs.com, *Prometrium Prescribing Information*, https://perma.cc/RDN3-WNQ8; *see also* Emily Oster, Expecting Better, 169 (Penguin Books 2016).

[12] Jessica C. Leek & Hasan Arif, *Pregnancy Medications*, StatPearls (Jul. 24, 2023), https://perma.cc/KL52-74KM.

[13] *See, e.g.*, Agata Bodie, Cong. Rsch. Serv., R45792, Off-Label Use of Prescription Drugs 10 (Feb. 23, 2021) (estimating that off-label prescriptions make up as many as 38% of doctor-office prescriptions in the United States and collecting sources). A true and accurate copy is attached as Exhibit N. *See also, e.g.*, *Wash. Legal Found. v. Henney*, 202 F.3d 331, 333 (D.C. Cir. 2000) ("[I]t is undisputed that the prescription of drugs for unapproved uses is commonplace in modern medical practice and ubiquitous in certain specialties.").

approved for marketing, a physician may prescribe it for uses or in treatment regimens of patient populations that are not included in approved labeling."[14]

90.    In November 2021, the United Kingdom's National Institute of Health and Care Excellence ("NICE") published new guidelines based on a review of recent studies—including the Progesterone in Spontaneous Miscarriage ("PRISM") study—recommending progesterone treatment for women with early pregnancy bleeding and at least one previous miscarriage.[15]

91.    The NICE committee specifically noted that "there was no evidence of harms for women or babies" from progesterone treatment, including "no increase in risk of stillbirth, ectopic pregnancy, congenital abnormalities or adverse drug reactions."[16]

---

[14] Citizen Pet. Regarding the Food and Drug Admin.'s Pol'y on Promotion of Unapproved Uses of Approved Drugs and Devices; Request for Comments, 59 Fed. Reg. 59820, 59821 (Nov. 18, 1994) (quoting 12(1) FDA Drug Bulletin at 5 (Apr. 1982), https://perma.cc/A5UJ-C5YL); *see also Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 350 (2001) (explaining that "'off-label' usage … is an accepted and necessary corollary of the FDA's mission to regulate … without directly interfering with the practice of medicine").

[15] *Ectopic pregnancy and miscarriage: diagnosis and initial management, Guideline NG126*, National Institute for Health and Care Excellence 18 (NICE) (updated Aug. 23, 2023). A true and accurate copy is attached as Exhibit O.

[16] *Ectopic Pregnancy and Miscarriage: Diagnosis and Initial Management, [C] Progestogens for Preventing Miscarriage, NICE Guideline NG126 (update), Evidence Review Underpinning Recommendations 1.5.2 and 1.5.3 and Research Recommendations in the NICE Guideline*, National Institute for Health and Care Excellence (NICE), 16–18 (Nov. 24, 2021). A true and accurate copy is attached as Exhibit P.

92.    The PRISM study followed over 4,000 women at 48 hospitals in the United Kingdom and found a 3% greater live-birth rate among the women who received progesterone treatment. The study found a 15% greater live-birth rate among women with early-pregnancy bleeding and three or more prior miscarriages. It also found no increased risk of birth defects.[17]

93.    Another recent study, known as the Progesterone in Recurrent Miscarriages ("PROMISE") study, evaluated more than 800 women with unexplained recurrent miscarriages in 45 hospitals in the United Kingdom and the Netherlands. The study found that progesterone treatment did not increase the risk of birth defects, while also finding that it did not produce a "significant difference" in the rate of live births.[18]

***Chemical Abortion***

94.    Chemical abortion, also known as "medication abortion," refers to the use of prescription drugs to end and then expel a pregnancy.

95.    The current abortion-drug regimen typically consists of two drugs: mifepristone (originally marketed as "RU-486" and now under the brand name "Mifeprex") and misoprostol.

[17] Arri Coomarasamy et al., *A Randomized Trial of Progesterone in Women with Bleeding in Early Pregnancy*, 380 N. Engl. J. Med. 1815 (2019). A true and accurate copy is attached as Exhibit Q.

[18] Ex. H, Coomarasamy et al., *PROMISE*, *supra* note 5.

96.    The FDA approved the two-drug regimen in 2000. Under the approved protocol, a woman takes mifepristone orally, followed up to 48 hours later by misoprostol.[19]

97.    Mifepristone is a synthetic steroid developed in the 1980s.

98.    Mifepristone blocks the actions of progesterone through a biochemical process "reversible competitive inhibition." It is a progesterone-receptor antagonist, meaning that it binds to and blocks the intracellular receptors that progesterone normally binds to.[20]

99.    As the FDA explains, "Mifepristone is a drug that blocks a hormone called progesterone that is needed for a pregnancy to continue."[21]

100.    By blocking the progesterone receptors, mifepristone causes the uterine lining to deteriorate, limiting oxygen and nutrition to the developing embryo or fetus.[22]

101.    The use of Mifepristone to block progesterone typically results in

---

[19] *Summary Review for Regulatory Action*, FDA (Mar. 29, 2016), https://perma.cc/F468-UFEJ.

[20] *See generally The Antiprogestin Steroid RU 486 and Human Fertility Control* (Etienne-Emile Baulieu & Sheldon J. Segal eds., Plenum Press 1985). A true and accurate excerpt is attached as Exhibit R.

[21] *Questions and Answers on Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation*, FDA (Jan. 4, 2023), https://perma.cc/5XDY-Q4T3.

[22] Mary L. Davenport et al., *Embryo Survival After Mifepristone: A Systematic Review of the Literature*, 32(1) Issues L. &Med. (2017). A true and accurate copy is attached as Exhibit S.

fetal demise.[23]

102. Misoprostol is then taken to induce uterine contractions to expel the embryo or fetus and gestational sac.

103. Since approving mifepristone, the FDA has considered it a high-risk drug because it can cause serious adverse events even when used in accordance with the approved label.

104. This is why mifepristone is "available only through a restricted program under a REMS called the Mifepristone REMS Program."[24]

105. A REMS, or "Risk Evaluation and Mitigation Strategy," is a drug-safety program required for certain medications with serious safety concerns.[25]

106. The FDA imposes a REMS when it determines that additional safeguards are necessary for the benefits of the drug to outweigh its risks.

107. A REMS may also include enhanced safety protocols, known as "elements to assure safe use," for a drug "because of its inherent toxicity or potential harmfulness." 21 U.S.C. 355-1(f). The FDA's approval of mifepristone contains these additional safety elements.[26]

---

[23] *Id.*

[24] FDA, *Mifeprex (mifepristone) label* at 6 (Jan. 2023), https://perma.cc/4895-X457. A true and accurate copy is attached as Exhibit T.

[25] *Risk Evaluation and Mitigation Strategies*, FDA (May 16, 2023), https://bit.ly/4aF77VU.

[26] *Id.*

108.  The FDA's current label for mifepristone contains a black-box warning that the drug can cause "[s]erious and sometimes fatal infections or bleeding."[27]

109.  It also directs women to emergency rooms if one of many adverse complications arise.[28]

110.  Based on two studies, the FDA's mifepristone label warns that between 2.9% and 4.6% of women who took abortion drugs ended up in an emergency room.[29]

111.  The FDA's mifepristone label also acknowledges that the abortion-drug regimen fails over 7% of the time between 9 and 10 weeks' gestation.[30]

112.  The FDA also warns that "[a]bout 2 to 7 out of 100 women taking [mifepristone] will need a surgical procedure because the pregnancy did not completely pass from the uterus or to stop bleeding."[31]

113.  The pro-abortion Guttmacher Institute reports that over 640,000 chemical abortions occurred in the United States in 2023.[32]

114.  Applying the FDA's 2.9–4.6% emergency-room data to the

---

[27] *See supra* note 24 (Ex. T, FDA, *Mifeprex label*) at 1.

[28] *Id.* at 2.

[29] *Id.* at 8, table 2.

[30] *Id.* at 13, table 4.

[31] *Id.* at 17.

[32] Rachel K. Jones & Amy Friedrich-Karnik, *Medication Abortions Accounted for 63% of All US Abortions in 2023, an Increase from 53% in 2020*, Guttmacher Inst. (Mar. 19, 2024), https://perma.cc/D2EP-CPTH.

Guttmacher Institute's figures means that mifepristone causes tens of thousands of women to seek emergency medical treatment each year.

***The Safety and Efficacy of Progesterone Treatment***

115. Many women regret taking chemical abortion drugs and ending the life of their unborn child.[33]

116. Some women experience this regret shortly after taking mifepristone but before taking misoprostol.

117. Some women have also taken mifepristone under duress or by trick or force.[34]

118. If a woman has taken mifepristone but has not yet taken misoprostol and decides within 72 hours that she would like to continue her

---

[33] Katherine A. Rafferty & Tessa Longbons, *#AbortionChangesYou: A Case Study to Understand the Communicative Tensions in Women's Medical Abortion Narratives*, 36(12) Health Commc'n. 1485, 1490 (2021), https://www.tandfonline.com/doi/epdf/10.1080/10410236.2020.1770507?needAccess=true. A true and accurate copy is attached as Exhibit U.

[34] *See, e.g.,* Lauren Aratani, *Texas man faces charges for allegedly slipping abortion drug in wife's drink*, The Guardian (Nov. 14, 2022), https://perma.cc/8NJD-3SSF; *Civil servant guilty of spiking drink with abortion drug*, BBC News (May 3, 2022), https://perma.cc/U43C-C2VU; Andy Wells, *NHS nurse struck off for supplying abortion pills to man who 'force-fed' them to pregnant partner,* Yahoo!news (Sept. 23, 2021), https://perma.cc/G88T-AXHX; Kevin Murphy, *Abortion-drug dealer pleads guilty, linked to Grand Rapids man accused of poisoning pregnant woman's drink*, Wisconsin Rapids Tribune (Mar. 5, 2020), https://perma.cc/4JSV-AJ64; Kristine Phillips, *A doctor laced his ex-girlfriend's tea with abortion pills and got three years in prison*, The Washington Post (May 19, 2018), https://perma.cc/W7QM-Q9VZ; Loulla-Mae Eleftheriou-Smith, *Man forced ex-girlfriend to miscarry after secretly feeding her abortion pills in a smoothie*, Independent (Mar. 13, 2015), https://perma.cc/KJF4-E9VX; Lateef Mungin, *Man pleads guilty to tricking pregnant girlfriend into taking abortion pill*, CNN (Sept. 10, 2013), https://perma.cc/RT4R-6LLL.

pregnancy and save her baby's life, she may request supplemental progesterone to try to counter the effects of mifepristone. This progesterone treatment is commonly called "Abortion Pill Reversal" or APR.

119.  The basic biochemical premise of progesterone treatment is that the effects of a receptor antagonist (mifepristone) can be reversed by increasing the concentration of the receptor agonist (progesterone).[35]

120.  Progesterone therapy therefore involves supplementing the pregnant mother's natural progesterone to compete with and outlast the effects of the mifepristone.

121.  Like other common uses of supplemental progesterone, progesterone treatment for APR is an off-label use.

122.  The scientific literature demonstrates the ability of progesterone to counteract mifepristone.

123.  In 1989, researchers investigated "the role of progesterone in the maintenance of pregnancy" using rats.[36]

124.  Rats are frequently used in biomedical research due to their

---

[35] *See generally* Barbara J. Pleuvry, *Receptors, agonists and antagonists*, 5(10) Anaesthesia & Intensive Care Med. 350–352 (2004). A true and accurate copy is attached as Exhibit V.

[36] Shingo Yamabe et al., *The effect of RU486 and progesterone on luteal function during pregnancy*, 65 Folia Endocrinologica Japonica 497, 497 (1989). A true and accurate copy is attached as Exhibit W.

anatomical, physiological, and genetic similarity to humans.[37]

125. After four days, only a third of pregnant rats who received mifepristone remained pregnant, but all of the pregnant rats who were given progesterone in addition to mifepristone remained pregnant.

126. In 2018, Dr. George Delgado published an observational case series that followed 754 pregnant women who had taken mifepristone, but had not yet taken misoprostol, and were interested in reversing mifepristone's effects.

127. A total of 547 women met inclusion criteria and underwent progesterone treatment within 72 hours after taking mifepristone.[38]

128. The overall success rate—247 live births, plus 4 viable pregnancies lost after 20 weeks gestation—was 48%.[39]

129. The 2018 study showed even higher success rates when the

---

[37] Elizabeth C. Bryda, *The Mighty Mouse: The Impact of Rodents on Advances in Biomedical Research*, 110(3) Mo. Med. 207, 207 (2013), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3987984/pdf/ms110_p0207.pdf. A true and accurate copy is attached as Exhibit X.

[38] George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33(1) Issues L. & Med. 21, 24–25 (2018). A true and accurate copy is attached as Exhibit Y. The 2018 study followed a 2012 case report, also published by Drs. Delgado and Davenport, that followed seven women who had taken mifepristone and then received progesterone therapy after "s[eeking] assistance to block the mifepristone effects." George Delgado & Mary L. Davenport, *Progesterone use to reverse the effects of mifepristone*, 46(12) Annals Pharmacotherapy 1723, 1723 (2012). A true and accurate copy is attached as Exhibit Z. Four of the six women who completed the study were able to carry their pregnancies to term.

[39] Ex. Y, Delgado et al., *A Case Series*, *supra* note 38, at 25–26.

patients were divided into treatment subgroups.

130.  It showed fetal survival rates of 64% for the subgroup that received progesterone through intramuscular injection and 68% for the subgroup that received a high dose of oral progesterone followed by daily oral progesterone until the end of the first trimester.[40]

131.  The survival rates in the 2018 study compare favorably with the baseline fetal survival rate of approximately 25% if no treatment is attempted after mifepristone is administered.[41]

132.  The 2018 study found no increased risk of birth defects after progesterone treatment. And the rate of preterm delivery was 2.7%, much lower than the 10% average in the general population in the United States.[42]

133.  As a result, the 2018 study recommended a protocol to "reverse" the effects of mifepristone by administering progesterone, either orally or by intramuscular injection, "as soon as possible" after taking mifepristone, followed by supplemental progesterone until the end of the first trimester if taken orally or a series of additional intramuscular injections.[43]

134.  The 2018 study properly used a historical control group, rather than a randomized controlled trial, because it would be unethical to administer a placebo to a pregnant woman seeking to reverse mifepristone's

[40] *Id*. at 26.

[41] *Id*.; *see also* Ex. S, Davenport et al., *supra* note 22.

[42] Ex. Y, Delgado et al., *A Case Series*, *supra* note 34, at 26.

[43] *Id*. at 29.

feticidal effects when evidence shows progesterone is safe and effective to do this.

135. A rat study published in July 2023 further found "a clear progesterone-mediated reversal of an initiated mifepristone-induced pregnancy termination in a rat model at first-trimester human equivalent."[44]

136. Fetuses survived in 81% of rats given progesterone after mifepristone, but no fetuses survived in rats given only mifepristone.

137. A 2023 review of 16 studies found "no increased maternal or fetal risk from using bioidentical progesterone in early pregnancy," and concluded that "mifepristone antagonization with progesterone is a safe and effective treatment."[45]

138. Critics of APR, including the Attorney General in his complaint against Heartbeat, often reference a randomized controlled trial that was halted after three participants experienced severe hemorrhage to imply that progesterone treatment is unsafe.[46]

139. But in that trial, two of the three women who experienced severe

---

[44] Christina Camilleri & Stephen Sammut, *Progesterone-mediated reversal of mifepristone-induced pregnancy termination a rat model: an exploratory investigation,* 13, 10942 Scientific Reports 1 (2023). A true and accurate copy is attached as Exhibit AA.

[45] Paul L.C. DeBeasi et al., *Mifepristone Antagonization with Progesterone to Avert Medication Abortion: A Scoping Review*, 90(4) The Linacre Quarterly 395 (July 2023). A true and accurate copy is attached as Exhibit BB.

[46] Mitchell D. Creinin et al., *Mifepristone Antagonization with Progesterone to Prevent Medical Abortion*, 135(1) Obstetrics & Gynecology 158 (2020). doi: 10.1097/AOG.000000000003620.

bleeding received only mifepristone and a placebo, not progesterone. Those two women required surgery.

140. The third woman, who took mifepristone and then progesterone, completed her abortion without further medical intervention.

141. So it was mifepristone, not progesterone, that caused the severe bleeding.

142. The study's authors concluded that "patients who receive high-dose oral progesterone treatment do not experience side effects that are noticeably different than placebo."[47]

143. Moreover, the progesterone treatment worked in four of the five women who finished it. Fetal heartbeats were detected two weeks after they ingested mifepristone.

144. Pregnancy centers have witnessed numerous successful cases of progesterone treatment resulting in continued pregnancies, such as those of Atoria Foley and Desirae Exendine, and other evidence shows that the APR protocol works as intended.[48]

145. Yale School of Medicine scientist Dr. Harvey Kliman—who favors

---

[47] *Id.* at 162.
[48] *E.g.*, *2022 Impact Report*, Heartbeat Int'l, https://perma.cc/6AWX-GF87; Fox 11 Los Angeles, *Woman shares story of abortion pill reversal*, YouTube (May 4, 2022), https://www.youtube.com/watch?v=0OaINTEpn5c; Heartbeat Int'l, *Sarah's Story*, Vimeo (Sept. 22, 2023), https://vimeo.com/867342614; Heartbeat Int'l, *Krystle's APR Story*, Vimeo (Sept. 29, 2023), https://vimeo.com/869600792; Heartbeat Int'l, *Sara's Story*, Vimeo (Sept. 16, 2023), https://vimeo.com/865197386.

expansive abortion policy—has explained that if one of his daughters accidentally took mifepristone during pregnancy, "he would tell her to take 200 milligrams of progesterone three times a day for several days," and "I bet you it would work."[49]

***The Term Abortion Pill "Reversal"***

146.  Given this evidence, saying supplemental progesterone can "reverse" the effects of abortion drugs is accurate.

147.  Calling the use of supplemental progesterone to counteract the effects of mifepristone "Abortion Pill Reversal" is not misleading.

148.  Mifepristone inhibits progesterone through "reversible" competitive inhibition.

149.  The scientific literature uses the term "reversal" to describe supplemental progesterone's effects on mifepristone.

150.  A reasonable person hearing the term "abortion pill reversal" understands that the treatment seeks to "reverse" the effects of the "abortion pill."

151.  Women who regret taking abortion drugs and search for information on how to save their babies use and understand the term

---

[49] Ruth Graham, *A New Front in the War Over Reproductive Rights: 'Abortion-Pill Reversal,'* N.Y. Times Mag. (July 18, 2017), https://perma.cc/CGV2-M8J6.

"reversal" in the context of APR.[50]

152. Naloxone, a drug designed to stop an ongoing opioid overdose, is a useful comparator.

153. The U.S. Centers for Disease Control ("CDC") explains, "Naloxone is a life-saving medication that can reverse an overdose from opioids…when given in time."[51]

154. California's Department of Health Care Services similarly states, "Naloxone is a life-saving medication that reverses an opioid overdose[.]"[52]

155. Similar to mifepristone, naloxone is an opioid-receptor antagonist that blocks the effects of opioids.[53]

156. Both the CDC and the California Department of Health Care Services use the term "reverse" to describe the actions of a drug that competes with another for receptors to halt an ongoing biological process that can lead to death.

---

[50] Ex. A, Foley Decl. ¶ 9; Ex. B. Exendine Decl. ¶ 10. *See also, e.g.*, *Ashley's Abortion Pill Reversal Story*, Heartbeat Int'l (2023), https://perma.cc/LT87-3JH4 ("Ashley went on the internet and searched, 'Is there any way to reverse an abortion?'"); *Sara's Story*, Heartbeat Int'l (Sept. 22, 2023), https://perma.cc/FZY4-EZWB.
[51] *Reverse Opioid Overdose to Prevent Death*, U.S. Ctrs. for Disease Control and Prevention (May 8, 2024), https://perma.cc/2MNK-47TJ.
[52] *Naloxone Distribution Project Frequently Asked Questions*, California Department of Health Care Services, 4 (May 2024), https://perma.cc/LMA5-HNTG.
[53] *Opioid Overdose Reversal Medications (OORM)*, Substance Abuse and Mental Health Services Administration (Mar. 26, 2024), https://perma.cc/MF8D-XSL3.

## III. California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, and False Advertising Law, Cal. Bus. & Prof. Code § 17500

157. California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, prohibits "unfair competition," defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

158. Section 17200 *et seq.* does not define "unfair," "deceptive," "misleading," "fraudulent business act," or other terms used in the statute.

159. Section 17204 grants authority to the attorney general to prosecute alleged violations of the chapter.

160. Section 17203 authorizes injunctive relief, and § 17206 authorizes monetary penalties for violations of the chapter.

161. Section 17200 *et seq.* does not define what evidence is sufficient to establish an unlawful practice.

162. Section 17200 *et seq.* gives the attorney general complete discretion to determine what evidence is satisfactory to institute an action alleging a violation of the statute.

163. California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, makes it unlawful for any person

"with intent directly or indirectly to dispose of real or personal

property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading ...."

164. Cal. Bus. & Prof. Code § 17500 *et seq.* does not define what constitutes "indirect" intent, "or anything of any nature," "misleading," "should be known," or other terms used in the statute.

165. § 17500 *et seq.* grants the attorney general authority to prosecute violations of the chapter and seek penalties for violations of the chapter.

166. A violation of § 17500 is a misdemeanor.

167. § 17500 *et seq.* gives the attorney general complete discretion to determine what evidence is satisfactory to institute an action alleging a violation of the statute.

## IV.    The California Attorney General's Censorship Campaign Against Pro-Life Organizations

168.    On September 21, 2023, Attorney General Bonta filed a complaint (Ex. C, "Bonta Complaint") in the Alameda Superior Court of the State of California against Heartbeat International, Inc. and RealOptions alleging violations of the Business Fraud Statutes.

169.    Heartbeat International is a non-profit organization that supports a network of over 3,000 pregnancy resource centers located in 80 countries. It also operates the Abortion Pill Rescue Network, including the website AbortionPillReversal.com and an abortion pill reversal hotline.

170.    RealOptions is a non-profit organization that operates five pregnancy-resource medical clinics in California.

171.    Defendant alleged that Heartbeat International and RealOptions made misleading statements regarding APR that violated California Business and Professional Code §§ 17200 and 17500. For example, Defendant targeted the following statements from Heartbeat's and RealOptions's websites, training manuals, and media appearances as misleading:

- Use of the term "reverse" and "reversal"
- Stating that "APR has been shown to increase the chances of allowing the pregnancy to continue" and that initial studies have shown that the success rate for APR is 64–68%
- Stating "We are here to help. It may not be too late."
- Stating "Initial studies have found that the birth defect rate in

babies born after the APR is less than or equal to the rate in the general population."

- Stating that APR has resulted in over 1,000 lives saved.
- Stating that APR has resulted in over 2,000 lives saved.
- Not including information on their websites about an alleged risk of bleeding associated with progesterone

172. Defendant also attacked other similar statements made by Heartbeat and RealOption on their websites and other media.

173. Medical professionals prescribe APR at several Heartbeat-affiliated medical clinics and at RealOptions's medical centers.

174. None of RealOption's centers charge patients for such services.

175. The Attorney General is using the power of the State to censor viewpoints about progesterone treatment that he disfavors.

176. The Attorney General has not identified, in his legal action to enforce the Business Fraud Statutes, any consumer who has been misled by the statements he alleges are false and misleading.

177. Nor has the Attorney General identified any person who has been harmed by the statements he alleges are false and misleading.

178. The Attorney General's application of the Business Fraud Statutes to pro-APR expression appears to be based on a bare desire to harm and censor pro-life and religious viewpoints and to impede women's access to information that could help them continue their pregnancies and save their babies' lives.

**V. The Attorney General's Censorship Campaign is Harming Plaintiffs and Chilling Their Speech, and Plaintiffs Face a Credible Threat of Prosecution.**

179. Like the faith-based, pro-life organizations named as defendants in the Attorney General's lawsuit, Plaintiffs NIFLA and the Centers are faith-based, pro-life pregnancy-support organizations that have made or would like to make public statements about the safety and effectiveness of progesterone treatment for women who do not wish to complete a chemical abortion.

180. All of the statements Plaintiffs have made and would like to make about progesterone treatment are true, supported by science, and not misleading.

181. Plaintiffs NIFLA, its members, and SCV have self-censored their statements about progesterone treatment because of the Attorney General's actions against these other organizations. His actions deprive mothers in their communities of potentially life-saving information and a true opportunity to choose their desired outcomes for their pregnancies.

*NIFLA and its Members*

182. NIFLA has spoken, and wishes to continue speaking, about progesterone treatment.

183. Before the Attorney General's censorship campaign against pro-life pregnancy-support organizations, many of NIFLA's California members made public statements about progesterone treatment or offered referrals to

physicians who could provide the treatment as a free service to women who have knowingly taken—or were tricked or coerced into taking—mifepristone but had changed their minds and wished to continue their pregnancies or did not want to have an abortion.

184.  Since the Attorney General's lawsuit, some of NIFLA's California members removed their statements about progesterone treatment from their online and print materials and self-censored other statements about progesterone treatment despite the truth and accuracy of the statements, and despite their faith-based desire to continue making them.

*NIFLA Member Pregnancy Care Clinic*

185.  For example, NIFLA Member Pregnancy Care Center (d/b/a Pregnancy Care Clinic) planned to offer abortion pill reversal services, but has canceled those plans, fearing similar retaliatory action and punishment from the Attorney General.

186.  Pregnancy Care Clinic is a faith-based not-for-profit organization that operates medical clinics in Santee, California and San Diego, California.[54]

187.  PCC opened its first pregnancy care center in San Diego County in 1994. *Id.* ¶ 6.

188.  In 2005, PCC's care center in San Diego County became a licensed medical clinic, and in 2017, PCC opened its second medical clinic in the city of

---

[54] Declaration of Joshua McClure, attached as Exhibit CC, ¶ 4.

35

San Diego. *Id.*

189.    PCC follows the Bible's teaching that human beings are created in the image of God. PCC believes human life is sacred and is a gift from God requiring respect and protection. *Id.* ¶ 7.

190.    Based on these beliefs, PCC exists to serve women and their unborn children. Its mission is to speak the truth in love and offer a loving refuge where each woman will find unconditional love, acceptance, and support. It seeks to advance this mission by providing accurate information about the developing life in the mother's womb and life-affirming alternatives to abortion. *Id.* ¶ 8. It is not the mission of PCC to talk women into keeping their babies, but rather to educate them about their options so they can come to an informed choice.[55]

191.    All of PCC's services are provided free of charge. Ex. CC, McClure Decl. ¶ 9.

192.    PCC currently does not administer APR, but it planned to begin those services within the next 5 years. *Id.* ¶¶ 12, 15.

193.    Since the Attorney General sued Heartbeat and RealOptions, however, PCC has suspended its plans to offer APR services. *Id.* ¶ 16.

194.    Despite a fear of prosecution from the Attorney General, PCC continues to provide information regarding APR on its website, including the

---

[55] Letting the Light In – The True Value of Pregnancy Care Clinic (2015), https://www.supportpcc.com/wp-content/uploads/2015/11/letting-the-light-in.pdf.

following statements from PCC's blog:

    a. "Enough women have changed their minds after taking the abortion pill that professional healthcare providers developed and operate a program called Abortion Pill Rescue (APR) for women who take the abortion pill but decide to continue their pregnancies after all[.]"

    b. "The abortion pill reversal process consists of taking the progesterone hormone that was blocked by mifepristone, but time is of the essence. Ideally the reversal protocol would be started within 24 hours."

    c. "If you changed your mind and have only taken the first set of pills, do not take the second medication and call APR at (877) 558-0333 so they can help you."

*Id.* ¶ 17.

195.  PCC also previously paid for an advertisement campaign to tell women about the potential option of progesterone treatment with a link abortionpillreversal.com but did not renew the campaign after the Attorney General sued other organizations for speaking about APR. The failure to renew was based on PCC's fear of prosecution.

196.  A true and accurate picture of PCC's APR advertisement is attached to the Declaration of Josh McClure. *Id.* ¶ 14.

*NIFLA Member Alternatives Pregnancy Center*

197. Alternatives Pregnancy Center, another NIFLA member, offers

37

free "Abortion Pill Reversal" services, and states so on its website, subjecting it to potential suit by the Attorney General.

198.  The mothers who successfully used progesterone treatment to save their babies after taking mifepristone, discussed in paragraphs 1 to 8, were provided free diagnostics and a prescription for progesterone treatment by medical professionals through Alternatives Pregnancy Center.

199.  Their babies are almost certainly alive today because Alternatives was able to tell them about the option of APR.

200.  Before the Attorney General's censorship campaign against faith-based, pro-life pregnancy centers, Alternatives Pregnancy Center made many statements about abortion pill reversal on its social media accounts.

201.  In 2018, for example, Alternatives stated on Facebook, "Science shows that Abortion Pill Reversal can be a second chance at choice. A new Abortion Pill Reversal Study has been published in a peer-reviewed journal. Its findings showed that the reversal success rates were 64%–68%. There was also no increased risk of birth defects or preterm birth."

202.  Soon after, Alternatives published a Facebook post that read, "'I want to choose Abortion Pill Reversal. What should I do now?' Talk with a hotline nurse at 877-558-0333. They will help you by answering basic questions to see if reversal is possible. The nurse will then connect you with a doctor or medical provider in your area to start treatment, if that is your choice.... More APR questions and answers on abortionpillreversal.com."

203.  And in 2021 Alternatives posted on Facebook, "Google has banned

38

ads for Abortion Pill Reversal (APR), a safe and effective medical treatment that can save the life of a baby from an abortion if the mother changes her mind. Censorship is only increasing – let's take action now before it's too late!"

204.  On the day the Attorney General sued Heartbeat International, Alternatives responded on Facebook, "In the last month, Alternatives Pregnancy Center has served four women who sought us out when they decided they didn't want to choose abortion. After taking progesterone (a safe treatment that has been used on pregnant women to prevent miscarriage for decades), three of those women are still experiencing viable pregnancies."

205.  Alternatives continued, "The amount of misinformation shared in [the Attorney General's] press-release is staggering and too much for one Instagram caption. (More educational posts to follow.)"

206.  But because of the Attorney General's censorship campaign, Alternatives decided not to make those additional posts. It has self-censored its speech on social media platforms and refrained from making similar statements about APR.

207.  If the Attorney General could not censor its information about APR, Alternatives would resume communicating similar messages about APR as it did before the Attorney General's lawsuit chilled its speech.[56]

---

[56] Declaration of Heidi Matzke, attached as Exhibit DD.

*NIFLA*

208.   Before the Attorney General's censorship campaign against faith-based, pro-life pregnancy centers, NIFLA made various statements about progesterone treatment to its California members. Because of the Attorney General's censorship campaign, NIFLA no longer makes these statements to its California members.

209.   Some of these statements were identical to—and others were substantially similar to—the statements made by the faith-based, pro-life pregnancy-support organizations that the Attorney General sued.

210.   For example, the Attorney General's lawsuit against other California organizations' speech alleges that using the term "Abortion Pill Reversal"—by which he means the protocol of administering progesterone to limit the effects of mifepristone—is false and misleading in violation of the Business Fraud Statutes.

211.   NIFLA used the term "Abortion Pill Reversal" and when it used that term, NIFLA referred to the protocol of administering progesterone to limit the effects of mifepristone.

212.   NIFLA also advised its California members to use Heartbeat International's Abortion Pill Rescue training program, linking to abortionpillreversal.com and the APR Hotline.

213.   Before the Attorney General's censorship campaign, NIFLA also published informational guides about progesterone treatment called "Clinic Tips," regularly consulted with centers regarding the treatment, and

provided sample policies that encouraged its members to speak about progesterone treatment and to provide it as one of their services. But the Attorney General's censorship campaign has caused NIFLA to stop each of these efforts with its California members and to revoke its recommendations regarding APR.

214. Attached as Exhibit EE is a true and accurate copy of materials NIFLA has provided and would like to continue to provide to its California members.

215. The Attorney General's lawsuit alleges that Heartbeat International violated the Business Fraud Statutes simply by stating that there is a way to reverse the effects of mifepristone. Ex. C, Bonta Compl. ¶¶ 3, 54.

216. In publications to its members, NIFLA shared the testimony of a woman who sought "medication and support to reverse the effect of the abortion procedure she had begun" and offered "[t]ips for pregnancy centers regarding use of progesterone therapy to serve women who want to reverse the effects of mifepristone." Ex. EE, NIFLA materials at 2–3.

217. Like Heartbeat International, NIFLA also stated that "time is of the essence for effectiveness" and linked to abortionpillreversal.com.

218. Like the organizations the Attorney General has sued, NIFLA stated that "[p]rogesterone has been used safely in pregnancy for over 40 years," and that "facts and science support APR." *Id*.

219. The Attorney General's suit against other California organizations

41

shows that he considers NIFLA's statements to be in violation of the Business Fraud Statutes.

220. NIFLA believes its statements about progesterone treatment are not false or misleading but has removed those statements and stopped advising its centers in California to offer progesterone treatment (unless they are already offering it) for fear of retaliation and punishment by the Attorney General.

221. For the same reasons, NIFLA has also stopped advising its California centers to advertise for or make statements about progesterone treatment.

222. Some NIFLA members have self-censored, and others continue to speak about APR but under threat of enforcement from the Attorney General.

223. NIFLA would like to resume using the term "Abortion Pill Reversal," linking to abortionpillreversal.com and the APR Hotline, making its prior statements about progesterone treatment, and advising its California members about the same.

224. If not for the threat of enforcement of the Business Fraud Statutes, NIFLA would re-publish its self-censored statements and resume advising its California members about progesterone treatment.

225. Not advising its centers to offer or advertise for these services undermines NIFLA's mission to promote life-saving alternatives to abortion.

226. Overall, the Attorney General's lawsuit has had a chilling effect on NIFLA and its members' speech about APR.

227. NIFLA's California members' statements about and referrals for progesterone treatment are a direct extension of their religious belief that life begins at conception.

228. All Plaintiffs' pro-life statements and beliefs in support of progesterone treatment are sincere and rooted in their Christian faith.

229. Plaintiffs, including NIFLA members, sincerely believe that human life begins at conception.

230. Plaintiffs, including NIFLA members, sincerely believe that it is their religious duty to inform women and pregnancy resource centers of options that may save an unborn human life, including about the option of progesterone treatment.

*SCV Pregnancy Center*

231. NIFLA member and Plaintiff SCV, fearing the gathering momentum of the Attorney General's campaign against other pro-life pregnancy-support organizations and fearing similar retaliatory action and punishment, removed statements and refrained from making new statements about progesterone treatment.

232. SCV Pregnancy Center has made various statements about progesterone treatment on its Facebook and Instagram pages.

233. Some of these statements were nearly identical or substantially similar to the statements made by the faith-based pregnancy centers that have been sued by the Attorney General.

43

234. The Attorney General's lawsuit against other organizations alleges that using the terms "reverse" and "reversal" when describing progesterone treatment is false and misleading in violation of the Business Fraud Statutes. Ex. C, Bonta Compl. ¶ 54.

235. SCV used the term "Abortion Pill Reversal" in multiple social-media posts to describe progesterone treatment. A true and accurate copy of one of those posts is attached as Exhibit FF.

236. The Attorney General's lawsuit specifically alleges that Heartbeat International violated the Business Fraud Statutes by "encourage[ing] potential patients to call its hotline and/or message through its live chat" on www.abortionpillreversal.com, which would connect them with medical professionals to "guide [them] towards reversing the effects of the abortion pill." Ex. C, Bonta Compl. ¶ 53.

237. On its Facebook and Instagram pages, SCV provided instructions to call this same hotline or use this same chat feature to be connected with an "on-call Healthcare Professional [who] will ask [the patient] some basic questions to see if a reversal is possible." A true and accurate copy of that post is attached as Exhibit GG.

238. The Attorney General's lawsuit specifically alleges that RealOptions violated the Business Fraud Statutes by stating on its website "that APR can 'reverse' a medication abortion." Ex. C, Bonta Compl. ¶¶ 91, 97, 100.

239. On its Facebook and Instagram pages, SCV made the following

44

statement multiple times: "Can the abortion pill be reversed? The simple answer is yes! If done in time." True and accurate copies of those posts are attached as Exhibits FF and HH.

240. The Attorney General's lawsuit specifically alleges that Heartbeat International violated the Business Fraud Statutes by stating "that APR is an 'effective process' because 'APR has been shown to increase the chances of allowing the pregnancy to continue.'" Ex. C, Bonta Compl. ¶¶ 55, 97, 100.

241. On its Facebook and Instagram pages, SCV stated, "There is an effective process called abortion pill reversal that can reverse the effects of the abortion pill and allow you to continue your pregnancy, but time is of the essence." True and accurate copies of those posts are attached as Exhibits HH and II.

242. After SCV learned that the Attorney General sued Heartbeat International and RealOptions for the statements above about progesterone treatment, SCV removed its nearly identical and substantially similar statements from its Facebook and Instagram pages.

243. Accordingly, women who have changed their minds after starting a chemical abortion and wish to try to save their pregnancy cannot find any help on SCV's social media pages.

244. The Attorney General's lawsuit against Heartbeat International and RealOptions shows that he considers SCV Pregnancy Center's nearly identical and similar statements to violate the Business Fraud States.

245. SCV believes its statements about progesterone treatment are not

false or misleading but has removed those statements for fear of retaliation and punishment by the Attorney General.

246. SCV would like to resume using the terms "reverse," "reversal," and "Abortion Pill Reversal"; describing progesterone treatment as "effective"; and making its prior statements about this treatment.

247. SCV previously planned to offer progesterone treatment to counter the effects of mifepristone, but the Attorney General's enforcement of the Business Fraud Statutes has deterred it.

248. If not for the threat of enforcement of the Business Fraud Statutes by the Attorney General, SCV would republish its self-censored statements about progesterone treatment and restart plans to offer progesterone treatment to counter the effects of mifepristone.

**VI.  The State of California and its Attorney General's Abortion Advocacy and History of Animus Toward Pro-Life Pregnancy Centers**

249. California has a history of unconstitutionally regulating pro-life viewpoints.

250. For example, in *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755, 779 (2018), the Supreme Court held that NIFLA on behalf of its members was likely to succeed on the merits of its claim against California's attempt to compel pregnancy resource centers to speak government-mandated messages about abortion.

251. In *California v. United States Department of Health & Human*

46

*Services*, 977 F.3d 801, 802 (9th Cir. 2020), the State led a coalition suing the U.S. Department of Health for exempting pro-life organizations like Little Sisters of the Poor and the March for Life from the Affordable Care Act's requirement that they cover abortifacient contraceptives.

252. Here, the Attorney General is targeting pregnancy centers for disfavored treatment because of their faith-based, pro-life views.

253. "Supporting, expanding, and protecting" abortion is "a top priority for Attorney General Bonta."[57]

254. But pregnancy centers' pro-life efforts counteract his pro-abortion mission. So the Attorney General believes it is "time" for a "ruthless, coordinated siege" on the pro-life movement.[58]

255. To put that belief into action, the Attorney General is on a campaign to malign pregnancy centers and suppress their pro-life speech.

---

[57] *Press Release: Attorney General Bonta Leads 21 States in Urging FDA to Approve Country's First Over-The-Counter Birth Control Pill*, State of California Department of Justice Office of the Attorney General 4 (Nov. 4, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-leads-21-states-urging-fda-approve-country%E2%80%99s-first-over. A true and accurate copy is attached as Exhibit JJ. *See also Press Release: Attorney General Bonta: U.S. Supreme Court Overturns Decision on Medication Abortion, but the Fight for Reproductive Rights is Far from Over*, State of California Department of Justice Office of the Attorney General (June 13, 2024), https://oag.ca.gov/news/press-releases/attorney-general-bonta-us-supreme-court-overturns-decision-medication-abortion. A true and accurate copy is attached as Exhibit KK.
[58] Sophie Austin & Adam Beam, *Planned Parenthood maps strategy to protect abortion rights*, The Associated Press 1 (Sept. 9, 2022), https://apnews.com/article/abortion-us-supreme-court-health-sacramento-planned-parenthood-2807bfb22b8d8df285e8794e227d3472. A true and accurate copy is attached as Exhibit LL.

*Consumer Alert*

256.   Two years ago, the Attorney General issued a Consumer Alert to vilify pro-life pregnancy centers in California.

257.   The Consumer Alert contained a "WARNING" that pregnancy centers "do not provide comprehensive reproductive healthcare."[59]

258.   The Alert stated that pregnancy centers "seek to discourage people facing unintended pregnancies from accessing abortion" and "do not provide abortion or abortion referral."[60]

259.   Without naming any offenders or citing any evidence, the Attorney General also alleged pregnancy centers "may not be licensed medical clinics or be required to keep medical records private," "may attempt to delay appointments," and "may provide inaccurate health information."[61]

260.   The Alert implied that pregnancy centers were untrustworthy by telling readers to file a complaint if they "have been the victim or target of deceptive, misleading, unfair, or unlawful conduct."[62]

---

[59] *Consumer Alert: Know the Difference: Crisis Pregnancy Centers V. Reproductive Healthcare Facilities*, California Department of Justice Office of the Attorney General 1, https://oag.ca.gov/system/files/attachments/press-docs/Crisis%20Pregnancy%20Center%20Bulletin.pdf. A true and accurate copy is attached as Exhibit MM.

[60] *Id.*

[61] *Press Release: Attorney General Bonta Issues Consumer Alert Warning Californians That Crisis Pregnancy Centers Do Not Offer Abortion or Comprehensive Reproductive Care*, State of California Department of Justice Office of the Attorney General 3 (June 1, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-issues-consumer-alert-warning-californians-crisis. A true and accurate copy is attached as Exhibit NN.

[62] Ex MM, *Consumer Alert*, *supra* note 59, at 2.

261.  The Attorney General directed readers to seek assistance from pro-abortion groups instead of pregnancy centers.[63]

***Enforcement Action and Accompanying Public Statements***

262.  The fact that some women regret taking abortion drugs threatens the Attorney General's pro-abortion message.

263.  So last year, the Attorney General filed his enforcement action against Heartbeat International and RealOptions to silence their speech about abortion pill reversal.[64]

264.  On the day he filed the lawsuit, the Attorney General issued a Press Release titled "Attorney General Bonta Sues Anti-Abortion Group, Five California Crisis Pregnancy Centers for Misleading Patients."[65]

265.  The Attorney General has not identified one patient harmed or misled by speech about APR.

266.  The Press Release described APR as an "unproven and largely experimental procedure" and falsely stated there is "absolutely no scientific basis to support" it.[66]

267.  The Attorney General is aware of the 2012 and 2018 studies that

[63] *Id.;* Ex. NN, *Press Release: Attorney General Bonta Issues Consumer Alert, supra* note 61, at 3.
[64] Ex. C, Bonta Compl.
[65] *Press Release: Attorney General Bonta Sues Anti-Abortion Group, Five California Pregnancy Centers for Misleading Patients* (Sept. 21, 2023), https://oag.ca.gov/news/press-releases/attorney-general-bonta-sues-anti-abortion-group-five-california-crisis-pregnancy. A true and accurate copy is attached as Exhibit OO.
[66] *Id.* at 1–2.

49

show the safety and effectiveness of APR, since his Complaint describes them.[67]

268. The Attorney General used the lawsuit as a means to spread his own pro-abortion message.

269. His Press Release asserted that "the vast majority of people do not regret their decision to have an abortion."[68]

270. He accused Heartbeat and RealOptions of "predatory" behavior, "t[aking] advantage of pregnant patients," and "using false and misleading claims to lure [patients] in and mislead them."[69]

271. The Attorney General also directed readers to pro-abortion resources.[70]

272. On the same day he filed the enforcement action and issued the press release, the Attorney General held a press conference about the suit.[71]

273. During the press conference, the Attorney General asserted "there is absolutely no scientific basis to support" the claim that supplemental progesterone can reverse the effects of mifepristone. "It's a claim," he said. "It is not based in any facts or scientific data. I cannot emphasize that

---

[67] Ex. C, Bonta Compl. ¶¶ 27–30.
[68] Ex. OO, *Press Release: Attorney General Bonta Sues Anti-Abortion Group*, s*upra* note 65, at 2.
[69] *Id.*
[70] *Id.* at 3.
[71] California Department of Justice, *Attorney General Bonta Announces Legal Action to Protect Reproductive Freedom and Transparency*, YouTube, at 2:04–2:36 (Sept. 21, 2023), https://www.youtube.com/watch?v=_kOyqRQ9EtU. A true and accurate copy is lodged as Exhibit PP.

enough[.]"[72]

274.  The Attorney General then contrasted APR with his view on chemical abortion: "While medication abortion has been proven by decades of research to be exceedingly safe and reliable, *no* credible research so far has supported the safety or efficacy of abortion pill reversal."[73]

275.  The Attorney General accused Heartbeat International and RealOptions of lying by describing APR as a valid and successful treatment option.[74]

276.  He repeated his message that "the vast majority of people don't regret their decision to have an abortion."[75]

277.  He again accused Heartbeat and RealOptions of "predatory" behavior and claimed they "took advantage of pregnant patients" by using "false and misleading claims to lure them in and mislead them[.]"[76]

278.  The Attorney General did not describe any material benefit Heartbeat or RealOptions gained from their speech about APR or anything lost by patients of RealOptions.

279.  The Attorney General did not identify any patients who have been misled or harmed by Heartbeat's or RealOptions's speech about APR.

280.  The Attorney General then used the opportunity to disparage pro-

[72] *Id.* at 3:28–4:03.
[73] *Id.* at 4:11–4:30.
[74] *Id.* at 5:08–5:27.
[75] *Id.* at 8:41–8:48.
[76] *Id.* at 8:54–9:15.

life pregnancy centers in general.

281.   He said he found it "horrifying" that "right now there are more crisis pregnancy centers in California than abortion care clinics."[77]

282.   According to the Attorney General, that fact is horrifying because "crisis pregnancy centers *do not* provide abortion or abortion referral."[78]

283.   He again criticized pregnancy centers by saying they "may not be licensed medical clinics," "may not be required to keep medical records private," "may attempt to delay appointments or provide misinformation about the legality or safety of abortions," and "may provide inaccurate health information[.]"[79]

284.   He contrasted them with "*real* reproductive healthcare facilities" that, presumably, do offer abortion.[80]

285.   And he again directed listeners to Planned Parenthood and other pro-abortion organizations and resources.[81]

286.   The Attorney General closed by saying, "DOJ is proud to stand up for people seeking or providing an abortion, here in California and across the nation."[82]

287.   At bottom, the Attorney General opposes pregnancy centers'

---

[77] *Id.* at 9:17–9:25.
[78] *Id.* at 9:26–9:33.
[79] *Id.* at 9:42–10:09.
[80] *Id.* at 10:15–10:22.
[81] *Id.* at 10:40–11:22.
[82] *Id.* at 12:19–12:27.

"attempt[s] to discourage people facing unintended pregnancies from ... abortion"[83] and wants to shut them down.

### *Open Letter Attacking Pro-Life Pregnancy Centers*

288.  Shortly after filing suit, the Attorney General spearheaded an open letter decrying the proliferation of "anti-abortion crisis pregnancy centers."[84] The letter was signed by 15 other state attorneys general.

289.  The letter expressed the Attorney General's "increasing concern" that pregnancy centers "outnumber[] abortion clinics by a three-to-one ratio."[85]

290.  The Attorney General also clarified his problem with pregnancy centers is that they "do not provide full-scope reproductive healthcare" (i.e., abortion).[86]

291.  He also again accused them of using "deceptive tactics to lure in patients."[87]

292.  The Attorney General demonstrated his knowledge that pregnancy centers are generally faith-based organizations. He asserted that centers "most commonly offered maternity and baby supplies (but usually

---

[83] Ex. NN, *Press Release: Attorney General Bonta Issues Consumer Alert*, *supra* note 61, at 1.
[84] Attorney General Rob Bonta, *Open Letter from Attorneys General Regarding CPC Misinformation and Harm,* State of California Office of the Attorney General (Oct. 23, 2023), at 1, https://perma.cc/4SA5-9FXD. A true and accurate copy is attached as Exhibit QQ.
[85] *Id.*
[86] *Id.*
[87] *Id.*

only if pregnant individuals attend religious-based programming)."[88]

293. And the Attorney General repeated his false claim that "[t]here is no credible science or evidence supporting" APR.[89]

294. The Attorney General alleged that pregnancy centers cause various harms, but none of the harms he cites were linked to their speech about APR.[90]

295. The Attorney General also praised Yelp's discrimination against pregnancy centers.[91]

296. On the same day that he published the letter, the Attorney General tweeted that he "support[s] @Yelp's efforts to ensure users get the information they need about 'crisis pregnancy centers'—anti abortion orgs that often rely on deceptive tactics to lure people in."[92]

297. At the end of his open letter, the Attorney General pledged he would continue to use his political office "to take numerous actions aiming to mitigate the harmful effects of" pregnancy centers' "misinformation."[93]

---

[88] *Id.* at 2.
[89] *Id.* at 5.
[90] *Id.* at 5–8.
[91] *Id.* at 1, 8; *See also* Noorie Malik, *Providing Consumers With Reliable Information About Reproductive Health Services*, Yelp Blog (Feb. 2023 update), https://perma.cc/A3B4-EP5M; Letter from Attorney General Daniel Cameron to Yelp CEO Jeremy Stoppelman, *Yelp Must Not Discriminate Against Crisis Pregnancy Centers*, Commonw. of Ky. Off. of the Att'y Gen. (Feb. 7, 2023), https://perma.cc/5BPW-7PYE.
[92] Att'y Gen. Rob Bonta, @AGRobBonta, X (Oct. 23, 2023, 4:56 PM), https://perma.cc/8ZTF-UTTT.
[93] Ex. QQ, Att'y Gen. Rob Bonta, *Open Letter, supra* note 84, at 8.

*Differential Treatment and Hostility Toward Pro-Life Pregnancy-Support Organizations*

298.  The Attorney General is targeting pro-life organizations for their pro-life views while echoing misleading statements by similarly situated pro-abortion organizations and encouraging women to visit only pro-abortion facilities.

299.  Pro-life pregnancy centers, including RealOptions clinics,[94] SCV Pregnancy Center, and NIFLA's other members, serve women seeking pregnancy-related services.

300.  Planned Parenthood affiliates also serve women seeking pregnancy-related services.[95]

301.  RealOptions clinics and many of NIFLA's members provide pre-abortion screening, pregnancy testing, pregnancy options counseling, ultrasound imaging, STD testing and treatment, and well-woman reproductive healthcare.[96]

302.  SCV Pregnancy Center provides pregnancy testing, ultrasounds, prenatal care referrals, STD testing and treatment, and parenting classes.

---

[94] *Our Services*, RealOptions Obria Medical Clinics, https://www.realoptions.net/services-3/. A true and accurate copy is attached as Exhibit RR.

[95] *Annual Report 2022–2023*, Planned Parenthood Pasadena & San Gabriel Valley 4, https://cdn.plannedparenthood.org/uploads/filer_public/18/55/1855ca42-7df4-4592-9ef9-53bf2c8a0447/annual_report_2022-2023_digital.pdf. A true and accurate copy is attached as Exhibit SS.

[96] Ex. RR, *Our Services*, *supra* note 94.

303.    Planned Parenthood affiliates similarly provide pregnancy testing, STI testing and treatment, and education.[97]

304.    Heartbeat International provides services, products, and education to its affiliated pregnancy centers.[98]

305.    NIFLA provides its affiliated pregnancy centers with legal resources, counsel, education, training, and support.

306.    The national Planned Parenthood organization provides similar support to its member affiliates.[99]

307.    Heartbeat International, NIFLA, their members, and RealOptions speak about the safety and effectiveness of progesterone for APR.[100]

308.    The national Planned Parenthood organization and its members speak about APR and allege that it is "dangerous," "unethical," and "inaccurate."[101]

309.    The national Planned Parenthood organization and its members

[97] Ex. SS, *Annual Report 2022–2023, surpa* note 95, at 4, 8.

[98] *Our Mission & Vision*, Heartbeat International, https://www.heartbeat international.org/about/our-passion. A true and accurate copy is attached as Exhibit TT.

[99] *Mission*, Planned Parenthood Federation of America, https://perma.cc/MT96-N5K3. A true and accurate copy is attached as Exhibit UU.

[100] *Abortion Pill Rescue Network*, Heartbeat Int'l, https://www.heartbeatinternational.org/our-work/apr. A true and accurate copy is attached as Exhibit VV. *Abortion Pill Reversal*, RealOptions Obria Medical Clinics, https://www.realoptions.net/abortion-pill-reversal/. A true and accurate copy is attached as Exhibit WW.

[101] *The Myth of Abortion "Reversal"*, Planned Parenthood Federation of America, Aug. 30, 2021, https://perma.cc/SDZ3-EXFP.

speak about the safety and effectiveness of chemical abortion.[102]

310. Planned Parenthood says chemical abortion is "really safe and effective."[103]

311. The statement that chemical abortion is "really safe and effective" is false and misleading.

312. In fact, mifepristone has known, serious risks.

313. Mifepristone's FDA-approved label contains a black box warning that "serious and sometimes fatal infections or bleeding" can occur."[104]

314. The label also cites evidence that roughly 1 in 25 women who take mifepristone end up in the emergency room.[105]

315. Because of mifepristone's serious risks, the FDA requires special safeguards known as REMS for its use.[106]

316. Planned Parenthood does not mention the black-box warning or REMS requirements when advertising chemical abortion.

317. Planned Parenthood states on its website that "[m]edication

---

[102] *How Safe is the Abortion Pill?*, Planned Parenthood Federation of America, https://perma.cc/PWW2-Q4AY. A true and accurate copy is attached as Exhibit XX. *Overview of the Abortion Pill (In-Clinic)*, Planned Parenthood Pasadena & San Gabriel Valley, https://www.plannedparenthood.org/planned-parenthood-pasadena-san-gabriel-valley/getcare/abortionservices/abortion-pill-in-clinic. A true and accurate copy is attached as Exhibit YY.
[103] Ex. XX, Planned Parenthood, *How Safe is the Abortion Pill?*, *supra* note 102, at 2.
[104] Ex. T, FDA, *Mifeprex (mifepristone) label*, supra note 24, at 2.
[105] *Id.* at 8, table 2.
[106] *Id.* at 2.

abortion is very safe. In fact, it's safer than many other medicines like penicillin, Tylenol, and Viagra."[107]

318.  The Attorney General begins his Complaint against Heartbeat International and RealOptions by declaring his pro-abortion stance and repeating Planned Parenthood's claim that mifepristone is safer than Tylenol. Ex. C, Bonta Compl. ¶ 1.

319.  The claim that mifepristone is safer than Tylenol is false and misleading.

320.  Mifepristone is not safer than Tylenol.

321.  No scientific evidence supports the conclusion that mifepristone is safer than Tylenol.

322.  The Attorney General cites two news articles to support his claim that mifepristone and misoprostol have "been proven to be incredibly safe— safer than ... even some over-the-counter drugs like Tylenol." Bonta Compl. ¶ 1.

323.  He first cites an article published by CNN that does not mention Tylenol.[108]

324.  He then cites an article published by the New York Times, which says, "*Abortion providers often say* that [mifepristone and misoprostol] are

---

[107] Ex. XX, Planned Parenthood, *How safe is the abortion pill?*, *supra* note 102, at 1.

[108] Annette Choi & Way Mullery, *How Safe Is the Abortion Pill Compared With Other Drugs?*, CNN (June 13, 2024), https://perma.cc/T7WA-9QAZ.

safer than many common drugs, such as Tylenol and Viagra. Drug safety experts do not typically compare drugs in this way, and they instead assess the safety of a given medication against other choices."[109]

325.  Planned Parenthood does not cite any sources to support its claim that mifepristone is safer than Tylenol.[110]

326.  In a separate blog post,[111] Planned Parenthood links to a two-page issue brief called "Analysis of Medication Abortion Risk and the FDA report 'Mifepristone US Post-Marketing Adverse Events Summary Through 12/31/2022" by Advancing New Standards in Reproductive Health.[112]

327.  With respect to Tylenol, that issue brief says only that "[a]cetaminophen (Tylenol) overdose is the most common cause of acute liver failure in the US and accounts for over 600 deaths annually."[113]

328.  The research article the issue brief cites does not support that proposition. The article does not mention liver failure, and it found 602

---

[109] Amy Schoenfeld Walker et al., *Are Abortion Pills Safe? Here's the Evidence*, N. Y. Times (updated March 25, 2024), https://perma.cc/CFT9-GU2P (emphasis added).

[110] Ex. XX, Planned Parenthood, *How safe is the abortion pill?*, *supra* note 102.

[111] Planned Parenthood, *What You Need to Know About the Latest Attack on Abortion Care: The Mifepristone Abortion Pill* (Feb. 17, 2023), https://perma.cc/93Q4-QKW5.

[112] *Analysis of Medication Abortion Risk and the FDA Report "Mifepristone US Post-Marketing Adverse Events Summary Through 12/31/2022"* at 3, Advancing New Standards in Reproductive Health (May 2024), https://perma.cc/MAX9-23QW.

[113] *Id.* at 3.

59

reported deaths related to acetaminophen over *two* years.[114]

329. But even if it were true that Tylenol overdose was "the most common cause of acute liver failure in the US" and accounted for "over 600 deaths annually," that does not mean that mifepristone is safer than Tylenol.

330. The FDA estimates that by the end of 2022, 5.9 million women in the United States had used mifepristone for an abortion, and there were 32 reported deaths associated with mifepristone.[115]

331. Per the Guttmacher Institute, in 2023 about 642,700 women took mifepristone for an abortion.[116]

332. In comparison, over 60 million Americans take acetaminophen on a weekly basis.[117]

333. And deaths caused by acetaminophen are generally caused by overdoses, not recommended doses.

334. Unlike mifepristone, Tylenol is an over-the-counter drug that does not have a black-box label or an FDA-required REMS protocol.

335. Acetaminophen does not send anywhere close to one in twenty-five

---

[114] Jae Min et al., *Reported Adverse Events with Painkillers: Data Mining of the US Food and Drug Adm*inistration Adverse Events Reporting System, 41 Drug Safety 313, 313, 315 tbl.1 (2017), doi.org/10.1007/s40264-017-0611-5.

[115] *Mifepristone U.S. Post-Marketing Adverse Events Summary Through 12/31/2022*, U.S. Food & Drug Admin., at 1, tbl.1, https://perma.cc/YZ9G-E9VK.

[116] Rachel K. Jones & Amy Friedrich-Karnik, *supra* note 32.

[117] Suneil Agrawal & Babak Khazaeni, *Acetaminophen Toxicity*, StatPearls (June 9, 2023), https://perma.cc/F423-5KSX.

users to the emergency room.

336.  Planned Parenthood charges for its services, including for abortion drugs.[118]

337.  Pregnancy centers offer their services, including APR services and referrals, for free.[119]

338.  The Attorney General staunchly supports Planned Parenthood and regularly attends Planned Parenthood's sponsored events.[120]

339.  The Attorney General frequently repeats Planned Parenthood's claim that mifepristone is "exceedingly safe and effective."[121]

340.  The Attorney General targets pro-life groups for prosecution

---

[118] *How much does the abortion pill cost?*, Planned Parenthood Federation of America, https://perma.cc/XS4J-LHVU. A true and accurate copy is attached as Exhibit ZZ.

[119] Complaint ¶¶ 8, 6, *Heartbeat Int'l Inc. v. James*, No. E2024007242 (N.Y. Sup. Ct., Monroe Cnty, Apr. 30, 2024) 3 ("Heartbeat Compl.") A true and accurate copy is attached as Exhibit AAA. Declaration of RealOptions CEO Valerie Hill ¶ 8, *People v. Heartbeat Int'l, Inc.*, No. 23CV044940 (Cal. Super. Ct., Alameda Cnty., Feb. 6, 2024). A true and accurate copy is attached as Exhibit BBB.

[120] Rob Bonta (@robbonta), Instagram (Sept. 1, 2023), https://perma.cc/5LNH-GBKF; Att'y Gen. Rob Bonta (@AGRobBonta), X (May 18, 2024, 5:13 PM), https://perma.cc/6EM8-Q7N4; Rob Bonta (@RobBonta), X (May 24, 2024, 9:08 PM), https://perma.cc/83TR-9YAX.

[121] *Press Release: Attorney General Bonta Backs Federal Fight to Defend Medication Abortion Acce*ss, State of California Department of Justice Office of the Attorney General (May 1, 2023), https://perma.cc/YCD4-RCR6; *see also* Letter from state attorneys general to Danielle Gray and Sam Khichi at 2–3 (Feb. 16, 2023), https://oag.ca.gov/system/files/attachments/press-docs/2-16-23%20Multistate%20Pharmacy%20Letter.pdf. A true and accurate copy is attached as Exhibit CCC; *Press Release: Attorney General Bonta Sues Anti-Abortion Group*; @agrobbonta, Instagram (June 13, 2024), https://perma.cc/F8HT-UCAW.

because they do not support or provide abortions or abortion referrals.[122]

341. The Attorney General knows pregnancy centers are predominantly faith-based.

342. The Attorney General re-tweeted an article claiming that pregnancy centers attempt to "convert [women] to evangelical Christianity."[123]

343. The Attorney General has sued pregnancy centers under the Business Fraud Statutes, but not Planned Parenthood or its affiliates.

344. The Attorney General recognizes the primary difference between Planned Parenthood affiliates and pro-life pregnancy centers is that Planned Parenthood affiliates advocate for and provide abortions,[124] whereas pregnancy centers "do not provide abortion or abortion referral" in accord with their religious beliefs.[125]

345. The Attorney General has not filed an enforcement action against Planned Parenthood or its affiliates under the Business Fraud Statutes.

---

[122] Ex. OO, *Press Release: Attorney General Bonta Sues Anti-Abortion Group*, *supra* note 65; Ex. PP, California Department of Justice, *Attorney General Bonta Announces Legal Action to Protect Reproductive Freedom and Transparency*, *supra* note 71.

[123] Rob Bonta (@RobBonta), X (Oct. 18, 2022, 3:07 PM), https://perma.cc/698A-E2MQ, (linking to Carrie N. Baker & Jenifer McKenna, *Anti-Abortion 'Crisis Pregnancy Centers' Face New Accountability Post-Roe*, Ms. Magazine (Oct. 18, 2022), https://perma.cc/38N4-2GGF).

[124] *Abortion*, Planned Parenthood Federation of America Inc., https://perma.cc/MGR6-FA4V. A true and accurate copy is attached as Exhibit DDD.

[125] Ex MM, *Consumer Alert*, *supra* note 59, at 1.

346. On information and belief, the Attorney General has not filed an enforcement action against Planned Parenthood or its affiliates under the Business Fraud Statutes, despite its false claims regarding mifepristone's safety vis-à-vis Tylenol, because he agrees with Planned Parenthood's pro-abortion views.

347. On information and belief, the Attorney General has filed an enforcement action against pro-life organizations under the Business Fraud Statutes, despite their true statements about APR, because he disagrees with their pro-life views.

348. All of the Attorney General's actions described above that occurred while he has been California's attorney general were taken under color of the laws of the State of California.

349. The Attorney General's actions have chilled the religious speech and exercise of the parties he has sued and Plaintiffs here.

350. The Attorney General's application of the Business Fraud Statutes as described herein violates the First and Fourteenth Amendments and causes irreparable harm to Plaintiffs.

351. The Attorney General's enforcement of the Business Fraud Statutes against speech about progesterone treatment violates the First and Fourteenth Amendments and causes irreparable harm to Plaintiffs, including chilling of their protected speech.

352. Plaintiffs have no adequate or speedy remedy at law to correct the Attorney General's deprivation of their rights.

353. The Attorney General's actions and policies set forth above do not serve any rational, legitimate, or compelling state interest and are not narrowly tailored to serve any such interests.

354. Because of the Attorney General's actions, Plaintiffs have suffered and continue to suffer irreparable harm, and are entitled to equitable relief, including a preliminary injunction.

355. Plaintiffs are entitled to injunctive and declaratory relief, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

## FIRST CAUSE OF ACTION

*Violation of Plaintiffs' First Amendment Right to Freedom of Speech: Content-Based Discrimination, Viewpoint-Based Discrimination, Unbridled Discretion, and Overbreadth*

356. Plaintiffs repeat and reallege each allegation in paragraphs 1-355 of this complaint.

357. Plaintiffs engage in speech to further their mission to support and provide for those facing unplanned pregnancies, to save the lives of unborn children from abortion, and to ensure women are fully informed and empowered to choose life.

358. NIFLA and its members associate for the purpose of furthering their expressive missions.

359. Motivated by their mission and their religious faith, Plaintiffs wish to engage in speech and advertising about progesterone treatment.

360. This speech is protected by the First Amendment.

361.  The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' statements about progesterone treatment has caused Plaintiffs, including SCV which does not offer APR services, to take down the statements about APR on their public sites and to refrain from making statements about APR despite a firm belief in their truth and accuracy and despite a desire to do so.

362.  If not for the Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' statements about progesterone treatment, Plaintiffs would immediately re-publish their statements about progesterone treatment.

363.  The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' statements about progesterone treatment—including the same or similar statements that Plaintiffs want to make—chills, deters, and restricts Plaintiffs' speech.

### *Unlawful Content- and Viewpoint-Based Discrimination*

364.  The First Amendment to the U.S. Constitution protects Plaintiffs' right to speak and be free from content-based discrimination.

365.  Laws that target speech based on its communicative content are presumptively unconstitutional.

366.  The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' statements about progesterone treatment is content-based because he punishes speech about topics and with perspectives that he dislikes and thus labels misleading,

while leaving unregulated speech that he supports.

367.  Government action that seeks to punish Plaintiffs' truthful statements about progesterone treatment violates the First Amendment.

368.  As religious nonprofit entities, Plaintiffs' speech about progesterone treatment services is not commercial speech.

369.  Even if Plaintiffs' speech about progesterone treatment qualifies as commercial speech, it is still constitutionally protected.

370.  The Attorney General's actions against pro-life pregnancy centers cannot survive strict or intermediate scrutiny.

371.  While certain traditional types of content-based speech restrictions, such as fraud claims, may not offend the First Amendment when the elements of fraud are present, the Attorney General's attempt to enforce these laws against pro-life pregnancy-support organizations lacks several of the guardrails for traditional fraud claims that allow them to comport with the First Amendment.

372.  The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy-support organizations without showing any fraud-based injury.

373.  The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy-support organizations without pleading facts that show any consumer relationship.

374.  The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy-support organizations without showing any

connection to an economic motive.

375.  The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy-support organizations without showing that the organizations obtained any money or property through deception.

376.  The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy-support organizations without showing knowledge of falsity or intent to deceive.

377.  The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy-support organization without showing materiality to any specific recipient of the allegedly false statements.

378.  The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy-support organizations without showing reliance on any allegedly false statement by any specific recipient.

379.  The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy-support organizations without showing any harm caused by the allegedly false or misleading statements.

380.  The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy-support organizations without showing any actual deception.

381.  The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy-support organizations without clear and convincing proof.

382.  The Attorney General enforces the Business Fraud Statutes

67

against pro-life pregnancy-support organizations without pleading fraud with particularity.

383.   Because the Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations lacks any of these critical guardrails for fraud claims, he claims the power to punish any speech that he thinks is misleading, even speech by non-commercial, nonprofit speakers.

384.   This is unlawful content-based discrimination that violates the First Amendment.

*Unlawful Viewpoint-Based Selective Enforcement*

385.   The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy-support organizations' statements about progesterone treatment in a viewpoint discriminatory manner.

386.   The Attorney General will not prosecute or threaten to prosecute under the Business Fraud Statutes statements opining that progesterone treatment is not safe and effective, but he is prosecuting statements opining that progesterone treatment is safe and effective.

387.   The Attorney General's public statements expressing his personal support for abortion and his opposition to pro-life pregnancy centers show that he is proceeding against pro-life organizations because of their expressed viewpoint concerning progesterone treatment and because of his animus against pro-life organizations and their views.

388. Plaintiffs' statements about progesterone treatment are not commercial speech.

389. Even if Plaintiffs' statements about progesterone treatment were commercial speech, it is still constitutionally protected.

390. To avoid prosecution and punishment, pro-life pregnancy-support organizations like Plaintiffs must refrain, and are refraining, from communicating that progesterone treatment is safe and effective, while others may communicate that it is not.

391. Meanwhile, despite scientific evidence showing that progesterone treatment is safe, Planned Parenthood publicly condemns progesterone treatment as being dangerous without prosecution.

392. This singling out, punishing, suppressing, and deterring certain speech solely based on its viewpoint that progesterone treatment is safe and effective is unlawful viewpoint-based discrimination.

393. If Plaintiffs continue to make their desired statements about progesterone treatment, they will face prosecution and other penalties for violation of the Business Fraud Statutes.

394. This threat chills Plaintiffs' constitutionally protected speech.

*Unbridled Discretion*

395. The First Amendment's Free Speech Clause prohibits the government from regulating expression based on standards that give officials unbridled discretion to arbitrarily allow some expression and prohibit other expression.

396.   In his enforcement of the Business Fraud Statutes, the Attorney General has demonstrated his unbridled discretion to arbitrarily allow some viewpoints while restricting others.

397.   The Business Fraud Statutes lack objective standards for enforcement, empowering the Attorney General to target and suppress any speech that expresses a viewpoint with which he disagrees, such as that progesterone treatment is safe and effective.

398.   The Statutes allow the Attorney General to exercise arbitrary enforcement power to suppress views with which he disagrees and decides is misleading.

399.   To enforce the Statutes, the attorney general must assess facts and exercise judgment; this invites decisions based on the content of the speech and the viewpoint of the speaker and raises a danger of censorship.

400.   For example, Cal. Bus. & Prof. Code § 17200 *et seq.* does not define "unfair," "deceptive," "misleading," "business," "fraudulent business act," or other key terms used in the statute.

401.   Section 17200 *et seq.* does not define what evidence is sufficient to establish an unlawful practice.

402.   Cal. Bus. & Prof. Code § 17500 *et seq.* does not define what constitutes "indirect" intent, "anything of any nature," "misleading," "should be known," or other terms used in the statute.

403.   § 17200 *et seq.* and § 17500 *et seq.* give the attorney general complete discretion to determine what evidence is satisfactory to institute an

action alleging a violation of the statutes.

404. The Attorney General has utilized this unbridled discretion to censor constitutionally protected speech.

405. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' speech about progesterone treatment has caused Plaintiffs harm by censoring their speech, burdening the exercise of their religion, and hindering their missions.

406. With so few restraints on the Attorney General's authority, California's Business Fraud Statutes grant him extraordinary power and unbridled discretion to suppress disfavored messages and are unconstitutional as applied to Plaintiffs' statements about progesterone treatment.

*Overbroad Prior Restraint on Speech*

407. The First Amendment prohibits governments from imposing overbroad prior restraints on speech.

408. Plaintiffs' speech about the safety and efficacy of progesterone treatment is noncommercial.

409. Plaintiffs SCV and NIFLA's California members do not charge for their services, including prescribing and referring for progesterone treatment.

410. The purpose of Plaintiffs' statements about progesterone treatment is to educate the public and women in particular about the availability of progesterone treatment and the potential that women may be

able to save their unborn child after taking mifepristone.

411. Plaintiffs' speech about progesterone treatment is not false or misleading.

412. But the Attorney General has invoked the Business Fraud Statutes against pro-life pregnancy-support organizations' statements about progesterone treatment to penalize, punish, and chill truthful, noncommercial speech.

413. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support centers' statements about progesterone treatment is overbroad because it reaches a substantial amount of impermissible applications in relation to the Statutes' plainly legitimate sweep.

414. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-resource centers' statements about progesterone treatment chills a person of ordinary firmness from continuing to engage in a constitutionally protected activity and has indeed caused Plaintiffs to self-censor their speech about progesterone treatment.

### *Constitutional Scrutiny*

415. Content-based and viewpoint-based restrictions on speech must survive strict scrutiny.

416. The Attorney General's application of the Business Fraud Statutes to pro-life pregnancy-support organizations' speech about progesterone treatment cannot survive even intermediate scrutiny.

417. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' statements about progesterone treatment—and the corresponding censorship of Plaintiffs' speech about progesterone treatment—do not serve any legitimate, rational, substantial, or compelling interest.

418. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' statements about progesterone treatment—and the corresponding censorship of Plaintiffs' speech about progesterone treatment—does not serve any legitimate, substantial, or compelling interest in a narrowly tailored way.

419. The Attorney General has alternative, less restrictive means to achieve any legitimate interests he might seek to advance.

420. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' statements about progesterone treatment burdens substantially more speech than necessary to further any interest in protecting consumers from deception by commercial speakers.

421. As the Attorney General's personal and official statements and actions attest, he is acting with a motive to suppress Plaintiffs' constitutionally protected speech and views.

422. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' statements about progesterone treatment has caused Plaintiffs harm by censoring their speech, burdening

the exercise of their religion, and hindering their missions.

423.  Accordingly, as applied to Plaintiffs' statements about progesterone treatment, the Business Fraud Statutes violate Plaintiffs' right to speak as protected by the First and Fourteenth Amendments of the United States Constitution.

## SECOND CAUSE OF ACTION

*Violation of Plaintiffs' First Amendment Right to Free Exercise of Religion*

424.  Plaintiffs repeat and reallege each allegation in paragraphs 1-355 of this complaint.

425.  Plaintiffs' pro-life statements and beliefs in support of progesterone treatment are sincere and rooted in their Christian faith.

426.  Plaintiffs sincerely believe that human life begins at conception.

427.  Plaintiffs sincerely believe that it is their religious duty to inform women and pregnancy centers of options that may save an unborn human life, including the option of using supplemental progesterone for APR to potentially counteract the effects of mifepristone.

428.  The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' speech about progesterone treatment forces Plaintiffs to an untenable choice: (1) adhere to their religious beliefs, publish their religiously motivated and required statements about progesterone treatment, and be penalized; or (2) violate their religious beliefs and refrain from publishing their religiously motivated and required statements.

74

429. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' speech about progesterone treatment burdens Plaintiffs' right to free exercise of religion by preventing them from expressing these religiously motived and required messages.

430. Unless government action is neutral and generally applicable, the Free Exercise Clause forbids government action that burdens religion— whether masked or overt—without satisfying strict scrutiny.

431. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy support organizations' speech about progesterone treatment is not neutral to religion or generally applicable for several reasons and fails strict scrutiny.

432. The Attorney General has shown direct targeting and hostility toward the Plaintiffs' faith-based, pro-life mission and their speech in support of that mission through both his public statements about them and his enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' speech about progesterone treatment under a consumer-protection theory divorced from any consumer relationship.

433. The Attorney General interprets and applies the Business Fraud Statutes to create a system of individualized assessments that empowers him to censor religiously motivated and required speech he dislikes while allowing secular speech that he favors.

434. The Attorney General has crafted an enforcement theory against

religious speech by a group of organizations that are predominantly, if not exclusively, faith-based organizations.

435. The Attorney General's hostility to religious organizations that provide free services to vulnerable women is irrational.

436. The Attorney General's interpretation of the Business Fraud Statutes that allows him to sue against speech he deems false without showing other elements of fraud amounts to a system of individualized assessments.

437. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations while leaving similarly situated entities like Planned Parenthood untouched is not neutral.

438. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' speech about progesterone treatment is thus not neutral.

439. The Attorney General lacks a legitimate or compelling state interest to justify targeting pro-life pregnancy-support organizations for their statements about progesterone treatment.

440. The Attorney General demonstrates that he lacks a compelling state interest because he has not censored misleading public statements about chemical abortion by Planned Parenthood.

441. Conversely, the Attorney General's actions and threat of sanctions place a substantial burden and pressure on Plaintiffs to remove their religiously motivated and required statements about APR.

442. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' speech about progesterone treatment has caused Plaintiffs harm by burdening the exercise of their religion and hindering their religiously motivated missions and religiously required speech.

443. Absent the Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' speech about progesterone treatment, Plaintiffs would immediately speak and publish their religiously motivated and required messages about progesterone treatment.

444. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' speech about progesterone treatment is not justified by any legitimate, rational, substantial, or compelling interest.

445. The Attorney General has alternative, less restrictive means to achieve any legitimate interests he might seek to advance.

446. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment also violates Plaintiffs' free exercise rights under the hybrid rights doctrine because it implicates free exercise rights in conjunction with other constitutional protections like the right to free speech.

447. The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy-support organizations' speech about

progesterone treatment violates the Free Exercise Clause of the First Amendment.

## THIRD CAUSE OF ACTION

*Violation of Plaintiffs' Fourteenth Amendment Right to Due Process:*

*Vagueness*

448. Plaintiffs repeat and reallege each allegation in paragraphs 1–355 of this complaint.

449. The Fourteenth Amendment to the U.S. Constitution prohibits the government from forbidding or requiring an act in terms so vague that people must guess at their meaning and can differ as to their application.

450. Laws that punish or otherwise interfere with free speech require greater definiteness than those in other contexts.

451. The government may not regulate speech based on policies that permit arbitrary, discriminatory, or overzealous enforcement.

452. The government may not regulate speech based on laws that do not provide persons of common intelligence with fair warning as to what speech is permitted and what speech is prohibited.

453. The Business Fraud Statutes, as applied to Plaintiffs' speech about progesterone treatment, are unconstitutionally vague.

454. The Business Fraud Statutes impermissibly delegate to the Attorney General basic policy matters for resolution on an ad hoc and subjective basis.

455. Due to the Statutes' vagueness, the Attorney General is

arbitrarily and discriminatorily enforcing them against faith-based, pro-life organizations' protected speech and religious exercise.

456. Cal. Bus. & Prof. Code § 17200 *et seq.* fails to give persons of ordinary intelligence fair notice of what constitutes a "business," an "unfair or fraudulent business act or practice" or an "unfair, deceptive, untrue or misleading advertising" in the context of non-commercial speech about abortion pill reversal.

457. Cal. Bus. & Prof. Code § 17200 *et seq.* does not define "business," "unfair," "fraudulent," "business act or practice," "deceptive," "untrue," "misleading," or "advertising."

458. Cal. Bus. & Prof. Code § 17200 *et seq.* leaves the determination of what constitutes an "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising" entirely to the enforcer's discretion.

459. A reasonable person must guess as to whether Plaintiffs' non-commercial speech violates Cal. Bus. & Prof. Code § 17200.

460. Plaintiffs believe their truthful, non-commercial speech about free APR services is not unfair, fraudulent, deceptive, untrue, misleading, advertising, or a business act or practice under the statute, but the Attorney General disagrees.

461. Cal. Bus. & Prof. Code § 17500 *et seq.* fails to give persons of ordinary intelligence fair notice of what it means to intend "directly or *indirectly*" to "dispose of real or personal property or to perform services,

79

professional or otherwise, or *anything of any nature whatsoever*." (emphases added).

462.  Cal. Bus. & Prof. Code § 17500 *et seq.* also fails to give persons of ordinary intelligence fair notice of what it takes for a statement to be "untrue or misleading" and through what "reasonable care" that condition "should be known."

463.  Cal. Bus. & Prof. Code § 17500 *et seq.* does not define these vague terms and so leaves persons of ordinary intelligence to guess as to what speech it prohibits.

464.  The Business Fraud Statutes' failure to define ambiguous terms also allows the Attorney General to resolve on an ad hoc and subjective basis what constitutes unlawful conduct under the Statutes.

465.  This vagueness invites arbitrary and discriminatory enforcement by giving the attorney general complete discretion when pursuing an investigation and enforcement proceeding.

466.  Construing these statutory terms to apply to Plaintiffs' speech about APR violates the vagueness doctrine.

467.  The Attorney General's enforcement of the Business Fraud Statutes against pro-life organizations' speech about APR, even though multiple scientific studies support that speech, shows that the Statutes do not provide persons of ordinary intelligence with fair warning as to what speech is permitted or prohibited.

468.  The Attorney General's enforcement of the Business Fraud

Statutes against pro-life organizations' speech about APR, because the Attorney General believes the studies that support that speech are not sufficiently reliable, shows that the Statutes do not provide persons of ordinary intelligence with fair warning as to what speech is prohibited.

469. An ordinary, reasonable person could only guess as to what studies the Attorney General would deem sufficiently reliable.

470. The Attorney General's enforcement of the Business Fraud Statutes without showing traditional fraud elements shows that the Statutes give the Attorney General discretion to punish whatever speech *he* decides is fraudulent, untrue, or misleading.

471. The Business Fraud Statutes also fail to describe what proof and relevant facts are sufficient to pursue an investigation and enforcement proceedings.

472. Courts have interpreted the Business Fraud Statutes to apply only to commercial speech, that is, factual representations made to promote commercial transactions, not expressions of opinion on scientific matters.

473. Plaintiffs' statements about APR are not commercial speech, yet the Attorney General has used the vague language of the Statutes to prosecute pro-life organizations for the same speech Plaintiffs want to make.

474. Because of the Business Fraud Statutes' vagueness, a reasonable person would have to guess as to whether their speech violates the Statutes.

475. This vagueness invites arbitrary and discriminatory enforcement.

476. The Business Fraud Statutes are so imprecise that discriminatory

enforcement is not only a possibility but also a reality.

477. The Attorney General's enforcement of the Business Fraud Statutes against pro-life organizations' speech about APR, and his refusal to prosecute Planned Parenthood's demonstrably false and misleading statements about chemical abortion, shows that the Statutes invite arbitrary and discriminatory enforcement.

478. Plaintiffs have censored their constitutionally protected speech to avoid prosecution by the Attorney General.

479. The Attorney General's enforcement of the Business Fraud Statutes against pro-life organizations' speech about progesterone treatment is not justified by any legitimate, rational, substantial, or compelling interest.

480. The Attorney General has alternative, less restrictive means to achieve any legitimate interests he might seek to advance.

## PRAYER FOR RELIEF

481. Plaintiffs respectfully pray for judgment against Defendant and request the following relief:

a. A preliminary and permanent injunction barring the Attorney General, his successors, agents, officials, servants, and employees, and any other persons acting on his behalf from enforcing Cal. Bus. & Prof. Code § 17200 and Cal. Bus. & Prof. Code § 17500 against Plaintiffs and NIFLA's members for speaking about the use of progesterone for abortion pill reversal with statements identical, nearly identical, or substantially similar to those

described in this lawsuit;

b. A declaration that Cal. Bus. & Prof. Code § 17200 and Cal. Bus. & Prof. Code § 17500 are unconstitutional under the First and Fourteenth Amendments as applied to restrict Plaintiffs and NIFLA's members' speech about progesterone for abortion pill reversal;

c. Plaintiffs' reasonable attorney's fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

d. All other further relief to which Plaintiffs may be entitled.

## DEMAND FOR JURY TRIAL

In accordance with Local Rule 38-1, Plaintiffs hereby respectfully request a jury trial.

Dated: October 2, 2024

J. Caleb Dalton*
cdalton@adflegal.org
Erik C. Baptist*
ebaptist@adflegal.org
Allison H. Pope*
apope@adflegal.org
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, Virginia 20176
T: (571) 707-4655
F: (571) 707-4656

Respectfully submitted,

*/s/ Sean Gates*

Sean Gates, SBN 186247
sgates@charislex.com
CHARIS LEX P.C.
155 N. Lake Ave., Suite 800
Pasadena, CA 91101
T: (626) 508-1715
F: (626) 508-1730

Lincoln Davis Wilson*
lwilson@adflegal.org
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
T: (202) 393-8690
F: (202) 347-3622

*Attorneys for Plaintiffs*

*Application for Admission Pro Hac Vice forthcoming*

## VERIFICATION OF COMPLAINT

I, Thomas Glessner, a citizen of the United States and a resident of Virginia, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein related to NIFLA and its members, and they are true and correct.

Executed this 1st day of ~~September~~ OCTOBER, 2024, at ____FREDERICKSBURG____, Virginia.

Thomas Glessner, J.D.
President
NIFLA

## VERIFICATION OF COMPLAINT

I, Angela Bennett. a citizen of the United States and a resident of California, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein related to SCV Pregnancy Center and they are true and correct.

Executed this 1st day of ~~September,~~ October 2024, at Valencia, CA, California.

Angela Bennett
President/CEO
SCV Pregnancy Center

86