Sean Gates, SBN 186247
sgates@charislex.com
CHARIS LEX P.C.
155 N. Lake Ave., Suite 800
Pasadena, CA 91101
T: (626) 508-1715 | F: (626)508-1730

J. Caleb Dalton (*pro hac vice*)
cdalton@adflegal.org
Erik C. Baptist (*pro hac vice*)
ebaptist@adflegal.org
Allison H. Pope (*pro hac vice*)
apope@adflegal.org
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, Virginia 20176
T: (571) 707-4655 | F: (571) 707-4656

Lincoln Davis Wilson (*pro hac vice*)
lwilson@adflegal.org
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
T: (202) 393-8690 | F: (202) 347-3622

*Attorneys for Plaintiffs*

*\*Application for admission pro hac vice pending*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| **NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES** et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>**ROB BONTA**, in his official capacity as Attorney General of the State of California,<br><br>*Defendant.* | Case No. 2:24-cv-08468-HDV-MARx<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: November 7, 2024<br>Hearing Time: 10:00 a.m.<br><br>Judge: Hernán D. Vera<br>Courtroom: 5B |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 3

    A.    Scientific research supports abortion pill reversal. ..................................... 3

    B.    Pregnancy centers promote and provide APR for free ............................... 5

    C.    The Attorney General invokes the UCL and FAL to suppress pregnancy centers' speech .......................................................................................... 6

    D.    Plaintiffs sue to stop the threat of unconstitutional enforcement............. 8

ARGUMENT ...................................................................................................................... 8

I.    Plaintiffs will likely prevail on the merits........................................................... 9

    A.    Applying the UCL and FAL to pregnancy centers' APR speech violates the First Amendment........................................................................ 9

        1.    The UCL and FAL are content-based speech restrictions applied in a viewpoint-discriminatory way ....................................... 9

        2.    Strict scrutiny applies......................................................................... 10

            a.    The pregnancy centers' APR statements are not false or misleading. ................................................................ 10

            b.    The pregnancy centers' APR statements are not commercial speech, but even if they were, the Attorney General's actions would violate the Free Speech Clause. ......................................... 12

        3.    The Attorney General is censoring speech without the constitutionally-required guardrails for fraud actions..................... 13

        4.    The Attorney General's actions fail heightened scrutiny ........................ 14

    B.    The Attorney General is selectively enforcing the UCL and FAL against pro-life pregnancy centers................................................................. 17

II.    The other preliminary injunction factors favor Plaintiffs. ................................. 20

CONCLUSION ................................................................................................................. 21

CERTIFICATE OF SERVICE ......................................................................................... 23

i

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart Inc. v. Rhode Island*,
    517 U.S. 484 (1996) ................................................................................ 15

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ................................................................. 8

*American Academy of Pain Management v. Joseph*,
    353 F.3d 1099 (9th Cir. 2004) ............................................................... 12

*Ariix, LLC v. NutriSearch Corp.*,
    985 F.3d 1107 (9th Cir. 2021) ............................................................... 12

*Ashcroft v. ACLU*,
    535 U.S. 564 (2002) .................................................................................. 9

*Baird v. Bonta*,
    81 F.4th 1044 (9th Cir. 2023) ........................................................... 20, 21

*Bigelow v. Virginia*,
    421 U.S. 809 (1975) ................................................................................ 21

*Buckman Co. v. Plaintiffs' Legal Committee*,
    531 U.S. 341 (2001) ................................................................................ 11

*Central Hudson Gas and Electric Corp. v. Public Service Commission of New York*,
    447 U.S. 557 (1980) ............................................................. 10, 12, 13, 15, 21

*City of Austin v. Reagan National Advertising of Austin, LLC*,
    596 U.S. 61 (2022) .................................................................................... 9

*Cuviello v. City of Vallejo*,
    944 F.3d 816 (9th Cir. 2019) ................................................................. 20

*Dobbs v. Jackson Women's Health Organization*,
    597 U.S. 215 (2022) ................................................................................ 11

*Donaldson v. Read Magazine*,
    333 U.S. 178 (1948) ................................................................................ 13

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ................................................................................ 15

ii

*Elrod v. Burns*,
    427 U.S. 347 (1976) ............................................................................... 20

*FilmOn.com Inc. v. DoubleVerify Inc.*,
    439 P.3d 1156 (Cal. 2019) ...................................................................... 6

*First National Bank of Boston v. Belotti*,
    435 U.S. 765 (1978) ............................................................................... 19

*First Resorts v. Herrera*,
    860 F.3d 1263 (9th Cir. 2017) ............................................................... 12

*Frederick Douglass Foundation, Inc. v. District of Columbia*,
    82 F.4th 1122 (D.C. Cir. 2023) .............................................................. 17

*Glovatorium, Inc. v. NCR Corp.*,
    684 F.2d 658 (9th Cir. 1982) ................................................................. 14

*Hoye v. City of Oakland*,
    653 F.3d 835 (9th Cir. 2011) ........................................................... 14, 17

*Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*,
    538 U.S. 600 (2003) ........................................................................ 14, 16

*Italian Colors Restraunt v. Becerra*,
    878 F.3d 1165 (9th Cir. 2018) ............................................................... 16

*Junior Sports Magazine Inc. v. Bonta*,
    80 F.4th 1109 (9th Cir. 2023) .......................................................... 12, 20

*Kasky v. Nike, Inc.*,
    45 P.3d 243 (Cal. 2002) .......................................................................... 6

*National Institute for Family and Life Advocates v. James*,
    No. 24-CV-514 (JLS), 2024 WL 3904870 (W.D.N.Y. Aug. 22, 2024) ............... 3

*National Institute of Family and Life Advocates v. Becerra*,
    585 U.S. 755 (2018) ........................................................................... 9, 16

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ............................................................................... 16

*Planned Parenthood Arizona, Inc. v. Humble*,
    753 F.3d 905 (9th Cir. 2014) ....................................................... 11, 15, 16

*Porzecanski v. Azar*,
    943 F.3d 472 (D.C. Cir. 2019) ............................................................ 11

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)................................................................. 9, 10, 13

*Rezec v. Sony Pictures Entertainment, Inc.*,
    10 Cal. Rptr. 3d 333 (Ct. App. 2004) ..................................................... 6

*Rosenbaum v. City and County of San Francisco*,
    484 F.3d 1142 (9th Cir. 2007) ............................................................. 17

*Rosenberger v. Rector and Visitors of University of Virginia*,
    515 U.S. 819 (1995).......................................................................... 9, 19

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011)............................................................................ 14

*Thimes Solutions, Inc. v. TP Link USA Corp.*,
    2024 WL 1328194 (9th Cir. 2024) ......................................................... 6

*Thompson v. West States Medical Center*,
    535 U.S. 357 (2002)............................................................................ 15

*United States v. Alvarez*,
    567 U.S. 709 (2012).............................................................. 13, 14, 16

*United States v. Caronia*,
    703 F.3d 149 (2d Cir. 2012)................................................ 11, 13, 15, 16

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976).............................................................. 12, 13, 21

*Waln v. Dysart School District*,
    54 F.4th 1152 (9th Cir. 2022) ............................................................. 17

*Wayte v. United States*,
    470 U.S. 598 (1985)............................................................................ 17

*Wendell v. GlaxoSmithKline LLC*,
    858 F.3d 1227 (9th Cir. 2017) ............................................................. 18

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)................................................................................. 8

iv

1

**Statutes**

2

Cal. Bus. & Prof. Code § 651 ..................................................................................... 15

3

Cal. Bus. & Prof. Code § 17200, *et seq.*
    (California's Unfair Competition Law (UCL)) ........................................................... 1

4

5

Cal. Bus. & Prof. Code § 17500, *et seq.*
    (False Advertising Law (FAL)) ............................................................................. 1, 6

6

7

Cal. Health and Safety Code §§ 1200–1796.70
    (Licensing Provisions) ............................................................................................ 15

8

9

Cal. Health & Safety Code §§ 109875–111929.4
    (Sherman Food, Drug and Cosmetic Laws) ............................................................ 15

10

11

Cal. Health & Safety Code §§ 11000–11651
    (Uniform Controlled Substances Act) ..................................................................... 15

12

Cal. Health & Safety Code §§ 24170–24179.5
    (Human Experimentation) ....................................................................................... 15

13

**Rules**

14

15

Fed. R. Civ. P. 9(b) ................................................................................................... 16

16

**Regulations**

17

88 Fed. Reg. 50158 (Aug. 1, 2023) .............................................................................. 4

18

**Other Authorities**

19

G. Orwell, Nineteen Eighty-Four (1949) ................................................................... 16

20

21

22

23

24

25

26

27

**INTRODUCTION**

Plaintiffs, National Institute of Family and Life Advocates ("NIFLA"), an association of pregnancy centers, including 136 in California, and SCV Pregnancy Center seek to provide the public with truthful, scientifically backed information about the efficacy and safety of taking supplemental progesterone to reverse the effects of the abortion drug mifepristone, commonly called Abortion Pill Reversal ("APR"). Seeking to censor nonprofit organizations from talking about this potentially life-saving care and as part of a "ruthless, coordinated siege" against pro-life organizations and viewpoints, the California Attorney General has sued another association of pregnancy centers and an operator of five California pregnancy centers, alleging that their truthful, scientifically backed statements regarding APR, which are the same as NIFLA and SCV Pregnancy Center seek to make, violate California's Unfair Competition Law (UCL) and False Advertising Law (FAL) (Cal. Bus. & Prof. Code §§ 17200, *et seq.* and 17500, *et seq.*). The Attorney General's actions and history of hostility toward pro-life organizations have chilled Plaintiffs' speech about how supplemental progesterone can limit and counteract the lethal effects of the chemical abortion drug mifepristone. Plaintiffs, therefore, ask the Court to preliminarily enjoin the Attorney General from enforcing the UCL and FAL against their speech regarding the efficacy and safety of taking supplemental progesterone to counteract the effects of mifepristone.

Pregnancy centers serve expecting mothers by providing ultrasounds, counseling, parenting classes, and material support like diapers, car seats, and baby clothes. Motivated by their faith to preserve unborn life and support families, these nonprofit organizations offer their services for free. For some pregnancy centers, these services also include free medical consultations with a licensed medical professional for pregnant mothers seeking to save the life of their unborn child after taking the abortion drug mifepristone. In appropriate cases, a medical professional may prescribe supplemental progesterone to women in those circumstances who wish to attempt to save their unborn child.

In a typical chemical abortion, a pregnant woman takes mifepristone, a drug that blocks

progesterone receptors and prevents nutrition from reaching her unborn child. If a woman

changes her mind and wants to continue her pregnancy, however, studies show that taking

supplemental progesterone within 72 hours can inhibit mifepristone's effects. According to

Heartbeat International, the operator of an APR hotline, the protocol has likely saved over 5,000

babies' lives.[1]

This includes children who are alive today because NIFLA member pregnancy centers

in California, in concert with Heartbeat International, told the public and women in particular

about the option of APR. Verified Complaint ("Compl.") ¶¶ 169-208; ECF 1-1 (Foley Decl.);

ECF 1-2 (Exendine Decl.).

But as part of his plan with Planned Parenthood to conduct a "ruthless, coordinated

siege" against pro-life advocates, the Attorney General has invoked California's UCL and FAL

to sue and silence Heartbeat International and other pro-life nonprofit organizations because, in

his view, their speech about APR is untrue and misleading, despite studies that affirm that APR

is safe and effective, children are alive today because of it, and pregnancy centers receive no

economic benefit from it.

The Attorney General's enforcement theory threatens the faith-based nonprofit

organizations here. NIFLA is an association of pregnancy centers ("the Centers") that

encourages its members to offer and speak about APR and provides resources to help them do

so. Many of the Centers, including Plaintiff SCV Pregnancy Center, have publicly spoken about

APR and promoted Heartbeat International's hotline to spread the word about this option. Some

Centers, including Alternatives Pregnancy Center, also prescribe APR. NIFLA and the Centers

wish to keep making statements about APR that the Attorney General has sued others over.

NIFLA and the Centers have chilled their speech in response to the Attorney General's actions.

When New York's Attorney General attempted a similar action to censor APR speech, a

federal district court enjoined that censorship. The court held that "[t]he First Amendment

---

[1] Abortion Pill Rescue Network, *2023 Impact Report*. Attached as Exhibit A.

2

protects Plaintiffs' right to speak freely about APR protocol and, more specifically, to say that it is safe and effective for a pregnant woman to use in consultation with her doctor." *National Inst. for Fam. & Life Advocs. v. James*, No. 24-CV-514 (JLS), 2024 WL 3904870, at *10 (W.D.N.Y. Aug. 22, 2024).[2]

This case is no different. The Court should grant a preliminary injunction for two reasons. *First*, the Attorney General's application of the UCL and FAL to the Centers' statements about APR prohibits speech based on its content and viewpoint and thus cannot satisfy heightened scrutiny. *Second*, the Attorney General is selectively enforcing the Statutes against pro-life organizations while promoting the misleading speech of pro-abortion groups. The Court should enjoin the Attorney General from enforcing the UCL and FAL to the Centers' statements about APR against NIFLA and the Centers for their speech about APR.

## FACTUAL BACKGROUND

### A. Scientific research supports abortion pill reversal.

In a typical chemical abortion, a woman takes two drugs. Decl. of Susan Bane, M.D., Ph.D. ¶ 13, attached as Exhibit B. She first takes mifepristone, which binds to and blocks receptors for progesterone, a natural hormone necessary for a healthy pregnancy. *Id.* Then 24 to 48 hours later, she takes misoprostol, which induces contractions to expel the unborn child. *Id.* But if a woman changes her mind shortly after taking mifepristone and before taking misoprostol, she may take supplemental progesterone to compete with the mifepristone, reverse its effects, and possibly save her baby. *Id.* ¶ 24. This process is supported by a biochemical principle called "reversible competitive inhibition." *Id.* ¶¶ 29–31.

Multiple scientific studies show progesterone can counter the effects of mifepristone. Ex. B ¶¶ 59–69. In 1989, researchers investigated progesterone's role in pregnancy in rats, known for their physiological similarity to humans. ECF No. 1-23, Yamabe; Bane Decl. ¶ 59. The study found that four days after receiving mifepristone, 100% of the rats that received

---

[2] Notice of appeal docketed. *NIFLA v. James*, 24-2481 (2nd Cir. Sept. 18, 2024).

supplemental progesterone were still pregnant, but only 33.3% of the rats that did not receive progesterone remained pregnant. *Id.* A 2023 study found 81% of fetuses survived in rats given progesterone after mifepristone, but none survived in rats given mifepristone without progesterone. ECF No. 1-27, Camilleri & Sammut. The researchers concluded this was evidence of a clear progesterone-mediated reversal of an initiated mifepristone-induced termination. *Id.*

A 2018 observational case study of pregnant women found a similar effectiveness result. Of 547 women who received progesterone within 72 hours after taking mifepristone, nearly half maintained their pregnancies through birth. ECF No. 1-25, Delgado (2018) at 24–25. When progesterone was administered intramuscularly or orally, unborn children survived at rates of 64% and 68%, respectively. *Id.* at 26. By comparison, if mifepristone alone is taken, the survival rate is only about 25%. Bane Decl. ¶ 64; *see also* ECF No. 1-19, Davenport (2017).

Studies also show that APR is safe. Bane Decl. ¶ 37. Progesterone is a naturally occurring hormone, and a woman's progesterone levels naturally rise during pregnancy. *Id.* ¶ 27. Since 1978, the U.S. Food and Drug Administration has approved supplemental progesterone in multiple forms.[3] ECF Nos. 1-11, -12, -13; FDA Approval Letters. And for decades doctors have safely prescribed it for various uses, including to support in vitro fertilization (IVF) pregnancies and to prevent miscarriages and preterm births. Bane Decl. ¶ 37; ECF No. 1-10, Di Renzo at 9; ECF No. 1-6, Kolatorova. A 2023 systematic review of 16 studies found "no increased maternal or fetal risk from using bioidentical progesterone in early pregnancy." ECF No. 1-28, DeBeasi at 1. The FDA classifies oral progesterone as a "Category B" drug for pregnant women, meaning animal studies have not found evidence it poses any risk to the fetus. Bane Decl. ¶ 38. The 2018 observational case series also found no increased risk of birth defects after supplemental progesterone. ECF No. 1-25, Delgado (2018) at 26. And the

---

[3] Determination that Progesterone Injection, USP, 50 Milligrams/Milliliter Was Not Withdrawn from Sale for Reasons of Safety or Effectiveness, 88 Fed. Reg. 50158, 50159 (Aug. 1, 2023) (intramuscular injection approved in 1978).

rate of preterm delivery for women taking supplemental progesterone was only 2.7%, much lower than the 10% rate in the general population. *Id.*

The United Kingdom's public health authority recommends progesterone treatment for women with early pregnancy bleeding and previous miscarriage. ECF No. 1-15, NICE Guideline NG126. In 2021, it specifically noted "there was no evidence of harms for women or babies" from progesterone, including "no increase in risk of ... congenital abnormalities or adverse drug reactions." ECF No. 1-16, NICE Guideline Evidence Review (Nov. 2021) at 16.

### B.    Pregnancy centers promote and provide APR for free.

Pregnancy centers provide services, resources, and community to families facing unexpected pregnancies. Compl. ¶¶ 68–70. In 2022 alone, pregnancy centers provided over 500,000 free ultrasounds, 3.5 million packs of diapers, and 43,000 car seats.[4] *Id.* ¶ 71. NIFLA is a Christian nonprofit association of pregnancy centers that provides legal counsel, training, and support to its member centers. *Id.* ¶ 30. SCV Pregnancy Center and Alternatives Pregnancy Center are two of NIFLA's pro-life, faith-based, nonprofit members in California. *Id.* ¶¶ 28–29.

Based on the evidence supporting APR, NIFLA and many of its members—including SCV and Alternatives—have promoted the use of supplemental progesterone as a safe and effective way to reverse the effects of mifepristone. *Id.* ¶¶ 179–248. Although SCV does not offer APR itself, it has spread the word about this life-saving option on its website and social media. *Id.* ¶¶ 232, 239, 241. Alternatives provides APR, among other women's healthcare services, and lists its services online. *Id.* ¶¶ 197, 201–02.

Motivated by their faith rather than profit, NIFLA's members provide all their services for free. *Id.* ¶ 38. They receive no economic benefit from informing women about APR. *Id.*

---

[4] *Pregnancy Centers Offer Hope for a New Generation*, Charlotte Lozier Institute (2022), https://perma.cc/WJJ2-45K3.

**C.      The Attorney General invokes the UCL and FAL to suppress pregnancy centers' speech.**

Last year, the Attorney General sued pro-life nonprofit organizations for their speech about APR. Invoking California's UCL and FAL, he filed an enforcement action against Heartbeat International, an association of pregnancy centers and the operator of an APR hotline and informational website, and RealOptions, which operates five pregnancy centers. Compl., *People v. Heartbeat Int'l*, No. 23CV044940, ¶¶ 9–11 (Cal. Super. Ct., Alameda Cnty, Sept. 21, 2023), ECF No. 1-3 ("Bonta Compl."). Despite the evidence that strongly supports APR's safety and effectiveness, the Attorney General claimed their statements—that APR can "reverse" the effects of the first abortion drug, is "effective," "has been shown to increase the chances of allowing the pregnancy to continue," has a 64 to 68% success rate, and does not increase the risk of birth defects—are "untrue and misleading." *Id.* ¶¶ 97, 100.

The Attorney General's lawsuit stretches the UCL and FAL beyond their limits. California Business and Professional Code Section 17200 prohibits "unfair competition," defined as "any unlawful, unfair or fraudulent business act or practice," "unfair, deceptive, untrue or misleading advertising," and "any act prohibited by ... Section 17500." Section 17500 in turn prohibits making "any statement" that the speaker knows or should know is "untrue or misleading" with intent "to dispose of real or personal property or to perform services ... or anything of any nature whatsoever." To state a claim under either law, one must show that "members of the public are likely to be deceived." *Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002) (citation omitted).

Although worded broadly, California courts have construed the UCL and FAL more narrowly to apply only to commercial speech. *Thimes Sols., Inc. v. TP Link USA Corp.*, 2024 WL 1328194 (9th Cir. 2024) (unpublished); *Rezec v. Sony Pictures Ent., Inc.*, 10 Cal. Rptr. 3d 333, 337 (Ct. App. 2004), *overruled in part on other grounds by FilmOn.com Inc. v. DoubleVerify Inc.*, 439 P.3d 1156 (Cal. 2019). Pro-life organizations' informational speech about APR does not fit that bill. Like NIFLA and the Centers, Heartbeat and RealOptions are

Christian nonprofits[5] that provide their life-affirming services to clients for free. Compl. ¶ 174; ECF No. 1-53, Heartbeat Compl. ¶¶ 8, 63; ECF No. 1-54, Decl. of RealOptions CEO Valerie Hill ¶ 8.

The Attorney General's manipulation of the UCL and FAL is consistent with his history of hostility against pro-life pregnancy centers. When announcing his lawsuit, the Attorney General stated that it was "horrifying" that "right now there are more crisis pregnancy centers in California than abortion care clinics." ECF 1-42, lodged at ECF No. 2, 9:17–9:25. This hostility is nothing new. Two years ago, he issued a consumer alert "WARNING" Californians that pregnancy centers "seek to discourage people facing unintended pregnancies from ... abortion...." ECF No.1-39 at 1. He asserted the centers "do not provide comprehensive reproductive healthcare" because they "do not provide abortion or abortion referral." *Id.* (emphasis removed). A few months later at a Planned Parenthood event, he revealed he believed it was "time" for a "ruthless, coordinated siege" on the pro-life movement. ECF No. 1-38.

Those plans became a reality when he filed suit against Heartbeat and RealOptions. In an accompanying press release, the Attorney General accused these charities of "predatory" behavior, asserting they "lure[d]" in and "took advantage of" pregnant women (even though they provide their services for free). ECF 1-41, at 2. He argued that pregnancy centers were not "*real* reproductive healthcare facilities" because they do not provide abortions. ECF 1-42, lodged at ECF No. 2, 10:15–10:22. At bottom, the Attorney General opposes pregnancy centers because he believes they "attempt to discourage people facing unintended pregnancies from ... abortion." ECF No. 1-40, at 1.

After suing Hearbeat and RealOptions, the Attorney General quickly spearheaded an open letter signed by 15 other state attorneys general decrying the proliferation of "anti-abortion crisis pregnancy centers." ECF No.1-43, at 1. The letter accused pregnancy centers of using "deceptive tactics to lure in patients" and praised Yelp's discrimination against these

---

[5] *Welcome to Heartbeat!*, Heartbeat International, https://perma.cc/7DNM-TQHJ.

organizations. *Id.* at 4, 9. The Attorney General pledged to use his consumer-protection

authority to "take numerous actions aiming to mitigate [pregnancy centers'] harmful effects."

*Id.* at 8.  Despite all this, the Attorney General has never identified anyone allegedly misled or

harmed by pro-life pregnancy organizations' speech about APR.

### D.   Plaintiffs sue to stop the threat of unconstitutional enforcement.

Based on the Attorney General's conduct and statements, NIFLA and SCV fear they will

be targeted next. They therefore brough this suit to protect their right to free speech. NIFLA and

many of the Centers have made statements about APR like those targeted by the Attorney

General, and they want to continue to do so. Compl. ¶¶ 179–248. SCV, for example, has used

the term "Abortion Pill Reversal," ECF No. 1-32, encouraged women to access Heartbeat

International's hotline, ECF No. 1-33, and stated that APR is an "effective process," ECF No. 1-

34. NIFLA encouraged its members to make these statements and to offer APR. Compl. ¶ 31.

But the Attorney General's lawsuit and hostility caused SCV to delete its published APR

statements and NIFLA to stop encouraging its California members to advertise for and offer it.

*Id.* ¶¶ 179–248. Plaintiffs seek a preliminary injunction to stop the Attorney General's

censorship.

## ARGUMENT

Plaintiffs seeking a preliminary injunction must show that they will likely succeed on the

merits, they will likely suffer irreparable harm without preliminary relief, the balance of equities

tips in their favor, and an injunction is in the public interest. *Winter v. Nat. Res. Def. Council,*

*Inc.*, 555 U.S. 7, 20 (2008). A strong showing of one factor may offset a weak showing of

another. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). All factors

favor enjoining the Attorney General from enforcing the UCL and FAL against NIFLA and the

Centers' APR speech.

**I.     Plaintiffs will likely prevail on the merits.**

      **A.     Applying the UCL and FAL to pregnancy centers' APR speech violates the First Amendment.**

      The First Amendment "prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018). This "means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quotation omitted). By applying the UCL and FAL to censor pro-life speech about APR, the Attorney General is doing just that.

            **1.     The UCL and FAL are content-based speech restrictions applied in a viewpoint-discriminatory way.**

      Under the First Amendment, laws that "target speech based on its communicative content" are "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A speech restriction is content-based if it "discriminate[s] based on 'the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73–74 (2022) (quoting *Reed*, 576 U.S. at 171)). One "blatant" and "egregious" form of content discrimination is viewpoint discrimination. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Viewpoint discrimination occurs when the government regulates speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Id.* The Constitution forbids the government from targeting "particular views taken by speakers on a subject." *Id.*

      As applied to the statements supporting APR, the statutes discriminate based on content and viewpoint. Plaintiffs express, based on the available data, that APR is a safe and effective option for women who wish to counteract the effects of a chemical abortion. Compl. ¶¶ 179–248. If they stated the opposite viewpoint, the Attorney General presumably would not take legal action against them. But because he disagrees with their viewpoint on APR, NIFLA, and the Centers risk prosecution for their speech. *Rosenberger*, 515 U.S. at 829; *see* Bonta Compl. ¶ 97(a), (c).

1

### 2.    Strict scrutiny applies.

2         Content-based speech restrictions "can stand only if they survive strict scrutiny, which

3   requires the Government to prove that the restriction furthers a compelling interest and is

4   narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (cleaned up). Strict scrutiny

5   governs here because the pregnancy centers' statements are accurate and noncommercial. *Cf.*

6   *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980)

7   (intermediate scrutiny applies to commercial speech).

8                    ### a.    The pregnancy centers' APR statements are not false or

9                                            misleading.

10        APR has a sound basis in theory, scientific research, and clinical practice. Mifepristone

11  is a "progesterone receptor antagonist" that acts by blocking the binding sites of progesterone.

12  Bane Decl. ¶¶ 28–31. Introducing more progesterone to compete with the mifepristone for

13  receptors helps limit its effects. *Id.* ¶ 31. In research, animal studies have shown "a clear

14  progesterone-mediated reversal of an initiated mifepristone-induced termination." ECF No. 1-

15  27, Camilleri & Sammut; ECF No. 1-23, Yamabe. And observational studies of pregnant

16  women have found the same. ECF No. 1-25, Delgado (2018). In practice, supplemental

17  progesterone has been used during pregnancy for over 50 years, and in APR for over a decade

18  without evidence that it harms pregnant women or babies. Bane Decl. ¶ 37; ECF No. 1-16,

19  NICE Guideline; ECF No. 1-28, DeBeasi. And pregnancy centers have witnessed firsthand APR

20  success stories. Compl. ¶ 144. The children of Atoria Foley and Desirae Exendine are almost

21  certainly alive today because they heard about APR from pregnancy centers. ECF Nos. 1-1, -2.

22        Describing APR as "abortion pill reversal" is accurate, not misleading. Mifepristone

23  inhibits progesterone through "reversible" competitive inhibition. Bane Decl. ¶ 29. And the

24  scientific literature uses the term "reversal" to describe supplemental progesterone's effects.

25  ECF Nos. 11-25, -27; Delgado (2018), Camilleri & Sammut. A reasonable person hearing the

26  term "abortion pill reversal" understands that the treatment seeks to "reverse" the effects of the

27  "abortion pill." Women who regret taking abortion drugs and search for information on how to

1  save their babies use and understand this terminology.[6] ECF No. 1-1, Foley Decl. ¶ 9; ECF No.

2  1-2, Exendine Decl. ¶ 10.

3  　　　　Naloxone, a drug designed to stop an ongoing opioid overdose, provides a useful

4  comparator. As the U.S. Centers for Disease Control and the California Department of Health

5  Care Services explain, "Naloxone is a life-saving medication that can reverse an overdose from

6  opioids ... when given in time." Compl. ¶¶ 152–54. Like mifepristone, naloxone is a receptor

7  antagonist which blocks the effects of a competing chemical. *Id.* ¶ 155. Thus, even the CDC and

8  California's Department of Health Care Services use the term "reverse" to describe a drug that

9  competes with another for receptors to halt an ongoing biological process that can lead to death.

10  　　　　That APR is an off-label use of progesterone does not change the analysis. In the leading

11  decision on this issue, *United States v. Caronia*, the Second Circuit rejected the government's

12  attempt to punish truthful speech about off-label use of a medication. 703 F.3d 149, 152 (2d Cir.

13  2012). Critical to the court's ruling was that the FDA generally permits off-label uses of

14  approved medications, and "courts and the FDA have recognized the propriety and potential

15  public value" of this common practice. *Id.* at 153 (quoting *Buckman Co. v. Pls.' Legal Comm.*,

16  531 U.S. 341, 350 (2001)). Off-label use may even be a medically recognized standard of care.

17  *Id.* Ultimately, it is the physician's role to evaluate all information and decide appropriate

18  treatment for a particular patient. *Id.* at 167; *see also Planned Parenthood Az., Inc. v. Humble*,

19  753 F.3d 905, 908–09, 915 (9th Cir. 2014), *abrogated on other grounds by Dobbs v. Jackson*

20  *Women's Health Org.*, 597 U.S. 215 (2022); Bane Decl. ¶ 81. Where circumstances make

21  "clinical trials virtually impossible," physicians may recommend drugs off label based on even

22  thin records that "show[] promising results." *Porzecanski v. Azar*, 943 F.3d 472, 476 (D.C. Cir.

23  2019). The scientific record here, in contrast, shows that progesterone for APR works.

24

25

---

26  [6] *E.g.*, *Ashley's Abortion Pill Reversal Story*, Heartbeat Int'l (2023), https://perma.cc/LT87-3JH4 ("Ashley went on
   the internet and searched, 'Is there any way to reverse an abortion?'"); *Sara's Story*, Heartbeat Int'l (Sept. 22, 2023),
27  https://vimeo.com/867342614 (Sara "started googling if there was [sic] ways to reverse the process").

The First Amendment protects truthful speech about lawful activities. *See Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1113 (9th Cir. 2023). That includes well-supported speech about the off-label use of progesterone for APR.

> **b.    The pregnancy centers' APR statements are not commercial speech, but even if they were, the Attorney General's actions would violate the Free Speech Clause.**

Commercial speech, at its core, "does no more than propose a commercial transaction" and is "related solely to the economic interests of the speaker and its audience." *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (quoting *Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 752 (1976); *Cent. Hudson*, 447 U.S. at 561. The "crux" when determining whether speech is commercial is whether "economic benefit was the primary purpose for speaking." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021).

NIFLA and the Centers are non-profits that offer information about APR to save lives; they do not propose a commercial transaction or speak out of an economic motive. Compl. ¶¶ 34–37. Neither NIFLA nor SCV even offer APR, and they do not receive any money for sharing information about it. *Id*. Even the Centers that do offer APR do not charge women for that service and are motivated by a desire to save lives. *Id*. NIFLA and the Centers speak about APR to help women and save lives, not to make money. *Id.* ¶¶ 227–230. So their APR statements propose no commercial transaction and are not commercial speech.

*First Resort v. Herrera*, 860 F.3d 1263, 1273 (9th Cir. 2017) does not apply. In that case, the court found a non-profit's client advertising to be commercial when it offered bonuses to staff for client recruiting—thus creating an economic incentive to potentially engage in deceptive practices. *Id.* Not so here. To the extent *First Resort* is read to apply to speech that does not propose a commercial transaction, as here, it is wrongly decided. *Cf. Cent. Hudson*, 447 U.S. at 562 (commercial speech is that which "propos[es] a commercial transaction.").

12

1    Regardless, the First Amendment "protects [even] commercial speech from unwarranted

2    government regulation." *Id.* at 561. The Supreme Court allows the government more leeway to

3    police it for two reasons, neither of which apply here. *Id.* at 563, 564 n.6. *First*, "the truth of

4    commercial speech ... may be more easily verifiable by its disseminator" because "ordinarily the

5    advertiser seeks to disseminate information about a specific product or service that he himself

6    provides and presumably knows more about than anyone else." *Va. State Bd. of Pharm.*, 425

7    U.S. at 772 n.24. This reasoning does not support restricting the speech of NIFLA and Centers

8    like SCV that do not provide APR themselves and only speak about it. *Second*, commercial

9    speech is "more durable" than other speech because "advertising is the sine qua non of

10   commercial profits" and "there is little likelihood of its being chilled by proper regulation and

11   foregone entirely." *Va. State Bd. of Pharm.*, 425 U.S. at 772 n.24. But NIFLA and the Centers

12   do not profit from APR, and their speech has been chilled.

13       Besides, as *Caronia* illustrates, even commercial speech about off-label use receives

14   First Amendment protection if it is not false. 703 F.3d at 166; *Cent. Hudson*, 447 U.S. at 566

15   (outlining test for commercial speech). The First Amendment permits nonprofits like NIFLA

16   and the Centers to speak truthfully about this service that they do not charge for and that

17   healthcare professionals provide using their best medical judgment.

18       **3.    The Attorney General is censoring speech without the**

19       **constitutionally-required guardrails for fraud actions.**

20       The First Amendment does not allow the Attorney General to silence what he considers

21   "false and misleading" speech without showing that anyone has been harmed by those

22   statements. As noted, content-based speech regulations are presumptively unconstitutional.

23   *Reed*, 576 U.S. at 163. That presumption is subject to carveouts for "the few 'historic and

24   traditional categories [of expression] long familiar to the bar.'" *United States v. Alvarez*, 567

25   U.S. 709, 717 (2012) (plurality op.) (quotation omitted). And those carveouts include fraud.

26   *Donaldson v. Read Mag.*, 333 U.S. 178, 190 (1948). But his enforcement theory lacks crucial

27   elements of that historical claim.

13

1    Traditional fraud claims share common elements that revolve around harm to a victim.

2    In California, "fraud is established when a misrepresentation is knowingly made with the intent

3    to induce reliance, and justifiable reliance results, causing plaintiff damage." *Glovatorium, Inc.*

4    *v. NCR Corp.*, 684 F.2d 658, 660 (9th Cir. 1982). In a "properly tailored" fraud action, "the

5    State bears the full burden of proof" and a "[f]alse statement alone" does not establish liability.

6    *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 620 (2003). Rather, the

7    First Amendment requires "exacting proof requirements"—such as knowledge of falsity,

8    materiality, intent to mislead, and success in doing so—to "provide sufficient breathing room

9    for protected speech." *Id.*

10    The government may punish false statements "made to effect a fraud or secure moneys

11    or other valuable consideration ... without affronting the First Amendment," but the Attorney

12    General's theory is "not so limited in reach." *Alvarez*, 567 U.S. at 723 (plurality op.). He alleges

13    false statements but does not identify any person misled or harmed, let alone harmed

14    financially, by those statements. Bonta Compl. ¶¶ 97, 100. Nor does he identify any material

15    benefit to the pro-life organizations from their APR speech. His use of the UCL and FAL to

16    censor life-saving informational speech violates the First Amendment.

17    **4.    The Attorney General's actions fail heightened scrutiny.**

18    "In the ordinary case, it is all but dispositive to conclude that a law is content-based and,

19    in practice, viewpoint discriminatory." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571 (2011).

20    "The First Amendment requires heightened scrutiny whenever the government creates a

21    regulation of speech because of disagreement with the message it conveys." *Id.* at 566 (internal

22    quotation marks omitted). To survive strict scrutiny, the Attorney General must show that

23    enforcing the UCL and FAL against NIFLA and the Centers is the least restrictive method to

24    serve a compelling state interest. *Hoye v. City of Oakland*, 653 F.3d 835, 853 (9th Cir. 2011).

25    But even under intermediate scrutiny, "the outcome is the same." *Sorrell*, 564 U.S. at

26    571. To meet that standard, the Attorney General would have to show that his enforcement

27    advances a "substantial" state interest, that "the harms [he] recites are real," and that the

14

restriction "will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 767, 770–71 (1993). His actions must also be "narrowly drawn," that is, "not more extensive than ... necessary to serve that interest." *Cent. Hudson*, 447 U.S. at 565–66. The Attorney General cannot meet even this burden.

*First*, applying the UCL and FAL to speech about APR by the pregnancy centers does not materially advance the Attorney General's asserted purpose. His lawsuit advocates not for protecting consumers from economic injury but for preventing potential medical harm. Bonta Compl. ¶¶ 6–7. But APR is safe and effective, Bane Declaration ¶ 40, and the Attorney General has not identified anyone who has been harmed by pregnancy centers' speech about it. So attacking the pregnancy centers for this speech does not protect women's health. *See Planned Parenthood Az.*, 753 F.3d at 914–15. Prescribing progesterone for APR is lawful, so "prohibiting the truthful promotion of [this] off-label drug usage" does not "directly further the government's goal[]" of protecting public health. *Caronia*, 703 F.3d at 166; *see also 44 Liquormart Inc. v. Rhode Island*, 517 U.S. 484, 509–10 (1996) (plurality op.) (prohibiting speech about a lawful product was not justified by the state's purported "temperance" interests).

*Second*, the Attorney General's application of the UCL and FAL is not "narrowly drawn" to advance an interest in women's health. *Cent. Hudson*, 447 U.S. at 565. "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). California has other laws specifically directed to policing medical advertisements and other practices that lead to medical harm. *See, e.g.*, Cal. BPC § 651 (licensed medical professional advertising); Cal. HSC §§ 1200–1796.70 (Licensing Provisions); *id.* §§ 11000–11651 (Uniform Controlled Substances Act); *id.* §§ 24170–24179.5 (Human Experimentation); *id.* §§ 109875–111929.4 (Sherman Food, Drug and Cosmetic Laws). But the Attorney General is using the UCL and FAL to go after nonprofits' informational speech about a lawful activity—presumably because APR is well within the standard of care. Bane Dec. ¶¶ 80–81.

1    Even assuming some regulation of noncommercial speech might be appropriate, a

2    traditional fraud action would provide a narrowly drawn remedy. By including elements of

3    knowledge, loss, reliance, materiality to the victim, and others, often to be pled with

4    particularity, *see* Fed. R. Civ. P. 9(b), traditional fraud claims regulate no more speech than is

5    necessary. *Telemarketing Assocs.*, 538 U.S. at 620–21. By forgoing these restraints, the

6    Attorney General's enforcement of the UCL and FAL against pro-life organizations chills

7    protected speech.

8    This chill is particularly harmful in the medical context, where the Attorney General's

9    "paternalistic[]" suppression of information "interferes with the ability of physicians and

10   patients to receive potentially relevant treatment information." *Caronia*, 703 F.3d at 166. This

11   censorship can "inhibit, to the public's detriment, informed and intelligent treatment decisions."

12   *Id*; *see also Planned Parenthood Az.*, 753 F.3d at 916. There is "no reasonable fit" between his

13   asserted interest in women's health and his regulation of speech based only on his own view of

14   the truth. *It. Colors Rest. v. Becerra*, 878 F.3d 1165, 1178 (9th Cir. 2018).

15   As the Supreme Court declared in vindicating pregnancy centers' First Amendment

16   rights in *National Institute of Family & Life Advocates v. Becerra*, "the best test of truth is the

17   power of the thought to get itself accepted in the competition of the market, and the people lose

18   when the government is the one deciding which ideas should prevail." 585 U.S. at 772

19   (quotation omitted). The Court has "consistently refused to recognize an exception [to First

20   Amendment guarantees] for any test of truth—whether administered by judges, juries, or

21   administrative officials—and especially one that puts the burden of proving truth on the

22   speaker." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964). "Our constitutional tradition

23   stands against the idea that we need Oceania's Ministry of Truth." *Alvarez*, 567 U.S. at 723

24   (plurality op.) (citing G. Orwell, Nineteen Eighty-Four (1949)).

25   Allowing the Attorney General to silence pro-life organizations' pure speech about APR

26   would permit the state to quash speech on "a host of good-faith disagreements" in medicine:

27   from "the ethics of assisted suicide" to "the benefits of medical marijuana." *Becerra*, 585 U.S.

16

1   at 772. The Court should enjoin the Attorney General from misusing his authority under the

2   UCL and FAL to censor nonprofits that seek to serve, not exploit, California's mothers and their

3   babies.

4       **B.      The Attorney General is selectively enforcing the UCL and FAL against pro-**

5           **life pregnancy centers.**

6           The Attorney General is also acting unlawfully by selectively enforcing the UCL and

7   FAL against pro-life pregnancy-support organizations but not abortion clinics. While the

8   Attorney General's "prosecutorial discretion is broad, it is not unfettered." *Wayte v. United*

9   *States*, 470 U.S. 598, 608 (1985) (cleaned up). Just as a law cannot prohibit a certain viewpoint,

10  a government official cannot enforce a facially viewpoint-neutral law in a viewpoint-

11  discriminatory way. *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022); *Hoye*, 653

12  F.3d at 854–56 (content discriminatory enforcement of a facially neutral law is not permissible).

13          Unconstitutional selective enforcement occurs when (1) the plaintiff was "similarly

14  situated in material respects to other individuals against whom the law was not enforced" and

15  (2) the "enforcement infringed on a constitutional right." *Frederick Douglass Found., Inc. v.*

16  *District of Columbia*, 82 F.4th 1122, 1136 (D.C. Cir. 2023); *see also Rosenbaum v. City & Cnty.*

17  *of S. F.*, 484 F.3d 1142, 1152–53 (9th Cir. 2007). Here, the Attorney General is selectively

18  enforcing the UCL and FAL against Christian organizations because of their pro-life views,

19  while leaving similarly situated abortion clinics' misleading statements untouched.

20          The pregnancy-support organizations targeted by the Attorney General, like NIFLA and

21  the Centers, are similarly situated to Planned Parenthood affiliates. They serve the same relevant

22  clientele—women seeking pregnancy-related services. Compl. ¶¶ 299–300; ECF Nos.1-44, -46.

23  And they provide many of the same services, including pregnancy tests, options counseling,

24  STD/STI testing, and educational resources. Compl. ¶¶ 301–02; ECF Nos. 1-44, -46. Heartbeat

25  and NIFLA are similarly situated to the national Planned Parenthood organization, as all

26  provide resources and support to their affiliates to further their respective missions. Compl.

27  ¶¶ 298–311; ECF Nos. 1-46, -47. And they all speak about the safety and effectiveness of the

1    services they promote: Planned Parenthood and its affiliates about abortion drugs and Heartbeat,

2    NIFLA, and their members about APR. Compl. ¶¶ 310, 307; ECF Nos. 1-50, -48.

3            In contrast to the truthful speech regarding progesterone treatment offered by pro-life

4    pregnancy care centers, Planned Parenthood and its affiliates frequently mislead consumers

5    about the safety of abortion drugs. They tout these drugs as "really safe and effective." ECF No.

6    1-50 at 2. Indeed, they repeat the Attorney General's own misleading statement that

7    mifepristone is safer than Tylenol. Compl. ¶ 317. While the Attorney General speculates that

8    progesterone treatments are not effective, the FDA itself acknowledges that mifepristone causes

9    serious adverse events, even when used according to its label. Mifepristone poses well-known

10    serious risks. Bane Decl. ¶ 20. Its label includes a black-box warning—"the strongest possible

11    warning" on a drug label, *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1238 n.7 (9th Cir.

12    2017)—that "serious and sometimes fatal infections or bleeding" may occur. ECF No. 1-20, at

13    1; Bane Decl. ¶ 20. The label also cites evidence that roughly 1 in 25 women who take the drug

14    end up in the emergency room. ECF No.1-20, at 8, table 2. Because of these serious risks, the

15    FDA determined that mifepristone may not be used without special safeguards. *Id.* at 2. Neither

16    Planned Parenthood nor the Attorney General mention these relevant facts each time they

17    proclaim mifepristone's "safety."

18            Further, the Attorney General only prosecutes one viewpoint on APR: that it is safe and

19    effective. Planned Parenthood falsely states that APR is "dangerous" and "unethical," Compl.

20    ¶ 308, yet the Attorney General does not prosecute it because he agrees with Planned

21    Parenthood's viewpoint on the question. The Attorney General is attacking pro-life

22    organizations because of their pro-life views. He targets Heartbeat and RealOptions not because

23    of any supposed lack of scientific basis for APR, but because their efforts frustrate his own

24    mission of "[s]upporting, expanding, and protecting" abortion. ECF Nos. 1-36 at 5, -37 at 3. The

25    Attorney General staunchly supports Planned Parenthood and regularly attends their sponsored

26    events. Compl. ¶ 338. He also repeatedly echoes Planned Parenthood's false claim that

27    mifepristone is "exceedingly safe and effective." *Id.* ¶ 339. Indeed, he begins his Complaint

1    against Heartbeat and RealOptions by declaring this pro-abortion stance and even repeats the

2    debunked claim that mifepristone is safer than Tylenol. Bonta Compl. ¶ 1; *see* Bane Decl. ¶ 23.

3         To be sure, the Attorney General is entitled to his own opinions, speech, and policy

4    positions. But he cannot use the power of his office to suppress views that he opposes. In his

5    own words, the Attorney General's lawsuit targets "anti-abortion" groups, ECF No. 1-43 at 1,

6    because they "do not provide abortion or abortion referral," Compl. ¶ 258. And he issued a

7    "warning" to Californians about pregnancy centers that seek "to discourage people facing

8    unintended pregnancies from ... abortion[.]" ECF No. 1-40 at 1. When government "suppression

9    of speech suggests an attempt to give one side of a debatable public question an advantage in

10   expressing its views to the people, the First Amendment is plainly offended." *First Nat'l Bank*

11   *of Bos. v. Belotti*, 435 U.S. 765, 785–86 (1978).

12        The Attorney General recognizes that the primary difference between Planned

13   Parenthood affiliates and pro-life pregnancy centers is that Planned Parenthood affiliates

14   provide abortions, while pregnancy centers "do not provide abortion or abortion referral," in

15   accord with their Christian beliefs. ECF Nos. 1-40 at 4, -43 at 1; Compl. ¶ 258. If his own pro-

16   abortion stance and pregnancy centers' pro-life views were irrelevant to his motives, he would

17   have no reason to blast Heartbeat as "anti-abortion" in a press release and begin his own lawsuit

18   by proclaiming that abortion drugs are "safe" and "effective." ECF No. 1-41 at 1; Bonta Compl.

19   ¶ 1.

20        Just as the Attorney General cannot justify applying the UCL and FAL to suppress

21   Plaintiffs' speech, *see* Section I.A.4, he cannot justify his selective enforcement against pro-life

22   organizations. That enforcement chills Plaintiffs' religiously motivated and constitutionally

23   protected pro-life speech. *Cf. Rosenburger*, 515 U.S. at 829. The Court should enter an

24   injunction to lift this chill.

25

26

27

## II.    The other preliminary injunction factors favor Plaintiffs.

"[W]hen a party has established likelihood of success on the merits of a constitutional claim ... the remaining *Winter* factors favor enjoining the likely unconstitutional law." *Junior Sports Mags.*, 80 F.4th at 1120.

Plaintiffs are suffering irreparable harm due to the chilling effect of the Attorney General's enforcement of the UCL and FAL against similar pro-life organizations. *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) ("loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *Cuviello v. City of Vallejo*, 944 F.3d 816, 832–33 (9th Cir. 2019). Before the Attorney General sued other pro-life organizations for their statements promoting APR, NIFLA encouraged its California members to provide APR services. Compl. ¶ 213. NIFLA published clinic guidelines on APR, regularly consulted with centers, and provided a sample APR policy. *Id.* But because of the Attorney General's lawsuit, NIFLA no longer urges California Centers to speak about and to offer APR. *Id.*

NIFLA's members are suffering similar speech harms. Many California Centers speak about and offer APR like Heartbeat and RealOptions do. *Id.* ¶ 183. At least one Center planned to promote and offer APR but scrapped those plans because of the Attorney General's lawsuit. *Id.* ¶ 185. SCV Pregnancy Center does not offer APR but would like to do so soon. *Id.* ¶ 247. Over the last three years, SCV has spoken about APR publicly saying that the abortion pill can be "reversed." *Id.* ¶ 241. SCV has now deleted these statements—despite its firm belief that the statements are accurate and its desire to keep making them—out of fear that the Attorney General will prosecute it too. *Id.* ¶ 242. This chilling of "free speech rights ... constitutes irreparable harm." *Cuviello*, 944 F.3d at 833.

"[A] plaintiff who can show that a statute likely violates the Constitution will also usually show 'that both the public interest and the balance of the equities favor a preliminary injunction.'" *Baird v. Bonta*, 81 F.4th 1044 (9th Cir. 2023). Without an injunction, NIFLA and its members are harmed every day that they are chilled from speaking about APR.

Further, it is "always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 1040 (citation omitted). And an injunction would also serve the public's interest "in the fullest possible dissemination of information." *Cent. Hudson*, 447 U.S. at 561–62. An individual's interest in the "free flow" of information—even commercial information—"may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Va. State Bd. of Pharm.*, 425 U.S. at 763. Just as "advertisements stating that referral services for legal abortions are available" are of public interest, so too are pregnancy centers' statements that abortion pill reversal is available. *Id.* at 764 (citing *Bigelow v. Virginia*, 421 U.S. 809, 822 (1975)).

Women who have taken mifepristone and regret it, like Atoria Foley and Desirae Exendine, have a priceless interest in information that could help them save their unborn child's life. The Court should reject the Attorney General's attempt to keep them in the dark about their options.

## CONCLUSION

The Court should issue a preliminary injunction prohibiting the Attorney General from enforcing the UCL and FAL against NIFLA and the Centers for the speech about APR that they have made and would like to make.

Respectfully submitted October 10, 2024.


By:    */s/ Sean P. Gates*

Sean P. Gates, SBN 186247
sgates@charislex.com
CHARIS LEX P.C.
155 N. Lake Ave., Suite 800
Pasadena, CA 91101
T: (626) 508-1715 | F: (626)508-1730

J. Caleb Dalton (*pro hac vice*)
cdalton@adflegal.org
Erik C. Baptist (*pro hac vice*)
ebaptist@adflegal.org
Allison H. Pope (*pro hac vice*)
apope@adflegal.org
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, Virginia 20176
T: (571) 707-4655 | F: (571) 707-4656

Lincoln Davis Wilson (*pro hac vice*)
lwilson@adflegal.org
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
T: (202) 393-8690 | F: (202) 347-3622

*Attorneys for Plaintiffs*

*\*Application for admission pro hac vice pending*

22

**CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2024, I electronically filed Plaintiffs' Memorandum of Law in support of their Motion for Preliminary Injunction with the Clerk of the Court using the CM/ECF system, and will serve on the Defendant along with the Summonses and Complaint.

*/s/ Sean P. Gates*
Sean P. Gates
*Attorney for Plaintiffs*

23