1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                       CENTRAL DISTRICT OF CALIFORNIA

10   NATIONAL INSTITUTE OF                 Case No. 2:24-CV-08468-HDV-(MARx)

11   FAMILY AND LIFE ADVOCATES,

12   et al.,                               **ORDER DENYING PLAINTIFFS'**
                                           **MOTION FOR PRELIMINARY**
13                                         **INJUNCTION [DKT. NO. 19]**

14                      Plaintiffs,

15

16            v.

17

18   ROB BONTA,

19

20                      Defendant.

21

22

23

24

25

26

27

28

                                        1

1

2    **I.    INTRODUCTION**

3        Plaintiffs National Institute of Family and Life Advocates ("NIFLA") and SCV Pregnancy

4    Resource Center ("SCV") (collectively, "Plaintiffs") bring this pre-enforcement challenge seeking

5    injunctive relief against Defendant Rob Bonta as Attorney General of California (the "Attorney

6    General").  Specifically, Plaintiffs contend that the Attorney General's public statements and

7    pending consumer protection lawsuit against third parties involving abortion pill reversal

8    ("APR")—a controversial and unproven practice that attempts to "reverse" a chemical abortion

9    through the administration of high doses of progesterone—chill Plaintiffs' First Amendment right to

10   advertise the practice using language that the Attorney General considers false and misleading.  To

11   that end, Plaintiffs ask this Court to enjoin the California Attorney General from any action that

12   seeks to prohibit their use of various terms and phrases touting APR as safe and effective.

13       For the reasons discussed below, Plaintiffs' motion for a preliminary injunction is denied.  As

14   an initial matter, the Court finds that Plaintiffs' conduct constitutes commercial speech because, at

15   its core, it involves advertisements for medical services for which Plaintiffs maintain an economic

16   incentive despite their nonprofit status.  *See First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1273 (9th

17   Cir. 2017).  Intermediate scrutiny is therefore the appropriate standard.  *Id.*

18       Applying that benchmark here, the Court concludes that Plaintiffs fail to establish a

19   likelihood of success on the merits to justify the extraordinary relief requested.  The principal reason

20   is that the First Amendment does not protect commercial speech that is inherently misleading.  *See*

21   *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980).  What

22   Plaintiffs' motion elides is that APR has been tested in the crucible of litigation by three separate

23   federal courts, and in all three cases the safety and efficacy of APR has been found wanting.  *See*

24   Section IV. A., *infra*.  Indeed, Judge William L. Campbell, Jr. of the Middle District of Tennessee,

25   after an extensive five-day evidentiary hearing involving six medical experts, found that similar

26   statements about APR were "untruthful and/or misleading," *Planned Parenthood of Tennessee and*

27   *North Mississippi, et al. v. Slatery, et al.*, 523 F. Supp. 3d 985, 1003–1004 (M.D. Tenn. 2021).

28

2

1    Simply put, this Court cannot conclude on this preliminary record that Plaintiffs are likely to prevail

2    once these scientific issues are fully tested here.

3         The Court's conclusion is not grounded solely in a retrospective probe of prior litigation.

4    The Court has independently considered the voluminous expert submissions by the parties and

5    concluded that (at least on this record) there is a dearth of credible scientific evidence supporting the

6    APR-related statements upon which Plaintiffs seek injunctive pre-clearance.  To be clear, the Court

7    appreciates that Plaintiffs have strongly held religious beliefs underpinning their efforts to advocate

8    for APR.  But Plaintiffs are not entitled to their own facts.  Here, Plaintiffs' proposed speech runs

9    headlong into scientific consensus.  The Court cannot ignore the science, and on that basis declines

10   to enjoin California's highest law enforcement officer from enforcing a consumer protection statute

11   designed to prohibit false advertising.

12   **II.    BACKGROUND**

13        NIFLA is a Christian non-profit headquartered in Virginia with a membership that includes

14   pro-life pregnancy centers throughout the nation, including 136 such centers in California.

15   Complaint ¶¶ 25–29 [Dkt. No. 1].   NIFLA provides its members with legal resources and counsel,

16   as well as informational materials, education, and training on various pro-life topics including APR.

17   *Id*. ¶¶ 30–31, 209–213.  NIFLA does not on its own provide any direct APR services to the public.

18   NIFLA members do not offer abortions or counseling that presents abortion as an option.  *Id.* ¶ 33.

19        SCV is a pregnancy resource center based in Santa Clarita, California, and a member of

20   NIFLA.  *Id.* ¶¶ 52–53.  SCV provides free family planning services, on-site medical services, and

21   medical treatment with prescriptions.  *Id.* ¶¶ 35–37.  Although some pregnancy centers and members

22   of NIFLA offer APR, SCV does not.  *Id.* ¶¶ 38, 192, 197.

23        Plaintiffs filed the instant action on October 2, 2024.  Plaintiffs seek an injunction barring the

24   Attorney General of California from taking enforcement action against NIFLA members for a series

25   of statements about APR.  Plaintiffs contend that, as a result of the Attorney General's prior

26   statements and enforcement actions, "California NIFLA members have canceled or postponed plans

27   to advertise about APR options, or to offer APR[.]"  Complaint ¶ 42.

28        The primary concern cited by Plaintiffs' Complaint relates to a consumer protection lawsuit

1   filed by the Attorney General on September 21, 2023, against Heartbeat International, a non-profit

2   network of pregnancy resource centers that operates the Abortion Pill Rescue Network,[1] and Real

3   Options, a non-profit that operates five pregnancy resource centers ("State Defendants").

4   Complaint, Ex. C, *People v. Heartbeat Int'l*, No. 23-CV-044940 (Cal. Super. Ct., Alameda C'nty,

5   Sept. 21, 2023) (the "State Case") [Dkt. No. 1-3]; *see also* Complaint ¶¶ 168–170.  In the State Case,

6   the Attorney General asserts claims under Cal. Bus. & Prof. Code Sections 17200 and 17500

7   ("Sections 17200/17500") for alleged false and misleading statements made by these State

8   Defendants involving the safety, efficacy, and impact of APR.  *See* the State Case ¶¶ 96–101.  The

9   State Case remains pending.

10        On October 10, 2024, Plaintiffs filed the instant Motion for Preliminary Injunction

11   ("Motion") [Dkt. No. 19].  Specifically, Plaintiffs seek an injunction barring the Attorney General

12   from using his regulatory powers to challenge Plaintiffs' use of

13       • statements using the terms "abortion pill reversal," "APR," or "reverse" related to the use

14         of supplemental progesterone to counteract the effects of mifepristone in a chemical

15         abortion;

16       • statements referring to the APR hotline or AbortionPillReversal.com;

17       • statements indicating that supplemental progesterone for abortion pill reversal is safe; and

18       • statements indicating that supplemental progesterone for abortion pill reversal is

19         effective.

20   Motion at 2.  On December 17, 2024, the Court held a hearing on the Motion and took the matter

21   under submission [Dkt. No. 44].

22   **III.    LEGAL STANDARD**

23        A preliminary injunction is "an extraordinary remedy that may be awarded only if the

24   plaintiff clearly shows entitlement to such relief."  *Am. Bev. Ass'n v. City and County of San*

---

[1] The Abortion Pill Rescue Network in turn operates the website AbortionPillReversal.com as well as an APR hotline that provides information on and referrals to providers of APR.  Complaint ¶¶ 169, 236. NIFLA advises its members to utilize the website and the hotline.  *Id.* ¶¶ 212, 223.

1    *Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc) (citing *Winter v. Nat. Res. Def. Council, Inc.*,

2    555 U.S. 7, 22 (2008)).  To prevail on a motion for a preliminary injunction, the movant must

3    establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent

4    the preliminary injunction, (3) the balance of equities tips in its favor, and (4) a preliminary

5    injunction is in the public interest.  *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024).  If

6    the party opposing injunctive relief is a government entity, the third and fourth factors merge.

7    *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th

8    Cir. 2023) (en banc) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

9       Preliminary injunctions are denied unless the movant can make a "clear showing of

10    evidence" that supports each of the preliminary injunction factors.  *J.L. Boyd v. Luna,*

11    No. 2:24-cv-05716-SPG-AJR, 2024 WL 4799125, at *2 (C.D. Cal. Oct. 21, 2024) (citing *Winter*,

12    555 U.S. at 22).  Where parties "fundamentally disagree on the facts underlying the case, courts

13    routinely deny requests for preliminary injunctions."  *Id.* (citation omitted).

14   **IV.**    **DISCUSSION**

15       Plaintiffs ask the Court to preliminarily enjoin the Attorney General of California from

16    bringing a *hypothetical* suit against Plaintiffs, *i.e.*, to enjoin the Attorney General from enforcing

17    Sections 17200 and 17500 for statements "about APR that they have made or would like to make"[2]

18    on the grounds that the postulated enforcement would violate Plaintiffs' First Amendment free

19    speech rights.[3]  Motion at 21.  For all the reasons discussed below, the Court disagrees.

20

---

21   [2] This is an as-applied constitutional challenge.  *Kuba v. 1-A Agr. Ass'n,* 387 F.3d 850, 856 (9th Cir.

22    2004) ("An as-applied challenge alleges that the restriction on speech is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to

23    others.").  Plaintiffs seek an injunction to protect them from enforcement resulting from, *inter alia*, statements they have not yet made but would like to make.  To the extent those statements would

24    differ in kind from the statements at issue in the State Case, it is unclear they have standing for such a challenge.  Out of an abundance of caution, the Court will find standing by assuming that this suit

25    is to prevent enforcement for statements already made or indistinguishable future statements.

26   [3] The Attorney General argues in his reply that the Motion is narrowly predicated on the abridgment

27    of Plaintiffs' freedom of speech argument, without implicating the other grounds for relief included in the Complaint (namely, free exercise of religion and due process).  Defendant's Opposition to

28

**A.  Likelihood of Success on the Merits**

The likelihood of success on the merits "is a threshold inquiry and is the most important factor," especially in "cases where a plaintiff seeks a preliminary injunction because of an alleged constitutional violation." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023).  If a movant fails to carry the first factor, the Court need not consider the other factors and may deny on that ground alone. *Babaria v. Blinken*, 87 F.4th 963, 980 (9th Cir. 2023).  In the First Amendment context, the "moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech." *California Chamber of Commerce v. Council for Education and Research on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (citation omitted).  Put simply, the Court must determine first whether Plaintiffs have met their burden of making a colorable claim that their First Amendment rights have been, or are in threat of being, infringed.  If so, the burden shifts to the Attorney General to justify the alleged restriction.  If the Attorney General meets that burden, Plaintiffs fail to make the requisite showing that they are likely to succeed on the merits.

Plaintiffs make two claims in their Motion—one alleging that future enforcement would constitute an unlawful regulation of speech and the second asserting that this future enforcement would constitute viewpoint discrimination.  The Court addresses each in turn.

**1.  Unlawful regulation of speech**

"Congress shall make no law…abridging the freedom of speech."  U.S. Const. amend. I.  Nor shall the States. *Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019) (recognizing incorporation of the First Amendment against the States by way of the Fourteenth Amendment).  First Amendment protections extend—subject to certain exceptions—to all speech, including commercial speech. *Bigelow v. Virginia*, 421 U.S. 809, 819–820 (1975).  However, the

---

Plaintiffs' Motion ("Opposition") at 12, n. 6.  The Attorney General reserved the right to ask for a sur-reply if Plaintiffs turned to these other grounds in their reply. *Id.*  Since Plaintiffs did not, and instead kept the focus on the free speech argument, the Court will put aside the remaining claims in the Complaint for the purposes of this Motion.

degree of protection can vary, and indeed turns on whether the speech is commercial or not. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 64–65 (1983) ("Thus, we have held that the Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression.").

In determining whether speech is commercial, courts must "give effect to a common-sense distinction between commercial speech and other varieties of speech." *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (citation omitted). The inquiry is "fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *Id.* "Where the facts present a close question, strong support that the speech should be characterized as commercial speech is found where (a) the speech is an advertisement, (b) the speech refers to a particular product, and (c) the speaker has an economic motivation." *Id.* (applying the *Bolger* factors from *Bolger*, 463 U.S. at 66–67 (1983)). It is the comprehensive balance of these characteristics that determines the result, and as such none are dispositive. *Id.* Applying the *Bolger* factors here, the Court concludes that the speech at issue is commercial.[4]

As to the first factor, Plaintiffs concede that they intend to advertise but aver that "advertisement" has a broad definition and that only advertisements "in the context of commercial transactions" count as commercial. Plaintiffs' Reply in Support of Plaintiffs' Motion ("Reply") at

---

[4] Plaintiffs concede that, as a matter of state law, Sections 17200/17500 apply *only* to commercial speech. Motion at 6 (citing *Thimes Sols., Inc. v. TP Link USA Corp.*, No. 22-56176, 2024 WL 1328194 (9th Cir. Mar. 28, 2024)). That may be dispositive on the question of whether Plaintiffs' speech is commercial for purposes of a future enforcement action. *See Am. Academy of Pain Management*, 353 F.3d at 1106 (finding that the speech at issue is advertising and thus commercial speech in part because the statute itself "identifies that the object of its regulation is 'advertising.'"). California courts define commercial speech coextensively with federal courts. *Rezec v. Sony Pictures Ent., Inc.*, 116 Cal. App. 4th 135, 140 (2004), *overruled in part on other grounds by FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133 (2019). Therefore, the Attorney General can only (lawfully) enforce Sections 17200/17500 if the speech at issue is commercial. Preliminarily enjoining the Attorney General from enforcing the state's laws against speech that the laws do not apply to is unnecessary at best and violative of federalism at worst, as it would require the Court to assume that State officials will improperly enforce state law in the future. *Cf. Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984), *superseded by statute on other grounds* ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.").

1    4–5 [Dkt. No. 35].  Plaintiffs further argue that their speech cannot be commercial because the APR

2    service providers do not charge for APR services.  Complaint ¶ 38.  But the Ninth Circuit in *First*

3    *Resort, Inc. v. Herrera*,[5] found that a nonprofit's advertisements to non-paying recipients were

4    nevertheless "advertisements" in the commercial sense because they were about the provision of

5    medical services rather than the "exchange of ideas."  860 F.3d 1263, 1273 (9th Cir. 2017).  So too

6    here.[6]  On this record, the Court concludes that Plaintiffs' proffered speech constitutes an

7    advertisement for APR services.

8         The second *Bolger* factor also militates strongly in favor of a finding that Plaintiffs' proffered

9    speech is commercial in nature.  Indeed, Plaintiffs do not claim that APR as a medical treatment is

10    not a product for the purposes of this inquiry.  Nor can they.  *See Am. Academy of Pain Management*

11    *v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) ("The advertising regulated relates to a specific

12    product, medical services.").

13         The Court reaches the same conclusion on the third *Bolger* factor.[7]  Plaintiffs admit that one

14    of the benefits they provide to their members is advising on APR.  Complaint ¶ 31.  That is a

15    powerful economic motivation since it is through their members that Plaintiffs raise funds.[8]  And

16    _____

17    [5] Plaintiffs argue that *First Resort* may be wrongly decided.  Memo at 12.  Unless it is overturned,
     however, the Court is bound by this decision.

18

19    [6] Plaintiffs further argue that they do not provide or sell APR.  Reply at 5.  But NIFLA advertises
     and seeks to advertise APR, and some members offer, plan to offer, or would plan to offer APR
20    (including SVC).  Complaint ¶ 247 ("SVC previously planned to offer progesterone treatment to
     counter the effects of mifepristone, but the Attorney General's enforcement of the Business Fraud
21    Statutes [in the State Case] has deterred it.").

22    [7] Having found that the first two factors favor a finding of commercial speech, the Court need not
     analyze the third factor.  *See Am. Academy of Pain Management v. Joseph*, 353 F.3d 1099,
23    1108–1109 (9th Cir. 2004) ("Thus, regardless of whether LSPCs have an economic motivation in
     advertising, their regulated speech can still be classified as commercial.").  The Court nonetheless
24    does so and finds that the third factor supports the same finding.

25

26    [8] Plaintiffs argue that *First Resort* does not apply because the non-profit in that case "offered
     bonuses to staff for client recruiting, thus creating an economic incentive to potentially engage in
27    deceptive practices."  Memo at 12.  While it is true that this fact helped bolster support for a finding
     of commercial speech, the finding was not solely predicated on this one fact.  Employee
     compensation was listed after the word "furthermore," meaning that the fact about bonuses was *in*

28

Plaintiffs do not dispute that they engage in grant fundraising based, in part, on their APR advocacy and technical support.[9]  Reply at 3–5.

Therefore, to determine whether a hypothetical enforcement action by the Attorney General under Bus. & Prof. Code Sections 17200 and 17500 predicated on Plaintiffs' commercial speech would be unlawful, the Court must apply the *Central Hudson* test.  *Am. Academy of Pain Management*, 353 F.3d at 1106 (applying *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,

---

*addition* to the aforementioned usefulness of the advertisements in fundraising.  Merriam-Webster, *Furthermore* (last accessed Mar. 5, 2025) https://www.merriam-webster.com/dictionary/furthermore).  At oral argument, Plaintiffs cited *Arixx, LLC v. NutriSearch Corp.*, 985 F.3d 1107 (9th Cir. 2021) to argue that *First Resort* was circumscribed to stand for the narrow proposition that an economic incentive for employees is required for a finding of commercial speech in this context.  But in *Arixx* the Ninth Circuit favorably cited a case from the Third Circuit that held speech was commercial due to the "general exposure of a product."  985 F.3d at 1117 (citing *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008)).  Putting aside the economic motivation from fundraising, Plaintiffs' positive statements about APR surely serve the purpose of general exposure to this medical service.

[9] Plaintiffs at oral argument attempted to draw an analogy to *Bernardo v. Planned Parenthood Federation of America*, 115 Cal. App. 4th 322 (2004) to argue that their speech is not commercial.  But the finding of non-commercial speech in *Bernardo* undercuts Plaintiffs' argument.  The plaintiff in *Bernardo* sought to: (1) to prevent defendants from publishing statements that the weight of credible medical research has failed to establish a link between induced abortion and breast cancer ("ABC theory"), and (2) to require defendant to provide information to former and prospective abortion patients that the medical research has established the veracity of the ABC theory.  *Id.* at 328.  The statements defendant was making in relation to ABC theory included the proposition that "the [ABC] theory has not been borne out by research," summaries of and citations to research studies both supporting and challenging ABC theory, and even a caveat conceding that "abortion does not offer the same protection against breast cancer as a full-term pregnancy."  *Id.* at 330–335.
Thus, in *Bernardo*, it was clear that defendant was presenting a position on a scientific debate rather than promoting a particular treatment.  The statements at issue here are markedly different.  Plaintiffs here are encouraging the proliferation of a specific medical intervention.  *See e.g.*, Complaint, Ex. EE ("NIFLA Materials") ("NIFLA encourages provision of Abortion Pill Reversal") [Dkt. No. 1-31].  Indeed, instead of encouraging consumers to contact a "qualified medical provider for personal medical evaluation and services" like in *Bernardo*, 115 Cal. App. 4th at 333, Plaintiffs are directing the public to contact providers of APR or conduits that can connect people to those providers.  NIFLA Materials ("Contact your Medical Director and other physicians and providers in your community to let them know of the successful abortion pill reversal rates…[and] [u]rge these medical professionals to review the research article offer [sic] this protocol as part of their practices."); Complaint, Ex. GG ("SVC post May 2023") [Dkt. No. 1-33].  In short, in *Bernardo*, defendant provided information for "personal education, but nothing on [the sites] constitutes a recommendation for medical care."  115 Cal. App. 4th at 345.  The opposite is true here.

1    447 U.S. 557, 561 (1980)).  The threshold question is whether the commercial speech is unlawful or

2    misleading, because the First Amendment does not provide any protection for such.  *Id.*  The law

3    differentiates between "inherently misleading" and "potentially misleading" speech.  *Id.* at 1106–

4    1107.  Speech is *inherently* misleading if it is "inherently likely to deceive or where the record

5    indicates that a particular form or method of advertising has been deceptive[.]"  *Id.* at 1107.

6    Inherently misleading speech is not protected by the First Amendment.  Speech is *potentially*

7    misleading when the "information may be presented in a way that is not deceptive[.]"  *Id.*  Whether

8    potentially misleading speech is protected is subject to the rest of the *Central Hudson* test.  *Id.*

9         As discussed below, the Court concludes that the statements at issue (at least on this record)

10   are inherently false and misleading.  To understand why, it is necessary to discuss briefly the theory

11   behind APR and prior litigation on this exact subject matter.

12        In 2000, the FDA preliminarily approved a two-drug medication abortion regimen that has

13   been used ever since.  Motion, Ex. B. Declaration of Susan Bane, M.D., Ph.D ("Bane Decl.") ¶ 14

14   [Dkt. No. 19-3]; Declaration of Dr. Mitchell D. Creinin ("Creinin Decl.") ¶ 15 [Dkt. No. 32].  The

15   first pill—mifepristone—binds to progesterone receptors in the uterine lining, preventing

16   progesterone molecules from binding to these receptors.  Bane Decl. ¶¶ 26, 30; Creinin Decl. ¶ 32.

17   The binding of progesterone to the receptors would result in a protein that thickens the uterine lining,

18   necessary for a healthy implantation of the embryo.  Bane Decl. ¶ 26; Creinin Decl. ¶ 34.

19   Mifepristone effectively blocks out the progesterone molecules, resulting in the breakdown of the

20   uterine lining and thereby disrupting embryo implantation and development.  Bane Decl. ¶¶ 27, 30;

21   Creinin Decl. ¶¶ 32, 34.  APR is an intervention that massively increases progesterone through

22   high-dose supplementation on the theory that an increase in progesterone will outcompete

23   mifepristone in binding to the progesterone receptors.  Complaint ¶¶ 118–120; Complaint, Ex. Y

24   ("Delgado et al. 2018") [Dkt. No. 1-25];  Complaint, Ex. Z ("Delgado & Davenport 2012") ("The

25   rationale of the proposed treatment was that higher bioavailable levels of progesterone could

26   competitively inhibit the mifepristone to prevent the induced abortion.").

27        The theory behind APR has been subjected to extensive litigation.  Those federal courts that

28   have engaged in evidentiary analysis of APR have almost uniformly found that statements regarding

its efficacy and safety are false and/or misleading.[10]  *Planned Parenthood of Tennessee and North Mississippi v. Slatery, et al.*, 523 F. Supp. 3d 985, 1003–1004 (M.D. Tenn. 2021) ("The word 'reversal' [in the context of APR] makes the mandated message untruthful and/or misleading because it promises more than progesterone therapy has even attempted to deliver…[r]equiring a physician to refer patients to [abortionpillreversal.com and the corresponding hotline] is likely to further mislead, and confuse patients"); *see All-Options, Inc. v. Attorney General of Indiana*, 546 F. Supp. 3d 754, 767 (S.D. Ind. 2021) (finding that there is insufficient medical evidence in the record to show that the statement "some evidence suggests that mifepristone's effects may be avoided, ceased, or reversed" is true and not misleading); *American Medical Association v. Stenehjem*, 412 F. Supp. 3d 1134, 1151 (D.N.D. 2019) (finding that statements relating to the reversal of an abortion through APR are "misleading and inaccurate").[11]  These courts did not come to their respective decisions lightly.  To wit:

- In *Planned Parenthood of Tennessee and North Mississippi, et al. v. Slatery, et al.*, Judge William L. Campbell, Jr. held hearings over five days that consisted of testimony from six experts (half called by plaintiff, the other half by defendant) including Dr. George Delgado

---

[10] The APR studies analyzed by other courts are the same studies Plaintiffs reference here.  *Compare* Delgado et al. 2018 and Bane Decl. ¶ 62–64 (citing to Delgado & Davenport 2012 and Delgado et al. 2018) *with Planned Parenthood of Tennessee and North Mississippi v. Slatery, et al.*, 523 F. Supp. 3d 985, 996–997 (M.D. Tenn. 2021) (discussing Delgado et al. 2018 and Delgado & Davenport 2012).  Plaintiffs do not argue that the scientific basis supporting APR in this case is stronger than the bases in those cases.  Reply at 7, n. 2.  Instead, their argument is that those other cases involved statutes requiring the state-compelled disclosure of statements relating to the potential effects of APR.  But that is a distinction without a difference vis-à-vis the question of whether the statements are false and/or misleading.

[11] Plaintiffs take issue with the Attorney General's omission of two cases that purportedly sided with Plaintiffs on this issue.  Reply at 7, n. 2.  One of those cases is irrelevant, given it involved statutes different in kind and a claim premised on religious liberty not invoked in this Motion.  *See Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189 (D. Colo. 2023).  The other case involves New York statutes equivalent to the Business Fraud Statutes and a free speech claim.  *Nat'l Inst. for Fam. & Life Advocs. v. James*, No. 24-cv-00514-(JLS), 2024 WL 3904870 (W.D.N.Y.  Aug. 22, 2024).  While the latter is relevant, Plaintiffs argue that the Court should credit this one case over the three district court cases finding those APR statements false or misleading.  While these three district court cases are not binding, the Court has reviewed them thoroughly and considers them persuasive.

("Dr. Delgado"), one of the authors of multiple studies Plaintiffs cite in support of their claims here.  Judge Campbell found that, *inter alia*, the terms "reverse" and "reversing" when used in the phrase "it may be possible to avoid, cease, or even reverse the intended effects of a chemical abortion utilizing mifepristone" render the phrase "untruthful and/or misleading," in part because that message "suggests [APR] has reached a level of safety and efficacy that is not supported by medical evidence." 523 F. Supp. 3d 985, 1003 (M.D. Tenn. 2021).

- In *All-Options, Inc. v. Attorney General of Indiana*, Judge James Patrick Hanlon held an evidentiary hearing where the defendant called Dr. Delgado (again, one of the authors of multiple APR studies cited as evidence by Plaintiffs here) and the plaintiff called a Dr. Courtney Schreiber.  After conducting the evidentiary hearing with expert testimony from both sides, Judge Hanlon held that there was "no medical evidence in the record" to support the veracity of the (somewhat watered-down) statement that "some evidence suggests that the effects of Mifepristone may be avoided, ceased, or reversed if the second pill, Misoprostol, has not been taken." 546 F. Supp. 3d 754, 769 (S.D. Ind. 2021).

- In *American Medical Association v. Stenehjem*, then-Chief Judge Daniel L. Hovland thoroughly examined extensive evidence proffered by a total of six individual experts and the American College of Obstetricians and Gynecologists ("ACOG")—the "nation's leading group of physicians providing healthcare to women"—and concluded that the record revealed "no real, serious debate within the medical profession at the current time" regarding APR.  412 F. Supp. 3d 1134, 1151 (D.N.D. 2019).  Chief Judge Hovland found that the "evidence in the record does not support" the theory that it "may be possible" to "reverse a medication abortion," and that "abortion reversal protocol" (APR) is "devoid of scientific support, misleading, and untrue." *Id.* at 1150–1151.

But the Court here does not merely rely on the conclusions of other courts.  The parties have submitted extensive declarations and studies, all of which the Court has reviewed and considered. On the basis of this voluminous record, the Court makes the following factual findings for purposes of this Motion.

1          a.   APR is not abortion reversal.

2          In making this finding, the Court relies primarily on Dr. Susan Bane's declaration and

3   rebuttal, the declaration of Dr. Mitchell Creinin, as well as the relevant underlying materials.[12]

4   Specifically, as to the phrase "abortion pill reversal" to describe what happens in APR treatment, the

5   Court finds that it is misleading.  To reverse something is to undo it or negate the effect of it.

6   *Slatery*, 523 F. Supp. 3d at 1002–1003 ("The plain and ordinary meaning of the word 'reverse' is to

7   'turn completely about in position or direction' or 'to undo or negate the effect of (something, such

8   as a condition or surgical operation.") (citing Merriam Webster, *Reverse*, (last updated March 3,

9   2025) https://www.MerriamWebster.com/dictionary/reverse).  But supplementing with large doses

10  of progesterone does nothing to undo or negate the effects of mifepristone in the body; it just

11  provides a higher concentration of progesterone, ostensibly to better the odds that these molecules

12  "outcompete" the mifepristone in binding to the progesterone receptors.  Bane Decl. ¶¶ 29–31.  Even

13  if supplementing with progesterone within 72 hours of taking mifepristone and before taking

14  misoprostol does minimally increase the chances of continued pregnancy (a highly disputed

15  outcome, as discussed below), the additional progesterone does not *reverse* mifepristone.  Plaintiffs'

16  own evidence, a 2023 article cited in support of APR, uses the phrase "abortion pill *rescue*" instead

17  of "reversal."  Complaint ¶ 137, Ex. BB ("DeBeasi 2023") ("The safety and efficacy of mifepristone

18  antagonization with progesterone to avert medication abortion, **also known as abortion pill rescue**,

19  is a subject of vigorous debate.") (emphasis added) [Dkt. No. 1-28].

20          b.   There is no credible scientific evidence that APR is safe.

21          The Court finds that statements claiming that APR is safe are (likely to be) inherently false or

22  misleading based on this limited record.  Indeed, the weight of institutional authority strongly favors

23  the position advanced by the Attorney General.  The American College of Obstetricians and

24

25

26  [12] Complaint ¶ 137, Ex. BB ("DeBeasi 2023"); Delgado & Davenport 2012; Delgado et al. 2018;
    Camilleri, C., & Sammut, S., *Progesterone-mediated reversal of mifepristone-induced pregnancy*
27  *termination in a rat model: an exploratory investigation.* Sci. Rep. 13, 10942 (2023); Couzinet, B.,
    et al., *Termination of early pregnancy by the progesterone antagonist RU 486 (Mifepristone).* N.
28  Engl. J. Med. 1986 Dec. 18;315(25):1565–70.

Gynecologists ("ACOG")—the primary professional membership organization for obstetricians and gynecologists in the United States boasting more than 60,000 members[13]—has adopted in its clinical guidance the position that "limited available evidence suggests that the use of mifepristone alone without subsequent administration of misoprostol may be associated with an increased risk of hemorrhage."  Bane Decl. ¶ 72 (citing The American College of Obstetricians and Gynecologists, *Medication Abortion Up to 70 Days of Gestation Practice Bulletin No. 225* (Oct. 2020) ("ACOG Bulletin")[14].  The parallel organization of Canada—the Society of Obstetricians and Gynaecologists of Canada ("SOGC")—agrees, stating that "not only are [APR] treatments unproven, they can also result in serious complications for the patient."  Declaration of Erica Connolly ("Connolly Decl.") [Dkt. No. 30], Ex. 6 ("SOGC Statement").  Finally, a joint statement joined by the premier parallel organization of the United Kingdom, the Royal College of Obstetricians and Gynaecologists ("RCOG")—as well as the Royal College of Midwives, the Faculty of Sexual and Reproductive Healthcare, and the British Society of Abortion Care Providers—agreed with ACOG and SOGC, citing the 2020 study that was "stopped prematurely, owing to safety concerns when three of the 12 patients experienced 'severe bleeding requiring ambulance transport to an emergency department.'" Connolly Decl., Ex. 7 ("UK Joint Statement") (citing Creinin, M.D., et al., *Mifepristone Antagonization with Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial*, Obstet. Gynecol. 2020 Jan;135(1):158–165 ("Creinin et al. 2020")).  In short, all these authorities agree that there is not enough medical evidence to suggest APR is safe.

In response, Plaintiffs offer the declaration of Dr. Bane, who opines that "progesterone ***can be safely [] utilized*** by women who change their mind after taking mifepristone to save their babies' lives."  Bane Decl. ¶ 40; *see also* Reply, Ex. D Rebuttal Declaration of Susan Bane ("Bane Rebuttal") ¶ 41 ("My expert opinion remains the same…[t]he currently available data…support the

---

[13] Creinin Decl., Ex. B.

[14] Dr. Bane criticizes the reliability of ACOG bulletins in the context of this unfavorable bulletin, Bane Decl. ¶ 54, but in the same declaration cites approvingly to a different ACOG practice bulletin. Bane Decl. ¶ 37, n. 33.

statement that progesterone treatment to attempt to reverse the effects of mifepristone *can be used safely*…."), ¶ 76 ("*can be safely [] utilized*….") (emphasis added) [Dkt. No. 35-2].  In forming her opinion, Dr. Bane relies on two sets of data.  First, Dr. Bane relies heavily on the safety record of progesterone when used in contexts other than APR.  Bane Decl. ¶ 37.  She also points to a 2018 case series (authored in part by Dr. Delgado) that provided "safety-related data" and found "no statistically significant difference [in preterm delivery or birth defects] compared to the general population."  Bane Decl. ¶ 64 (citing Delgado et al. 2018).

Neither basis is sufficient to make the proffered point.  As Dr. Creinin notes in no uncertain terms, there are no studies that have assessed the safety of progesterone use for APR.  Creinin Decl. ¶ 65.  Dr. Creinin's point is that the fact that progesterone has been found to be safe in other contexts cannot be extrapolated to support a safety finding in the context of APR, especially since APR involves (by definition) the combination of mifepristone and progesterone.  And the 2018 case series "only looked at preterm delivery and birth defects for pregnancies in which the mifepristone was unsuccessful in terminating the pregnancy [and indeed failed to document] any adverse effects, side effects, or details of what happened to the pregnant women in the report for whom the pregnancy did not continue."  *Id.* ¶ 47.  In sum and substance, there is no study or other credible evidence finding that APR is safe, and stating otherwise is therefore likely to mislead the public.

c.   There is no credible scientific evidence that APR is effective.

The Court further finds, for purposes of this Motion, that statements representing APR to be effective are also likely false or (at the very least) misleading.  Once again, the weight of authority is against Plaintiffs' position.  *See* ACOG Statement ("Claims regarding abortion 'reversal' treatment are not based on science and do not meet clinical standards."); SOGC Statement ("The claims regarding so-called abortion 'reversal' treatments are not based on scientific evidence."); UK Joint Statement ("There are no reputable national or international clinical guidelines that recommend the use of progesterone to reverse the effect of mifepristone, and no evidence that it increases the likelihood of continuing pregnancy, compared to expectant management alone.").

Plaintiffs' proffer to the contrary is unpersuasive.  In forming her opinion about the efficacy of APR, Dr. Bane first relies on several research experiments conducted on animals.  Bane Decl.

15

¶¶ 57–61.  Dr. Bane suggests that animal studies are valuable in that they are more amenable than human studies to randomized controlled trials—the kind of study both experts agree is the most probative.  *See* Bane Decl. ¶ 51 ("Randomized controlled trials are considered the best way to evaluate the efficacy of a treatment because of their ability to limit and control bias.") and Creinin Decl. ¶ 29 ("The gold standard for experimental research is a randomized controlled trial….").  But while these animal studies are undoubtedly helpful in conducting research, they cannot be enough to support a finding on effectiveness in humans.  Moreover, the studies themselves are not altogether reliable.  The first study cited by Plaintiffs involved the administration of mifepristone and progesterone simultaneously, which is not the same protocol as APR.  Bane Decl. ¶ 59 (citing Yamabe S., et al., *[The effect of RU986 and progesterone on luteal function during pregnancy]*. Nihon Naibunpi Gakkai Zasshi. 1989 May 20; 65:497–511).  And the other principal animal study was clear about the material differences in gestation between pregnancies in rats and human pregnancies.  Bane Decl. ¶ 61 (citing Camilleri, C. & Sammut, S., *Progesterone-mediated reversal of mifepristone-induced pregnancy termination in a rat model: an exploratory investigation*. Sci. Rep. 13, 10942 (2023)).

    In addition to the animal studies, Dr. Bane cites a few human studies.  Again, however, these studies are riddled with problems, sample size issues, and other defects.  The first human study cited by Dr. Bane is a 2012 case series (authored in part by Dr. Delgado) that performed a "retrospective chart review of six women who had received progesterone after taking mifepristone."  Bane Decl. ¶ 62 (citing Delgado & Davenport 2012).  Aside from the obvious problem that it is a case study (which Dr. Bane admits yield "lower levels of evidence[.]"  Bane Decl.  ¶ 47),[15] the study itself only followed six patients—of which only four were tracked through delivery.[16]

---

[15] As Dr. Creinin explains in more detail, "[c]ase reports and case series are ranked lower in the context of study design strength than other study designs because they have a lack of random sampling, the absence of controls or a comparison group, heterogeneity of subjects, and associated bias."  Creinin Decl. ¶ 28.

[16] Another problem is each of the four women that delivered received different dosages of progesterone and different routes of administration.  *Id.*  ACOG issued a statement that stated in part

1          The second human study relied on by Dr. Bane fares no better.  Again, it involves a case

2   study—this one with only nine patients.  Bane Decl. ¶ 63 (citing Turner, J.V., et al., *Progesterone*

3   *after mifepristone: A pilot prospective single arm clinical trial for women who change changed their*

4   *mind after commencing medical abortion*, J. Obstet. Gynaecol. Res. 2024 Feb;50(2): 182–189

5   ("Turner et al.")).  Worse yet, the nine patients were expected to self-report mifepristone ingestion

6   and progesterone supplementation.  Creinin Decl. ¶ 49.  The authors themselves concluded that the

7   results merely "support the *need for further larger scale trials* in this field."  Bane Decl. ¶ 63

8   (emphasis added).

9          The third human study is, again, a case series; albeit one with a much larger sample size.

10  Bane Decl. ¶ 64 (citing Delgado et al. 2018).  But this 2018 study contained even more glaring

11  issues.  First among these is the fact that it fails to report on the full outcome for all patients and

12  instead excluded from the report (a) the results of 50% of patients for which the pregnancy did not

13  continue and (b) outcomes for 207 patients that had received the treatment but had either taken the

14  misoprostol before progesterone, chose to complete the abortion, or with whom Dr. Delgado lost

15  contact.  Creinin Decl. ¶ 45a, b.  Second, the process by which the authors calculated the base rate of

16  pregnancies after ingesting mifepristone is notably flawed and fails to account for the probability

17  that pregnancy continuation after mifepristone ingestion depends in part on gestational age.

18  *Id.* ¶ 45a–c, e.  Third, the ingestion of progesterone varied in myriad ways and was administered by

19  over 300 providers.  *Id.* ¶ 45d.  And fourth, the case series hardly qualifies as scientific since it was

20  not published in a peer-reviewed journal directed toward providers, but rather in a journal that deals

21  in "technical and information assistance" for "attorneys, healthcare professionals, educators, and

22  administrators on legal, medical, and ethical issues rising from healthcare decisions."  *Id.* ¶ 45f

23  (citing Creinin Decl., Ex. C).[17]

24  _____

25  "[the Delgado & Davenport 2012 case series] is not scientific evidence that progesterone resulted in
    the continuation of the pregnancies."  ACOG Statement.

26

27  [17] Dr. Delgado has previously admitted to many of the shortcomings of this 2018 case series.  *See*
    *Slatery*, 523 F. Supp. at 993–994 ("Dr. Delgado agreed that there is a greater possibility of bias with

28

1       The fourth study Plaintiffs rely on is the first randomized controlled trial they have presented,

2  but concededly "this study's primary focus was not to examine the effectiveness of progesterone to

3  reverse an abortion[.]"  Bane Decl. ¶ 66 (citing Raymond, E.G., et al., *Effects of Depot*

4  *Medroxyprogesterone Acetate Injection Timing on Medical Abortion Efficacy and Repeat*

5  *Pregnancy: A Randomized Controlled Trial*, Obstet. Gynecol. 2016 Oct;128(4):739–45).  The results

6  of the study are relevant insofar as they show that administration of injectable progestin "might

7  slightly decrease medication abortion effectiveness and increase risk for ongoing pregnancy."  Bane

8  Decl. ¶ 66 (citing Kathryn M. Curtis et al., *U.S. Selected Practice Recommendations for*

9  *Contraceptive Use, 2024*, 73 Centers for Disease Control & Prevention Morbidity & Mortality

10  Weekly Report 1, 24 (2024)); Creinin Decl. ¶ 50.  But that conclusion rather proves the Attorney

11  General's point.  It boggles the mind to conceive of any situation where a member of the public

12  hearing, "APR is effective!" would not feel misled upon finding out that the assertion was based on

13  one 2016 study showing a "slight decrease" in the effectiveness of mifepristone following APR.

14       The last human study that Dr. Bane cites is, coincidentally, the randomized controlled trial

15  co-authored by the Attorney General's expert Dr. Creinin.  Bane Decl. ¶ 67.  Dr. Bane claims that

16  the results show "[p]rogesterone use for the reversal of mifepristone *in this study* was both safe and

17  effective."  Bane Decl. ¶ 69 (emphasis added) (citing Creinin et al. 2020).  But Dr. Creinin himself

18  says that the study "could not estimate the efficacy" of APR treatment because the sample size is too

19  small; the doctors recruited only 12 patients before halting the study due to "safety concerns."

20  Creinin Decl. ¶¶ 60–61.  That reaffirms the conclusion included in the study itself.  Creinin et al.

21  2020 ("We could not estimate the efficacy of progesterone for mifepristone antagonization due to

22  safety concerns when mifepristone is administered without subsequent prostaglandin analogue

23

24  ―――――――――――――――

25  a case series than a controlled trial…Dr. Delgado admitted to excluding those women whose
pregnancies had terminated after mifepristone alone [] from the 754 women who initiated

26  progesterone therapy[,] nor did he count these excluded women as 'reversal failures'…Dr. Delgado
admitted the characteristics of [the historical control group] did not align with those of the patients in

27  the case series [for example] patients in his case series include[ed] women with a higher gestational
age [and] Dr. Delgado agreed mifepristone becomes less effective as gestational age increases…Dr.

28  Delgado also admitted that patients in his case series received a lower dose of mifepristone…").

treatment [i.e., misoprostol]."). Dr. Bane counters by suggesting the "authors' conclusions of their own study are faulty." Bane Decl. ¶ 71. But Dr. Bane does not state that the evidence available is enough to deem APR effective, rather she states that the "evidence is sufficient to support informing women who regret taking mifepristone that progesterone treatment may be an option and that the studies to date have shown that it ***may*** be effective." Bane Decl. ¶ 73.

Finally, Dr. Bane cites a couple of specific examples from her clinical experience that are purportedly success stories illustrating the efficacy of APR. *Id.* ¶ 79. But anecdotal evidence cannot substitute for scientific studies of the kind Dr. Bane herself seems to concede are generally preferred. *See id.* ¶ 46–50.[18]

Even if the Court concluded that the statements are only ***potentially*** misleading, Plaintiffs cannot prevail. The next part of the *Central Hudson* analysis requires the Attorney General to demonstrate that the regulation on commercial speech directly advances a substantial government interest. "There is no question that California has a substantial interest in protecting consumers from misleading advertising by medical professionals." *Am. Academy of Pain Management*, 353 F.3d at 1108. While the advertising at issue here is not strictly *by* medical professionals, it is about medical treatment purportedly carrying the weight of medical authorities—which is the principal concern underpinning the state's interest. *Id.* (citing *In re R.M.J.*, 455 U.S. 191, 202 (1982) ("The public's comparative lack of knowledge, the limited ability of the professions to police themselves, and the absence of any standardization in the 'product' renders advertising for professional services

_____

[18] Plaintiffs cite a 2023 article by Paul L. C. DeBeasi in further support of the efficacy of APR. Complaint ¶ 137, DeBeasi 2023. DeBeasi reviews 16 case studies analyzed by three previous articles to determine the continuing pregnancy rate after mifepristone alone, and then reviews four journal articles that looked at APR to determine the continuing pregnancy rate after ingesting mifepristone followed by progesterone. DeBeasi 13 at 4. But the underlying articles have problems. One article is Delgado & Davenport 2012 that only included six patients. *Id.* Another is Delgado et al. 2018, which—as discussed above—Dr. Delgado himself admitted has a plethora of issues affecting reliability of the conclusion. *Id.* And the third article is Dr. Creinin's that—as Dr. Bane herself admits—came to a conclusion that fails to support Plaintiffs' proposition. Bane Decl. ¶ 70 (citing Creinin et al. 2020). Not only is DeBeasi not a doctor, three of the four articles he reviewed to determine the efficacy of APR are either unreliable or undermine his conclusion.

1    especially susceptible to abuses that the States have a legitimate interest in controlling.").

2            The Attorney General must then establish that the regulation directly advances the asserted

3    government interest.  *Am. Academy of Pain Management*, 353 F.3d at 1109.  The regulation need not

4    be the least restrictive means nor the perfect or single best way to achieve the desired ends, but

5    rather the fit must be reasonable and the regulation narrowly tailored to achieve the ultimate goal.

6    *Id.* at 1111; *see Yim v. City of Seattle*, 63 F.4th 783, 795–796 (9th Cir. 2023) ("In considering the fit

7    between the legislature's ends and the means chosen to accomplish those ends, the fit must not

8    necessarily be the least restrictive means, but reasonable and through a means narrowly tailored to

9    achieve the desired objective.").

10           That standard is amply met here.  Sections 17200/17500 are consumer protection statutes

11   used principally to address unfair, unlawful, and fraudulent conduct, as well as false advertising.

12   Here, the California Attorney General in the State Case is seeking to put a stop to commercial speech

13   concerning the advertising of a medical intervention that he considers to be false and misleading to

14   the public.  The "fit" is more than reasonable.  Plaintiffs argue that the Attorney General's

15   enforcement of the California Business and Professions Code in this context is not narrowly tailored

16   because there are other laws the Attorney General could utilize that more directly target the kind of

17   harm the government intends to punish.  Motion at 15 (citing California statutes covering licensed

18   medical professional advertising, licensing provisions, and human experimentation).  While that

19   *might* be true, there very well may be valid reasons why the Attorney General would choose to bring

20   suit under the Business & Professions Code rather than under a different law.  Perhaps the laws cited

21   by Plaintiffs as alternatives are not applicable to third parties.[19]  For present purposes, it is sufficient

22   to note that Sections 17200/17500 fit reasonably with the prevention of false or misleading

23   advertising related to medical treatment.[20]

24   ───────────────────

25   [19] *See e.g.*, Cal. Bus. & Prof. Code § 651(a) (applying only to "any person licensed under this
26   division or under any initiative act referred to in this division.").

27   [20] Plaintiffs lastly argue that future enforcement actions for APR-related advertisements do not
     materially advance California's asserted interest because such enforcement would only prevent
28

In summary, Plaintiffs cannot carry their burden of showing likelihood of success on the merits. Commercial speech that is inherently false or misleading is not entitled to First Amendment protection. And even if it was potentially misleading, the Attorney General more than carries his burden under *Central Hudson*.

### 2. Viewpoint discrimination

Plaintiffs' alternative argument is that an enforcement action by the Attorney General against APR-related speech would constitute selective enforcement and therefore constitute unlawful viewpoint discrimination.[21] Motion at 9 ("If [Plaintiffs] stated the oppositive viewpoint, [the Attorney General] presumably would not take legal action against them. But because [the Attorney General] disagrees with [Plaintiffs'] viewpoint on APR, [Plaintiffs] risk prosecution for their speech.").[22]

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). The government is presumed to be acting unconstitutionally when enforcing laws against

---

*medical* harm, whereas Sections 17200/17500 are meant to prevent consumers from *economic* injury. Memo at 15 (emphasis added). Not so. The Business & Professions Code is intended to prevent the dissemination of false or misleading information in commercial speech, whether the resulting harm is economic or not. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) ("To state a claim under either the UCL or the [FAL], based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived.") (citation omitted).

[21] Plaintiffs' two viewpoint discrimination arguments—that Sections 17200/17500 are viewpoint discriminatory as applied to statements about APR and that the selective enforcement of the statutes against Plaintiffs would be viewpoint discrimination—are one in the same. Motion at 9, 17. Both essentially allege that any enforcement of these statutes against Plaintiffs regarding APR would be solely because of Plaintiffs' viewpoint. The Court does not take Plaintiffs to be arguing that Sections 17200/17500 are facially viewpoint discriminatory, seeing as they do not discriminate "based on the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

[22] Here again Plaintiffs attempt to litigate the merits of the State Case. Motion at 17 ("The Attorney General is also acting unconstitutionally by selectively enforcing the UCL and FAL against pro-life pregnancy-support organizations [in the State Case] but not abortion clinics."). That is a legal conclusion that the State Case has not reached.

21

1   speech if "the specific motivating ideology or the opinion or perspective of the speaker is the

2   rationale for the [enforcement]." *Waln v. Dysart School District*, 54 F.4th 1152, 1162 (9th Cir.

3   2022) (citing *Rosenberger*, 515 U.S. at 829); *Rosenbaum v. City and County of San Francisco*. 484

4   F.3d 1142, 1158 (9th Cir. 2007) (citing *Rosenberger*, 515 U.S. at 828). Governments may not

5   circumvent the First Amendment by selectively enforcing facially viewpoint neutral laws against

6   certain parties because of disagreement with those parties' viewpoint. *Hoye v. City of Oakland*, 653

7   F.3d 835, 851 (9th Cir. 2011).

8       To prevail on a selective enforcement claim[23], the party alleging discrimination must first

9   show that the enforcement had a discriminatory effect, and the government was motivated by a

10   discriminatory purpose. *See Rosenbaum*, 484 F.3d at 1152–53; *U.S. v. Armstrong*, 517 U.S. 456,

11   465–466 (1996). If a party can carry its burden on effect and purpose, plaintiffs "seeking to enjoin

12   alleged selective enforcement must demonstrate the [Attorney General's alleged] misconduct is part

13   of a policy, plan, or a pervasive pattern." *Rosenbaum*, 484 F.3d at 1153. "Selective enforcement

14   claims must clear a high hurdle." *Frederick Douglass Foundation, Inc. v. District of Columbia*, 82

15   F.4th 1122, 1140 (D.C. Cir. 2023) ("Because the lawful exercise of prosecutorial discretion does not

16   violate the Constitution, disparate enforcement of a neutral ordinance based on viewpoint is unlawful

17   only when the prosecutorial factors are similar, and 'unlawful favoritism' remains the predominant

18   explanation for the government's targets.") (citing *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325

19   (2002)).

20

21

─────────────────────

22   [23] Plaintiffs use interchangeably the phrase "selective prosecution" and "selective enforcement."
     While there may be a fine line between the two and the ultimate label is probably not relevant, the

23   proper avenue of challenging the actions of a prosecutor on the grounds that they are selectively
     enforcing laws in a discriminatory manner seems to be a claim of selective enforcement. *See United*

24   *States v. Mumphrey*, 193 F. Supp. 3d 1040 (N.D. Cal. 2016). Selective prosecution claims are
     brought as violations of the Fourteenth Amendment's Equal Protection Clause. *Rosenbaum*, 484

25   F.3d at 1152–53; *Lacey v. Maricopa County*, 693 F.3d 896, 920 (9th Cir. 2012) ("Although the

26   district court primarily characterized [plaintiff's] claim as one for 'selective prosecution,' on appeal
     [plaintiff] calls it a claim for 'selective enforcement.' [Plaintiff's] complaint adequately supports this

27   characterization, although the label is probably not relevant.").

28

1      Plaintiffs fall well short of clearing this high bar.[24]  Most notably, there is insufficient

2   evidence of a "policy plan, or pervasive pattern" of enforcement sufficient to merit an injunction.

3   The California Attorney General has filed a grand total of **one** enforcement action on this issue, and

4   that litigation is scheduled to go to trial later this year.  That the Attorney General issued two press

5   releases and made a few public appearances is of little moment when weighed against the nearly 18

6   months that have elapsed without a second action since the filing of the State Case.[25]  Indeed,

7   perhaps the strongest evidence that Plaintiffs themselves are not concerned about a "pervasive

8   pattern" or "plan" is the fact that this motion for injunctive relief was filed nearly a year after the

9   state court proceedings were initiated.

10      Plaintiffs argue that the Attorney General is engaging in viewpoint discrimination by

11   bringing the State Case but not bringing similar cases against Planned Parenthood.  Motion at 17–19.

12   What clearly distinguishes the State Case from any lack of enforcement against Planned Parenthood

13   is the undeniable fact that California's law enforcement officer views the APR statements as false

14   and injurious to public health (again, correctly in all likelihood based on the submitted evidence).

---

[24] As an aside, it is unclear whether Plaintiffs even have standing to bring a pre-prosecution selective enforcement challenge.  *See Hoye,* 653 F.3d at 859. ("Any resolution of [plaintiff's] paradigmatic as-applied challenge could only be relevant to future applications of the Ordinance. We have previously declined to entertain as-applied challenges that would require us to speculate as to prospective facts…as to [plaintiff's] challenge to whether Oakland may apply the Ordinance to situations in which doing so would prevent him from communicating his message, we conclude that the success of the challenge depends on Oakland's future enforcement policy and the particular circumstances in which that policy may be applied. We therefore do not reach that challenge but also do not preclude [plaintiff] from bringing such a challenge in the future.").

[25] What's more, a governmental entity "can say what it wishes and select the views that it wants to express"; without that ability "the government could barely function."  *National Rifle Association of America v. Vullo,* 602 U.S. 175, 187 (2024).  Each time a government entity acts, "it necessarily takes a particular viewpoint and rejects others," thus it need not "maintain viewpoint neutrality when its officers and employees speak about that venture."  *Id.*  Requiring viewpoint neutrality would be "paralyzing."  *Matal v. Tam,* 582 U.S. 218, 234 (2017).  Of course, the State cannot abuse its power by punishing disfavored expression or exert its authority to suppress viewpoints it disfavors.  *Vullo,* 602 U.S. at 188.  But it is the *application* of state power that must be scrutinized.  *Id.*  Here, there is no exertion.  Nor have Plaintiffs shown that the State Case is an unlawful application of that power as it relates to California's clear interest in preventing false and misleading commercial advertisements to its consuming public.

1  That should be the end of the analysis.  There is no comparable situation where the Attorney General

2  has failed to enforce the Business & Professions Code against, say, a pro-choice pregnancy center or

3  other service provider making what, according to the corpus of medical literature, are likely

4  inherently false or misleading statements.

5       The cases cited in support of Plaintiffs' position are distinguishable and reflect a very

6  different procedural posture allowing a claim to proceed past the motion to dismiss stage—a

7  relatively minor hurdle where allegations of fact by Plaintiff are taken as true.  *Waln*, 54 F.4th at

8  1163 ("Therefore, at this procedural stage, Plaintiff has plausibly alleged [her claims]….[t]aking the

9  [plaintiff's] allegations in the complaint as true, as we must,…the [defendant] cannot meet its

10  burden."); *Frederick Douglass Foundation, Inc.*, 82 F.4th 1135 (finding that plaintiff had plausibly

11  alleged its First Amendment claim when construing the complaint "liberally" and granting it "the

12  benefit of all inferences that can be derived from the facts alleged.").  Here the Court is addressing a

13  motion for preliminary injunction—a request for "an extraordinary remedy," which requires a "clear

14  showing" of justification that is not entitled to the procedural concessions of a motion to dismiss.

15       Because Plaintiffs have thus failed to establish the "threshold inquiry" of likelihood of

16  success, *Baird*, 81 F.4th at 1042 (9th Cir. 2023), the Court need not engage in an analysis of

17  irreparable harm or a balance of equities.

18  **V.    CONCLUSION**

19       For the foregoing reasons, Plaintiffs' Motion is denied.

20

21  Dated: March 6, 2025

22                                    Hernán D. Vera
                                      United States District Judge

23

24

25

26

27

28